UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISLAMIC RELIEF USA,<br><br>               Plaintiff,<br><br>-  against  -<br><br>ISLAMIC RELIEF WORLDWIDE, INC.,<br><br>               Defendant. | Civil Action No.: 1:26-cv-2367<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Islamic Relief USA ("IRUSA") for its complaint against Islamic Relief Worldwide, Inc. ("IRW") alleges and states as follows:

### NATURE OF THE ACTION

1.      IRUSA is the largest and leading Muslim charity in the United States. It provides emergency relief assistance and implements development projects that deliver immediate, long term, and sustainable solutions to humanitarian crises in the United States and in 60 countries across the world. IRUSA takes most seriously its organizational integrity and commitment to assisting people who need it around the world without regard to race, religion, belief, or any requirement other than need. As a 501(c)(3) non-profit organization, IRUSA does not participate in partisan politics or religious proselytization, nor does it endorse any political party or religious organization.

1

2.      IRUSA is a donor-driven institution, committed to full transparency and accountability. It holds the 2025 GuideStar Gold Seal of Transparency[1] and a four-star ranking from Charity Navigator,[2] the largest charity evaluator in the United States. It is also on the U.S. government's Combined Federal Campaign charity list (CFC number 10154), which means that federal employees can choose to contribute to IRUSA through automatic payroll deductions.

3.      IRUSA is a wholly independent and autonomous organization. Historically, IRUSA had been an independent partner of Defendant IRW, a charity registered in the United Kingdom. In December 2019, IRUSA and IRW clarified their relationship in writing to establish that any such past or historic arrangements or understandings were superseded by the absolute right and obligation of IRUSA to be completely independent and autonomous under the supervision of its Board of Directors, none of whom are Directors of or hold any position with IRW. IRW does not control IRUSA's operations and has no influence over what projects IRUSA chooses to fund (or chooses not to fund), or over who implements such projects. Similarly, IRUSA exercises no control or influence over IRW.

4.      On or about October 12, 2025, IRUSA notified IRW of IRUSA's formal suspension of any and all continuing relationships, such suspension rights as provided for by a Members Agreement, a document that itself affirms IRUSA's total independence and autonomy. While IRUSA has maintained friendly relations and cooperation on projects with IRW and other entities within the IRW network, for reasons stated below, certain events have precluded IRUSA from maintaining

---

[1] *Islamic Relief USA*, Candid, https://app.candid.org/profile/8460202/islamic-relief-usa-95-4453134 (last visited Mar. 23, 2026).
[2] *Islamic Relief USA*, Charity Navigator, https://www.charitynavigator.org/ein/954453134 (last visited Mar. 23, 2026).

any such ongoing cooperation to ensure that it can maintain its continuing status and viability as a 501(c)(3) organization under applicable law and regulation.

5. The crux of this complaint is that certain allegations regarding the conduct of IRW would be viewed by relevant governmental and other authorities and entities as attributable to IRUSA and such alleged conduct would affect negatively IRUSA's well-deserved good reputation in the U.S. Loss of reputation would, in turn, threaten to end IRUSA's ability to fund and provide for humanitarian assistance in the U.S. and globally. IRUSA was told by U.S. governmental entities that its tax-exempt status would be threatened if it continued to maintain any operational or institutional relationships with IRW. IRUSA informed IRW in detail of these risks, yet IRW has not only refused to cooperate in taking steps to avoid such existential risks but took further steps to increase those risks to IRUSA, which in turn threatened its ability to provide relief to its beneficiaries worldwide. IRW's conduct has harmed IRUSA and increased the urgency for IRUSA to take necessary and immediate steps to sever any such relationships or perceived relationships going forward.

6. The complaint sets forth in support of its need for relief three discrete examples.

7. First, IRW wrongly and illegally sought donations from U.S. persons in multiple states, including within the State of New York, which, by law and contract, it is not permitted to do. By doing so, IRW has created confusion between it and IRUSA, piggybacked on IRUSA's reputation, and, by its apparent violation of New York law and the laws of other states, threatened to cause material damage to IRUSA's reputation to the detriment of IRUSA. Moreover, IRW's conduct focuses further attention on IRUSA, suggests an eliding of the two organizations in public and governmental perception, and could draw unwarranted regulatory scrutiny, threatening IRUSA's tax-exempt status.

8.      Second, IRW acted with determined abandon to undermine IRUSA's substantial efforts to fund sponsorships for orphans globally. In an effort to damage IRUSA's reputation, and to punish IRUSA for its independence, IRW illegally and fraudulently created records supporting the false inference that IRUSA had affirmatively through its own staff taken actions to abandon the benefits for and sponsorship of hundreds of orphans. In fact, IRUSA had simply sought to transfer the administration of payments to make clear that IRUSA was not using IRW to implement its programming any longer, given the allegations against IRW and the threats that they would adversely affect IRUSA in the U.S. IRW wrongfully used the email of an IRUSA employee to create the false impression that IRUSA was cancelling benefits to orphans, when in fact IRW took these actions while refusing to cooperate in the transfer of orphan support programming to other partners.

9.      Third, IRW violated its contractual obligation to comply with U.S. laws, including laws and regulations promulgated by the U.S. Office of Foreign Assets Control ("OFAC"), when it caused the exportation of sewing machines from Iran to Afghanistan for purposes of executing an earthquake relief project, and refused IRUSA's demands to audit the project and that IRW return unused funds. Given the issue of attribution of IRW's actions to IRUSA by relevant authorities, this conduct created potential jeopardy to IRUSA.

## THE PARTIES

10.     IRUSA is a California not-for-profit corporation with its principal place of business located in Alexandria, Virginia. IRUSA is a 501(c)(3) non-profit organization. It has operated in the United States since 1993. IRUSA is registered in all states in the U.S. where registration is required, as well as Puerto Rico, to solicit and receive charitable donations from residents located in those jurisdictions.

11.     IRW is a United Kingdom-based organization with head office in Birmingham, England, registered as a charity only in the United Kingdom. It is not registered as a 501(c)(3) charity in the United States, nor, on information and belief, has it registered in any state of the U.S. to solicit or receive charitable donations.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and the suit is between IRUSA, which is a citizen of Virginia and California, and IRW, which is a citizen of the United Kingdom.

13.     This Court has personal jurisdiction over Defendant IRW pursuant to CPLR 302(a)(1) because IRW transacted business within the State of New York by operating without registration, failing to make required disclosures and unlawfully soliciting donations from individuals located in the State, and receiving donations from individuals located in the State properly intended for IRUSA. IRUSA is registered to solicit donations in New York. IRW's unregistered and thus unlawful New York activities have confused New York-located donors, including donors in the Southern District of New York, who have mistakenly provided funds to IRW when in fact they intended to donate to IRUSA.

14.     This Court has personal jurisdiction over Defendant IRW pursuant to CPLR 302(a)(3)(i) because IRW committed tortious acts outside the State of New York causing injury to persons within New York, and because IRW regularly does and solicits business and engages in other persistent courses of conduct or derives substantial revenue from services rendered in New York.

15.     This Court has personal jurisdiction over Defendant IRW pursuant to CPLR 302(a)(3)(ii) because IRW committed tortious acts outside New York causing injury to persons within New

York, and because IRW expects or should reasonably expect the act to have consequences in the State and derives substantial revenue from interstate or international commerce.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District, and because a defendant not resident in the United States may be sued in any judicial district. 28 U.S.C. § 1391(c)(3).

## BACKGROUND AND NATURE OF THE CASE

17.     IRUSA provides emergency relief assistance and implements development projects that deliver immediate, long-term, and sustainable solutions to humanitarian crises in the United States and in 60 countries across the world. IRUSA maintains a humanitarian and development portfolio surpassing $350 million of domestic and international programs.[3]

18.     IRW is the head office and organization that operates through offices and partners in multiple countries as part of the overall "Islamic Relief" umbrella. It is located in the United Kingdom. IRUSA operated under the IRW umbrella for some years until in or around December 2019, when it executed a new and revised agreement with IRW which, *inter alia*, gave IRUSA total autonomy and independence over its operations and governance and the right and authority to suspend any grant agreements should it be necessary to do so. Although the new and revised agreement contained provisions that contemplated possible continued cooperation and consultation, it made clear through the overarching autonomy and independence provisions that any contemplated cooperation was within the sole and absolute discretion of IRUSA.

19.     Various federal and governmental entities have raised multiple and significant concerns about IRW and its practices. Both Israel and the United Arab Emirates have sanctioned IRW. The House Ways and Means Committee has called upon the Internal Revenue Service to investigate

---

[3] Islamic Relief USA, https://irusa.org/ (last visited Mar. 23, 2026).

whether IRUSA should have its 501(c)(3) status revoked, not because of anything IRUSA has been alleged to have done, but because of certain actions and statements allegedly undertaken or made by IRW. Unfortunately, and erroneously, those findings have conflated the actions and conduct of IRW with the purely humanitarian works of IRUSA.

20.     In response to those concerns, IRUSA has taken necessary, affirmative, and permissible steps to sever any ties with IRW. IRUSA does not want its charitable efforts jeopardized by governmental concerns regarding IRW's alleged improper actions or statements. IRUSA has no information and expresses no view about these alleged actions or statements, other than that if they are attributed to IRUSA based upon some perception of lingering contacts between the two organizations, they threaten IRUSA and its charitable mission. But the very fact of these concerns having been raised, coupled with the conflation of the two organizations and the perception of continuing links between the two organizations, creates unacceptable risk to IRUSA.

## A.  IRUSA'S RELATIONSHIP WITH IRW

21.     The December 14, 2019 Members' Agreement, also known as the Membership Agreement, between IRW and IRUSA ("Members' Agreement," **Exhibit A**) specifically recognizes IRUSA to be an "independent and autonomous entity" from IRW. Members' Agreement § 3.5. The Members' Agreement provided that there should only be one Islamic Relief entity operating in any geographic territory (*id.* § 3.4). The agreement defined the "United States of America" as the territory for IRUSA to operate exclusively (*id* § 1). Per the terms of the Members' Agreement, IRUSA, "in its sole discretion" agreed to "adopt and implement the principles of [IRW's global] strategy *to the extent permitted by their fiduciary duties and by Applicable Laws and the capacity and strategic objectives of IR USA*" (*id.* § 3.2 [emphasis added]). In other words, IRUSA contracted for the ability to work in a way that in its judgment and sole discretion, was compatible

with the overall group's goals to the extent, and only to the extent, that it was in the interests of IRUSA as determined by its independent board.

22.     The Members' Agreement included a five-year term and was subject to automatic renewal absent certain notice or amendment. *Id.* § 6.1.

23.     Under a License Agreement dated December 20, 2020 ("License Agreement," **Exhibit B**), also known as the Licensing Agreement, IRUSA was also provided an exclusive license to use

certain trademarks, including a logo –  – as well as "Islamic Relief," "Islamic Relief USA," "IRUSA," and "Islamic Relief Worldwide," within the United States of America. It was also permitted to use the IRUSA name and logo where it was conducting its own operations with its own funds.

24.     The pertinent section of the License Agreement, section 1.07, reads:

> Subject to the Licensor's right to use, advertise or display the Trade-marks, the Licensor hereby licenses to the Licensee an otherwise exclusive, non-transferable and non-assignable license, without the right to sub-license except with the prior written approval of the Licensor, to use, advertise or display the Trade-marks in the geographical territory of USA and on the internet to target a USA audience for uses that are substantially related to the tax-exempt purposes of Licensee. Notwithstanding the above, the Licensor grants Licensee an exclusive license to use, sub-license, advertise or display the Trade-marks on the Internet and/or on promotional materials, provided that such use is targeted towards a USA audience and the use is substantially related to the tax-exempt purposes of Licensee.

25.     In other words, just as the Members' Agreement established that only IRUSA was to operate in the U.S. and to act autonomously here, under the License Agreement IRUSA also has

the exclusive right to raise funds from donors within the U.S. under the "Islamic Relief" name-recognition umbrella.

26.    The License Agreement included a five-year term, subject to automatic renewal absent certain notice or amendment. License Agreement at 2.

27.    Although IRUSA as an organization is completely independent from IRW in terms of its personnel and its decision-making, IRUSA has over the years been a party to certain grant agreements with IRW in order to more conveniently effectuate the provision of humanitarian aid globally in places where there are IRW offices and personnel that can assist in implementing grants using funds provided by IRUSA.

28.    A typical grant agreement between IRUSA and IRW is designed to govern the funding and execution of a specific philanthropic project. Examples of IRUSA/IRW grant agreements are attached as **Exhibits C and D**.

29.    The grant agreements contain multiple provisions to ensure IRUSA's ability to monitor whether its funds are being used consistently with IRUSA's intended purpose and each party acts in compliance with all applicable laws, rules, regulations, decrees, or official government orders, including but not limited to U.S. law. IRUSA frequently acts through partners in various conflict zones and provides itself the right to ensure that the partners it uses are acting lawfully and honestly and do not jeopardize IRUSA's status and reputation. IRUSA has used IRW as a partner as well as other third-party partners. IRUSA cannot, consistent with its mission and its status, continue to work with third-party partners that are non-compliant with these requirements.

30.    With respect to project monitoring, the grant agreements impose obligations on IRW to submit periodic financial and program reports detailing the expenditures made with grant funds to

IRUSA at various stages of the project. They also authorize IRUSA to conduct its own independent review of IRW's program activities.

31.    With respect to compliance with laws, the grant agreements contain a provision that requires IRW and IRUSA to warrant that they shall comply with all applicable laws, rules, regulations, decrees or official government orders. Exhibit C § XII(A); Exhibit D § XII(A). Further, the grant agreements prohibit IRW from making corrupt payments, and to warrant that "[a]ll payments by IRUSA to IRW will be received by IRW on its own account for the sole purpose of meeting its obligations under th[e] Agreement." Exhibit C § XII(B); Exhibit D § XII(B). IRW is required immediately to notify IRUSA if IRW discovers any instance where IRW fails to comply with the compliance with laws provision. Exhibit C § XII(C); Exhibit D § XII(C).

32.    With respect to audits, the grant agreements specifically provide that "IRUSA has the discretion to conduct an audit at any time upon reasonable notice to IRW," and further that "IRW shall facilitate any audit conducted by IRUSA," and that IRW must provide "any assistance or cooperation requested by any authorized representative of IRUSA." *See* Exhibit C § X; Exhibit D § X. The grant agreements specify further that "IRW's failure to assist or fully cooperate with any audit conducted by IRUSA hereunder shall be construed as a material breach of this Agreement." *Id.*

33.    With respect to anti-terrorist financing, the grant agreements contractually require IRW to take precautions that no funds will be used to "support or promote violence, terrorist activity or related training, whether directly through its own activities and programs, or indirectly through its support of or cooperation with any third parties." Exhibit C § XIII(A); Exhibit D § XIII(A). Further, the grant agreements contain the following provision:

> IRW is specifically reminded that U.S. Executive Orders, statutes and regulations prohibit transactions with, and the provision of resources and support to,

10

individuals and organizations associated with terrorism. It is the legal responsibility of IRW to ensure compliance with these U.S. Executive Orders and laws. This anti-terrorism provision must be included in any sub-contracts or sub-grants that IRW may enter into in fulfilling its obligations under this Agreement. For further information, see http://sdnsearch.ofac.treas.gov.

Exhibit C § XIII(B); Exhibit D § XIII(B).

34. The grant agreements further require IRW, within ten business days of an IRUSA request, to submit to IRUSA details about any anti-terrorist financing screening conducted by IRW; to confirm that, if positive matches are identified to screened lists of designated individuals and entities, any such positive matches are not the recipients of IRUSA funding; and to confirm further that IRW immediately terminated any relationship with such individual or entity. Exhibit C § XIII(C); Exhibit D § XIII(C).

35. IRUSA's ability to require that IRW comply with U.S. laws when it entered a grant agreement with IRW, including but not limited to laws and regulations promulgated by OFAC, and IRUSA's ability to monitor the projects and exercise audit rights to ensure that IRW did comply with U.S. law, were key components of IRUSA's December 2019 revised agreement with IRW. The provisions evidence IRUSA's total autonomy and independence over its operations and governance, and these principles have informed all subsequent grant agreements between IRUSA and IRW. The control provisions were critical to IRUSA's ability to manage its risks, maintain its 501(c)(3) status, and to make certain that donor money was used for its intended philanthropic purpose.

## B. IRUSA'S EFFORT TO SEVER TIES WITH IRW

36. In September 2024, the Chairman of the United States House of Representatives Ways and Means Committee (the "House Ways and Means Committee") requested that the Internal Revenue Service "investigat[e]" IRUSA for possible termination of its "tax-exempt status." The reasons for that request had to do solely with the history of IRW and IRW's alleged statements and actions in

support of purported terrorist organizations. As for IRUSA, the governmental suspicions were due solely to the fact that, as part of its charitable operations, IRUSA had provided IRW funds to advance humanitarian projects. There is no suggestion that IRUSA had advanced funds to IRW for projects that IRUSA had not previously investigated, subjected to appropriate due diligence, and determined were legitimate, or that any such projects were involved in any way with the actions or statements allegedly made by IRW.

37.    IRUSA was told, and understood, that the House Ways and Means Committee had investigated the previous funding of projects and had serious concerns about IRUSA sending any money to IRW given the negative view it expressed regarding IRW. Effectively, IRUSA was told and understood that it was to send no more funds to IRW even for redirection to charitable programs, and that doing so would jeopardize its tax-exempt status.

38.    IRUSA has received inquiries from individual state regulators and from its banking partners that seek information about IRUSA's relationship with IRW.

39.    On or about October 18, 2024, IRUSA provided IRW with notices invoking the requirement that IRW enter into good-faith negotiations with respect to the License Agreement and the Members' Agreement with the aim to sever any remaining obligations or relationships between IRUSA and IRW. These notices were authorized by the terms of those agreements.

40.    IRW refused to enter any good-faith negotiations with IRUSA.

41.    In addition, IRUSA made, generally through counsel, continuing inquiries to IRW for information and to invoke its audit rights on projects, which included certain projects in Afghanistan under an Earthquake Recovery Grant Agreement (Ex. C) and a Health Education Grant Agreement (Ex. D) (together, the "Grant Agreements"), as described in more detail in Section C below. IRW refused to engage with IRUSA's inquiries.

12

42.     On October 6, 2025, the House Ways and Means Committee asked the Internal Revenue Service to investigate whether IRUSA's tax-exempt status should be revoked – again, to IRUSA's knowledge, solely due to IRUSA's relationship with IRW. With the change in administration, such requests took on additional significance and signaled increased risk.

43.     On October 12, 2025, IRUSA invoked Section 6.5 of the Members' Agreement to suspend participation in all programs executed by IRW. The suspension notice sought to engage in good-faith negotiations to resolve the situation, without permanent and complete severance of any possible informal relationship between IRUSA and IRW.

44.     Instead of the contractually required discussions between IRUSA and IRW, IRW simply informed its offices and affiliates not to cooperate in any way with IRUSA – an act that by itself violated the above-described control provisions of multiple grant agreements.

45.     On October 30, 2025, IRW formally advised IRUSA that it would not permit IRUSA to conduct the demanded and contractually required audits of the Afghanistan projects covered by the Grant Agreements. In response, on November 2, 2025, IRUSA again demanded its contractual right to conduct the audits. IRUSA also requested that IRW discuss the matter in order to resolve it. IRW again refused.

46.     On December 4, 2025, IRUSA notified IRW, as stated further below, that as a result of the continuing concerns of the United States government about the affairs of IRW, it was necessary to terminate the orphans sponsorship program – as it currently was being administered – and that IRUSA and IRW needed to discuss transfer of the sponsored orphans to an administrator other than IRW. IRUSA made clear that its objective was to maintain support of the orphans without interruption of the necessary relief, but that the parties needed to cooperate in good faith with a

transfer to an administrator that was not the focus of governmental scrutiny for alleged terrorist links or statements supportive of terrorism. IRW refused to engage in such discussions.

47.     On December 7, 2025, IRUSA provided another notice to initiate formal dispute resolution discussions with IRW, advising IRW specifically that continued association with IRW "presents an immediate threat to the reputation, integrity or operation" of IRUSA. IRUSA explained that the U.S. government was actively considering removing IRUSA's tax-exempt status if it continued to be associated with IRW. IRUSA had previously advised of this risk on multiple occasions in discussions. The view that such action would almost certainly be taken was strongly advocated by various IRUSA advisors. This was a result of the U.S. governmental entities indicating their concern IRW and its leadership were connected to "terror finance, associations with alleged terrorist organizations, and/or antisemitic actions or statements." IRUSA further advised IRW that the refusal to discuss separation of IRUSA from IRW would end up only hurting the beneficiaries of IRUSA humanitarian endeavors and would draw negative attention to IRW. In other words, both parties and the beneficiaries had an overarching incentive to resolve these issues. Yet IRW not only refused to engage with IRUSA, it began to escalate the situation aggressively to the detriment of IRUSA and its beneficiaries.

48.     The December 7, 2025 notification listed a number of specific issues that IRUSA had previously raised and was refused discussion and dispute resolution. These included: (1) IRW's refusal to permit audit processes of the Afghanistan project and the orphans' program; (2) return of funds in connection with the terminated Grant Agreements; and (3) return of $3.6 million in excess funds provided by IRUSA in connection with certain completed projects.

49.     On or about December 24, 2025, good-faith negotiations having failed to take place in connection with the October 2024 notices, and as a result of several continuing unresolved disputes

14

between IRUSA and IRW, as well as the continuing concerns of the House Ways and Means Committee (including the fact that "IRW has been the subject of severe and escalating scrutiny by authorities in the United States"), IRUSA provided IRW notice seeking to "sever any existing contractual obligations or relationship to maintain continuity of independent operations and protect the interests of beneficiaries." It sought an immediate meeting during the first week of the new year at a location in Europe of IRW's choosing. IRW declined to commit to such a meeting and it continues to do so to this day.

50.     On February 3, 2026, counsel for IRUSA wrote to counsel for IRW seeking to have "detailed discussions on … multiple issues." In that communication, IRUSA advised IRW that there was information showing that IRW was conducting fundraising in the United States and that dispute resolution was being invoked in connection with that issue. Again, IRW refused to engage in the required CEO-to-CEO and Board-to-Board negotiations.

51.     IRW's conduct and regulatory scrutiny on IRW has resulted in other humanitarian entities seeking to disengage from their partnerships with IRW as well. As an example, in March 2026, an entity called USA for UNHCR wrote to IRUSA to request to "disengage" from Islamic Relief Jordan, in light of the fact that there was a compliance hold placed on a wire transfer initiated by USA for UNHCR to fund Islamic Relief Jordan through a bank account registered under IRW's name. USA for UNHCR requested to work directly with IRUSA to adjust the funding program so that it was no longer providing funds to Islamic Relief Jordan.

52.     IRW currently holds at least $6,412,509 in funds provided by IRUSA from all projects which have been concluded or terminated by IRUSA.

### C. IRW'S MISCONDUCT UNDER THE GRANT AGREEMENTS

53. As stated above, IRUSA had entered into two Grant Agreements in connection with certain projects in Afghanistan: an Earthquake Recovery Grant Agreement (**Exhibit C**) and a Health Education Grant Agreement (**Exhibit D**).

54. These Grant Agreements, in substance, imposed on IRW the contractual requirement to follow U.S. law, by specifying that any action by IRW that would constitute a violation of U.S. sanctions, such as the export of goods from Iran by a U.S. person, would violate the contractual requirements of the Grant Agreements even if it did not represent an actual violation of OFAC sanctions by IRW. Exhibit C § XII; Exhibit D § XII. The Grant Agreements also require IRW to take reasonable precautions to ensure that none of the grant funds have been raised for or used to "support or promote violence, terrorist activity or related training." Exhibit C § XIII; Exhibit D § XIII. The Grant Agreements also provide the right of IRUSA to conduct an audit at IRUSA's discretion of IRW's financial records, its activities under the project, and its compliance with the agreements. Exhibit C § Section X; Exhibit D § X. The Grant Agreements also provide that upon termination, IRW shall return all unspent funds and unused equipment and/or supplies to IRUSA within 90 days of any notice of termination. Exhibit C § XV; Exhibit D § XV.

55. In or about July 2025, IRUSA learned from IRW during an update report on the Grant Agreements that IRW had exported certain sewing machines from Iran for purposes of executing the Grant Agreements.

56. IRW responded in writing to subsequent IRUSA inquiries about the event and admitted that the sewing machines had been exported from Iran.

57. IRUSA sought to invoke its audit rights under the Grant Agreements, to assess whether IRW's purchase of certain sewing machines from Iran for use in Afghanistan represented a

reportable potential violation of U.S. law or whether it evidenced a serious deficiency in IRW's control infrastructure that required enhanced IRUSA scrutiny of other IRW-related projects.

58.    IRUSA also sought the return of unspent funds provided by IRUSA to IRW in connection with those agreements.

59.    Based on IRUSA's investigation, IRUSA determined that IRW exported sewing machines from Iran for the purpose of executing the relevant Grant Agreement. Neither IRUSA nor any U.S. person, associated with IRUSA or otherwise, had any dealings associated with purchase of the sewing machines. As a result, there was no violation of U.S. law that occurred that required a report to OFAC or another U.S. enforcement agency, but it was clear to IRUSA that IRW had violated its contractual agreement with IRUSA that it would operate in compliance with U.S. law, and had created additional risk for IRUSA.

60.    On July 10, 2025, IRUSA sent a letter to IRW formally notifying it of material breaches and immediate termination of the Grant Agreements. IRUSA demanded that, pursuant to the Grant Agreements, IRW return the balance of any unspent project funds, unused equipment, and/or supplies provided to IRW by IRUSA.

61.    On August 7, 2025, IRUSA retained an accounting and consulting firm to conduct an audit of the Afghanistan projects under the Grant Agreements. The accounting and consulting firm was unable to proceed with the audit due to a lack of cooperation from IRW.

62.    On September 19, 2025, with no funds, unused equipment, or supplies returned to IRUSA, and with no independent audit undertaken of the Afghanistan projects under the Grant Agreements, IRUSA invoked its rights to conduct additional audits under various other agreements. IRW also ignored this demand.

63.     On October 2, 2025, IRUSA, unsatisfied with IRW's insufficient responses, again demanded formal dispute resolution regarding the Grant Agreements. The dispute resolution clauses of the Grant Agreements provide that in the event of "any dispute, controversy or claim" the parties will attempt to reach an amicable agreement, and that if no such agreement is reached, the respective Chief Executive Officers of IRUSA and IRW shall attempt to resolve the dispute. Exhibit C § XIX; Exhibit D § XIX. If the matter is unresolved after sixty days, the issue is referred to negotiations between the Board of Directors of IRUSA and IRW. *Id.*

64.     On the same date, IRW replied that it outright rejected IRUSA's claims. IRW repeated this position on October 10, 2025. IRW insisted that there was corruption in Afghanistan that should be considered an acceptable risk and would not constitute negligence or recklessness if it had occurred. Such a view was and is anathema to the values, policies, and procedures of IRUSA.

65.     As a result, despite IRUSA having raised one via the channels specified in the Grant Agreements, IRW simply denied that there was a dispute requiring formal resolution.

66.     On October 30, 2025, IRW formally advised IRUSA that it would not permit IRUSA to conduct the demanded audits of the Afghanistan projects. In response, on November 2, 2025, IRUSA again demanded its contractual right to conduct the audits. IRUSA also requested that IRW discuss the matter to seek resolution. IRW again refused.

**D.  IRW'S MISCONDUCT IN CONNECTION WITH THE ORPHAN PROGRAM**

67.     As indicated above, one of the charitable projects in which IRUSA has participated in with IRW – indeed the largest – is the Orphan Sponsorship Programme ("OSP"). Under that five-year program, which originated in 2022 and is governed by a separate OSP Agreement executed December 30, 2021 ("OSP Agreement," **Exhibit E**), funds supplied by IRUSA would be transmitted to IRW as administrator to distribute the funds to orphans in various locations around the world for "improving the health, nutrition, education, mental and physical wellbeing of orphans

and their families." OSP Agreement, Recitals. IRUSA agreed to provide IRW with certain funds to the extent that IRUSA has been able to raise such funds. *Id.* § III(K). The funds provided to IRW were to be "strictly administered" in accordance with the OSP Agreement. *Id.* at 2. IRW was to administer the use of the funds, provide reports regarding the use of the funds including "accurate, complete and up-to-date records," (*id.* § VI(B)(4)) and to permit inspection and audits by IRUSA (*id.* § X). Unlike the Members' Agreement and the License Agreement, although the OSP Agreement contains provisions favoring internal resolution of disputes, it contains no requirement for arbitration.

68.    The OSP Agreement provided for a schedule of quarterly grant payments by IRUSA, the last to be provided in August 2026. *Id.* § III(D). Under the terms of the OSP Agreement, IRW was obliged to return to IRUSA any unused funds within 90 days of the termination of the OSP Agreement or the end of the five-year period. *Id.* § IV(A). The OSP Agreement also provided for a procedure to resolve disputes. *Id.* § XIX.

69.    IRUSA made its contracted quarterly payments to IRW in connection with the OSP from 2022 through the second quarter of 2025. No additional funds were sent, as it was IRUSA's understanding that the United States government did not consider any transmittal of funds to IRW to be appropriate.

70.    As indicated above, on December 4, 2025, IRUSA gave notice to IRW that the OSP Agreement as it currently existed, with IRW as the administrator of funds supplied by IRUSA, needed to be terminated but that the orphans needed to continue to be supported. IRUSA stated that, to avoid any of the orphans in the program suffering a loss of support, IRUSA would transfer all IRUSA-sponsored orphans to non-government organizations vetted by IRUSA (other than IRW). The letter notice called for termination of certain limited country programs – those in South

Africa, Chechnya, and Afghanistan. It did not request or suggest the termination of any other orphan sponsorships, and IRW still had funds it had received from IRUSA to support orphans in its other country programs.

71.    Without any discussion with IRUSA, as alleged below, IRW unilaterally treated this letter as an outright and immediate termination by IRUSA of all orphan sponsorships – to the detriment of the orphans' welfare, as well as IRUSA's reputation and stated intent, including representations IRUSA made to its donors. Such action was unjustified, unnecessary, malicious, and intended to harm IRUSA and its reputation, and its relationship with its donors, via unnecessary and unacceptable collateral damage to orphans worldwide.

72.    Having notified IRW, as alleged above, of the need to reformulate the OSP on or about December 4, 2025, IRUSA again requested clearly in its December 24, 2025 letter to IRW that "all orphan sponsorship lists currently managed through IRW shall be transferred to a local partner designated by IRUSA as soon as possible, ensuring uninterrupted care regardless of organizational adjustments." Again, nothing in the notice requested or suggested the complete termination of orphan sponsorships. To the contrary, it unambiguously sought cooperation to effect a prompt transfer to reduce the risks to IRUSA in the U.S. and to provide uninterrupted support to the vast majority of orphans. Nor did IRW seek clarification or confirmation of any other understanding.

73.    Instead of working with IRUSA to transfer the orphan sponsorships maintained under the OSP to another entity, and thus to provide funding continuity for the orphans affected, IRW, on or about January 15, 2026, cancelled the sponsorship of hundreds of orphans. But this cancellation was done with a malicious twist, falsely and without authorization using the email of an IRUSA employee to create a record that suggested that IRUSA was taking the action to cancel all of the orphan sponsorships.

20

74.     The effect of IRW's conduct was as follows: According to the OSP records, an total of 645 orphans from Albania, Bangladesh, Bosnia, Ethiopia, Indonesia, Iraq, Malawi, Mali, and Pakistan, previously sponsored through IRUSA and its donors, had their humanitarian benefits cancelled because IRW falsely stated there was no donor available or, in some cases, that the donor had cancelled participation in the OSP. In truth, IRUSA had requested only that the administration of the benefits for those orphans be transferred to an entity other than IRW.

75.     IRUSA had been providing, through its donors, benefits to 20,780 orphans under the OSP as of July 2025.

76.     On February 12, 2026, having discovered IRW's actions, counsel for IRUSA demanded from counsel for IRW an explanation for IRW's conduct in creating records that made it "falsely appear that IRUSA had proactively cancelled hundreds of orphans." IRUSA requested that the false entries be reversed. In addition, IRUSA demanded an accounting of how the funds previously provided by IRUSA for the OSP had been used. IRUSA further demanded that the email of an IRUSA employee not be used to communicate cancellations, as neither the employee nor IRUSA had authorized the wrongful use of an IRUSA employee's email.

77.     IRW's response, also by counsel, refused to reverse the false OSP entries. Nor did IRW provide an accounting of how IRUSA's funds had been used. As a result, IRW allowed false business records to remain in the OSP's records that stated (a) that 645 orphans had had their sponsorships terminated; (b) that the reason for the terminations was a lack of donors; and (c) that an IRUSA employee had entered and created the false terminations and the false reasons.

78.     After creating the false OSP records, IRW then cut off IRUSA's access to the software that identified the orphans in the OSP, whether they were receiving benefits, and through whom such benefits were being provided. Thus, IRUSA has no way of knowing whether IRW has also cut off

benefits to numerous other orphans that had been funded by IRUSA and its donors. Again, such actions were unnecessary, unwarranted, malicious, intended to harm IRUSA, and, worst of all, harmful to the orphans.

### E.  IRW'S ILLEGAL SOLICITATION OF DONATIONS FROM UNITED STATES PERSONS

79.    Charities must register in multiple U.S. states, including New York, before soliciting charitable donations within those states. IRUSA is registered in all states that require registration. IRW is not registered with the New York State Attorney General as a charity and, on information and belief, IRW is not registered to solicit donations in any U.S. state – nor is it registered in the United States as a 501(c)(3) organization.

80.    In New York, under Executive Law Article 7-A § 171-A(10), "solicit" means "[t]o directly or indirectly make a request for a contribution, whether express or implied, through any medium." For such solicitations to be lawful, New York requires that the organization making the solicitation be registered.

81.    IRW is not a religious organization and, on information and belief, its annual gross contributions from New York residents exceed $25,000.

82.    According to the New York State Attorney General's Office (the "NYAG"), the NYAG "regulates nonprofit organizations and fundraisers and provides them with helpful resources. In addition, [the NYAG] protect[s] nonprofits and their donors from fraud and ensure[s] that charitable donations are used as the donor intended."[4]

83.    IRW maintains a website, https://islamic-relief.org/, accessible to people within the United States, including the State of New York. The top of the home page seen upon opening the website

---

[4]*Charities, Nonprofits & Fundraisers*, N.Y. State Off. of the Att'y Gen., https://ag.ny.gov/resources/government-organizations/charities-nonprofits-fundraisers (last visited Mar. 23, 2026).

only identifies the organization as Islamic Relief. At the bottom of the page, the entity is identified as "Islamic Relief Worldwide" and the webpage states that it is "Registered Charity No. 328158." IRW's website also states that it "works with the Fundraising Regulator,"[5] an "independent regulator of charitable fundraising in England, Wales and Northern Ireland."[6]

84.     There is a bright red "Donate" button on the initial website page. Clicking the "Donate" button brings the user to a page permitting both "one-off" and monthly donations. Selecting a program to donate affords the user the option of donating by credit card in United States dollars as well as Euros and British pounds. In addition, there is the option to make payment via Apple Pay or Google Pay, i.e., via U.S.-based payment processors.



85.     Before a donation is consummated, the user is presented with and required to complete a series of form fields. Among the required fields for the user to enter information are name, physical address (including street, state, and zip code), and email address.

---

[5] *Our Supporter Promise*, Islamic Relief Worldwide, https://islamic-relief.org/our-supporter-promise/ (last visited Mar. 23, 2026).
[6] *About Us*, Fundraising Regulator, https://www.fundraisingregulator.org.uk/about-us (last visited Mar. 23, 2026).



86.     After the user completes the required fields, including physical address, the site requires the user to click through to the payments page, thereby submitting the donor's information, including their physical address, to IRW. As detailed below, IRW collects the information and then issues direct email solicitations for donations to the user, including but not limited to users who tell IRW that they are located in New York.

87.    Upon information and belief, that is, research done using internet analytics, for the period of from November 20, 2025 to February 18, 2026, 25% of IRW's internet traffic was from internet addresses based in the United States.

88.    The above allegations do not simply present hypothetical possibilities. Internet analysis shows that IRW has been paying for advertisements seeking donations within the United States on Meta and on Google. These advertisements specifically target United States persons, including persons in New York, for the purpose of seeking donations.

89.    IRW solicited, and received, charitable donations from an individual in the State of New York that were intended for IRUSA.

90.    On or about December 16, 2025, using IRW's web site, Donor A, a resident of Scarsdale, New York, made an on-line donation in the amount of $10,140 to IRW.

91.    Donor A is a frequent donor to IRUSA and was accustomed to making donations to IRUSA through IRUSA's website. As was her typical custom, she searched for "Islamic Relief" on Google, expecting to see IRUSA's website appear as the top search result. Instead, IRW's website was the first search result, and Donor A clicked on the website believing it to be IRUSA's. Upon information and belief, IRW's website was the top search result because of sponsored advertisements paid for by IRW on Google. In light of the similarity in the style of IRW's website to IRUSA's, and the use of the same logo, Donor A proceeded with her donation through IRW's website, believing that the donation was being made to IRUSA.

92.    Donor A, when she became aware of her mistake, contacted IRW to inform them that she had intended the donation to go to IRUSA, and asked that the funds be rerouted to IRUSA. She included her contact information, including her mailing address in New York, in her correspondence.

93.     Donor A has not received any response from IRW regarding her request that the mistaken donation be transferred to IRUSA. However, since her mistaken donation, she has received almost daily emails from IRW soliciting donations. Hyperlinks in the emails are directed to IRW's website.

94.     Numerous donors aside from Donor A have contacted IRUSA in recent months to inform IRUSA that they had mistakenly donated to IRW rather than IRUSA, or to request from IRUSA a receipt for their donation or other service related to their donation when they had in fact made a donation to IRW. Several of these donors are located in the State of New York. In light of the volume of internet traffic routed to IRW from the United States with the aid of sponsored searches and advertisements, IRUSA reasonably believes that these donors who contacted IRUSA represent just a fraction of many U.S. persons who have been subject to IRW's purposeful solicitations of donations. The number of donors located in the United States that have contacted IRUSA who mistakenly donated to IRW when intending to donate to IRUSA has increased in the past year.

95.     IRUSA also became aware that, in early 2026, IRW solicited donations from a New York-based university student organization through an Australian organization named Project Blackseed, with which IRW is partnered. Upon information and belief, IRUSA alleges that IRW is also actively soliciting donations from other individuals and organizations located in New York and in the United States through channels other than its website.

96.     Not only are such solicitations illegal under New York law, and the laws of the various states where registration is required to solicit residents of those states, but such solicitations were and are a violation of and breach of the Members' Agreement and the License Agreement between IRUSA and IRW.

97.     As set forth above, both the Members' and License Agreements provided that IRUSA would be the "Islamic Relief" independent organization that would act exclusively in the United States.

98.     Upon information and belief, IRW's purposeful – and illegal – solicitation of donors in the United States has increased dramatically in late 2025 and early 2026, precisely as IRUSA notified IRW of its concerns regarding IRW's conduct and its intent to distance itself from IRW. Upon information and belief, IRW has increasingly targeted Google advertisements to the United States during these months, soliciting donations. IRW's unlawful actions have caused further confusion among donors as to the identities of IRW and IRUSA and have had a devastating impact on IRUSA's fundraising efforts and ability to carry out its humanitarian mission. Ramadan is historically an important period for fundraising for IRUSA, and web donations constitute the vast majority of IRUSA's fundraising. The amount of donations IRUSA received during Ramadan in 2026 to date has decreased by almost 50% compared to last year.

### F.  BASED UPON IRW'S CONDUCT, ARBITRATION CLAUSES IN THE MEMBERS' AND LICENSE AGREEMENTS SHOULD BE NULLIFIED

99.     Unlike the OSP Agreement, the Members' Agreement and the License Agreement contain clauses that favor arbitration when dispute resolution has not resulted in an agreed-upon result. Nevertheless, those clauses should be found to be void against public policy and nullified.

100.    First, the claims against IRW within this complaint describe illegal misconduct by IRW. IRW has violated the laws of the United States, and of numerous states within the United States, by its active solicitation of donations. IRW is not a tax-exempt charity registered in the United States or in any state. Yet it seeks donations as if it were, and promotes itself as a charity, without disclosing that donations from persons in the United States are not tax deductible, nor even permitted, as IRW is not a registered charity as required under New York law. Such conduct is

against United States law and public policy and should not be subject to private arbitration under English law.

101.    Similarly, IRUSA's claim regarding IRW's termination orphan sponsorships where funds had already been provided by IRUSA, as described above, also involves illegal misconduct by IRW. IRW altered its computer and business records to make it appear that the termination of funding for benefits for over six hundred orphans was at not only the behest of, but was done by specific IRUSA personnel, and initiated by those personnel. And IRW made it appear, in addition, that the cancellations were because donors were not available. Both are outright false and resulted in the creation of false business records. Falsification of business records is a crime under New York Penal Law § 175.05. Such conduct is against United States law and public policy and should not be subject to private arbitration under English law.

102.    Second, IRW demonstrated a pattern of being unwilling to hold good-faith negotiations to resolve disputes, which are required by the terms of its agreements with IRUSA prior to proceeding to mediation, and ultimately to arbitration. In short, IRW has, itself, treated the agreements as non-binding or unenforceable against IRW when it suits IRW's desires. Having selectively disregarded its contractual obligations, IRW should not now be permitted to invoke those same agreements to its benefit.

103.    Regardless of the Court's view of the arbitration clauses, were IRW to challenge the claims on that ground, because the OSP Agreement and the Grant Agreements contain no requirement to arbitrate, the claims relating to those agreements are not affected by any arbitration provisions.

### G.    IN THE ALTERNATIVE, THE AGREEMENTS BETWEEN IRW AND IRUSA ARE NULL AND VOID

104.    In the alternative, the Members' Agreement, License Agreement, the OSP Agreement, and the Grant Agreements should be declared null and void as unconscionable and as against public

policy, and in light of IRW's refusal to engage with IRUSA in good faith and IRW's illegal conduct, would leave IRUSA with no realistic remedies under the agreements.

105. As stated above, IRW has been engaging in illegal solicitations of donations in the United States in violation of state laws and in breach of the Members' Agreement and License Agreement. IRW has also been acting in violation of the Members', License, OSP, and Grant Agreements, which all require IRW to act in compliance with applicable laws and regulations. IRW's conduct has deliberately and maliciously jeopardized IRUSA's reputation and mission through fraudulent and illegal conduct.

106. IRW has flatly refused to engage with IRUSA's multiple attempts to enforce its obligations under the agreements, or with IRUSA's formal invocation of dispute resolution. As to the Grant Agreements in particular, IRW has taken the position that a dispute does not exist. Because the dispute resolution provisions of the Grant Agreements simply require IRW and IRUSA to negotiate an agreement in the event of dispute, the agreements leave no remedy for IRUSA in this situation, where IRW is refusing to engage in good faith. The agreements should be declared null and void.

## CAUSES OF ACTION

### COUNT I
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

107. IRUSA re-alleges and incorporates by reference paragraphs 1 through 106.

108. IRUSA has a valid business expectancy to be able to raise funds in the United States under its name and reputation, unimpeded by competitors seeking to raise funds by using its name. IRUSA has business relationships with frequent donors located in the U.S., like Donor A and many others, who are committed to supporting IRUSA's mission. IRW knew this and, in fact, was well aware of IRUSA's business expectancy to raise funds and IRUSA's business relationships with

29

frequent donors, including Donor A. In fact, IRW had agreed that IRUSA would be the only charity under the "Islamic Relief" name recognition umbrella to raise funds within the United States.

109.    However, by IRW (illegally) soliciting donations in the United States under the same "Islamic Relief" name recognition umbrella as IRUSA, IRW intentionally has intruded into the United States, inducing IRUSA's donor audience to send funds to IRW rather than IRUSA. Further, by confusing IRUSA with IRW in the United States, IRW has caused IRUSA to suffer material reputational damage, and to defend itself from inquiries by government and business partners that seek explanations about the connection between the two entities. Put simply, IRW's illegal operations in the United States cause IRW to suffer reputational damage and incur legal fees.

110.    As a direct and foreseeable result of IRW's conduct, IRW has damaged IRUSA's relationships and business expectancy to raise donations from the same audience, in an amount to be determined at trial, plus punitive damages.

## COUNT II
### UNLAWFUL DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF
### NEW YORK GENERAL BUSINESS LAW § 349

111.    IRUSA re-alleges and incorporates by reference paragraphs 1 through 106.

112.    IRW's illegal solicitation of funds in the State of New York and in the United States is likely to cause and is causing confusion, mistake, and deception among the general public. Such acts are also likely to deceive the public into believing that the services offered by IRW originate from, are associated with, or are otherwise endorsed by IRUSA.

113.    IRW's deceptive acts and practices involve public sales activities of a recurring nature, are consumer-oriented, and are materially misleading.

114.    IRUSA has suffered, and will continue to suffer, irreparable harm as a result of IRW's actions, unless IRW is enjoined from engaging in such unlawful and deceptive acts and practices.

115.    As a direct and foreseeable result of IRW's conduct, IRUSA has been injured and has suffered damages in an amount to be determined at trial.

## COUNT III
## BREACH OF CONTRACT – LICENSE AGREEMENT

116.    IRUSA re-alleges and incorporates by reference paragraphs 1 through 115.

117.    The License Agreement was intended as a valid, legally binding agreement between IRUSA and IRW. Under its terms, in particular § 1.07, IRUSA had the exclusive right to use the "Islamic Relief" name recognition umbrella to raise charitable donations in the United States.

118.    IRUSA has performed under the terms of the contract.

119.    IRW has breached the contract by seeking to raise funds (illegally) in the United States. IRW's violation and breach of the License Agreement has damaged and injured IRUSA in its competition for the same pool of donors within the United States.

120.    As a direct and foreseeable result of IRW's conduct, IRUSA has been injured and has suffered damages in an amount to be determined at trial.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – LICENSE AGREEMENT

121.    IRUSA re-alleges and incorporates by reference paragraphs 1 through 106 and 116-120.

122.    The License Agreement imposed an implied duty of good faith and fair dealing on both parties.

123.    IRW violated this duty by, *inter alia*, depriving IRUSA of the benefits of the License Agreement by harming IRUSA's reputation within the United States and the value of using the "Islamic Relief" name in the United States through its illegal and intentional solicitation of donors

31

in the United States. IRW's efforts in this respect escalated after IRUSA notified IRW of its intent to sever its relationship with IRW.

124. IRW's actions are in bad faith and breach the implied duty of good faith and fair dealing inherent in all contracts.

125. As a direct and foreseeable result of IRW's conduct, IRUSA has been injured and has suffered damages in an amount to be determined at trial.

**COUNT V**
**BREACH OF CONTRACT – MEMBERS' AGREEMENT**

126. IRUSA re-alleges and incorporates by reference paragraphs 1 through 106.

127. The Members' Agreement was intended as a valid, legally binding agreement between IRUSA and IRW. Under its terms, and in particular §§ 3.2 and 3.5, IRUSA had the exclusive right to use the "Islamic Relief" name recognition umbrella in connection with its charitable activities in the United States.

128. IRUSA has performed under the terms of the contract.

129. IRW has breached the contract by seeking to raise funds (illegally) in the United States. IRW's violation and breach of the Members' Agreement has damaged and injured IRUSA in seeking to make impermissible and deliberately confusing solicitations to the same pool of donors within the United States.

130. As a direct and foreseeable result of IRW's conduct, IRUSA has been injured and has suffered damages in an amount to be determined at trial.

## COUNT VI
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – MEMBERS' AGREEMENT

131. IRUSA re-alleges and incorporates by reference paragraphs 1 through 106 and 126 through 130.

132. The Members' Agreement imposed an implied duty of good faith and fair dealing on both parties.

133. IRW violated this duty by, *inter alia*, depriving IRUSA of the benefits of the Members' Agreement by rendering meaningless the independent status of the two entities specifically guaranteed in the agreement. IRW's conduct caused intentional confusion among donors and regulators regarding IRUSA's connections to IRW and has harmed IRUSA's reputation. IRW's efforts in this respect escalated after IRUSA notified IRW of its intent to sever its relationship with IRW.

134. IRW's actions are in bad faith and breach the implied duty of good faith and fair dealing inherent in all contracts.

135. As a direct and foreseeable result of IRW's conduct, IRUSA has been injured and has suffered damages in an amount to be determined at trial.

## COUNT VII
### BREACH OF CONTRACT – EARTHQUAKE RECOVERY GRANT AGREEMENT

136. IRUSA re-alleges and incorporates by reference paragraphs 1 through 106.

137. The Earthquake Recovery Grant Agreement was intended as a valid, legally binding agreement between IRUSA and IRW. Under its terms, in particular §§ XII and XIII, IRW had the obligation to comply with relevant laws, rules, regulations, decrees or official government orders and to ensure that none of the grant funds would be used to support or promote violence, terrorist

activity or related training. Under § XIV of the agreement, IRUSA had the right to the balance of any funds unused by IRW upon termination of the agreement. § X of the agreement also provided IRUSA the right to conduct an audit of IRW's records and compliance with the agreement.

138.    IRUSA has performed under the terms of the contract.

139.    IRW has breached the contract by failing to comply with applicable U.S. laws and regulations, refusing to cooperate with IRUSA's audit request, and failing to return any unused funds and supplies.

140.    As a direct and foreseeable result of IRW's conduct, IRUSA has been injured and has suffered damages in an amount to be determined at trial.

**COUNT VIII**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING –**
**EARTHQUAKE RECOVERY GRANT AGREEMENT**

141.    IRUSA re-alleges and incorporates by reference paragraphs 1 through 106 and 137 through 140.

142.    The Earthquake Recovery Grant Agreement imposed an implied duty of good faith and fair dealing on both parties.

143.    IRW violated this duty by, *inter alia*, depriving IRUSA of the benefits of the Earthquake Recovery Grant Agreement by rendering meaningless IRUSA's audit rights to ensure IRW's compliance with laws and with the agreement.

144.    IRW's refusal to engage with IRUSA's efforts and denial that there is a dispute requiring resolution at all are in bad faith and breach the implied duty of good faith and fair dealing inherent in all contracts.

145.   As a direct and foreseeable result of IRW's conduct, IRUSA has been injured and has suffered damages in an amount to be determined at trial.

## COUNT IX
## BREACH OF CONTRACT – HEALTH EDUCATION GRANT AGREEMENT

146.   IRUSA re-alleges and incorporates by reference paragraphs 1 through 106.

147.   The Health Education Grant Agreement was intended as a valid, legally binding agreement between IRUSA and IRW. Under its terms, in particular §§ XII and XIII, IRW had the obligation to comply with relevant laws, rules, regulations, decrees or official government orders and to ensure that none of the grant funds would be used to support or promote violence, terrorist activity or related training. Under § XIV of the agreement, IRUSA had the right to the balance of any funds unused by IRW upon termination of the agreement. Section X of the agreement also provided IRUSA the right to conduct an audit of IRW's records and compliance with the agreement.

148.   IRUSA has performed under the terms of the contract.

149.   IRW has breached the contract by failing to comply with applicable laws and regulations, refusing to cooperate with IRUSA's audit request, and failing to return any unused funds and supplies.

150.   As a direct and foreseeable result of IRW's conduct, IRUSA has been injured and has suffered damages in an amount to be determined at trial.

## COUNT X
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – HEALTHCARE EDUCATION GRANT AGREEMENT

151.   IRUSA re-alleges and incorporates by reference paragraphs 1 through 106 and 147 through 150.

152. The Healthcare Education Grant Agreement imposed an implied duty of good faith and fair dealing on both parties.

153. IRW violated this duty by, *inter alia*, depriving IRUSA of the benefits of the Healthcare Education Grant Agreement by rendering meaningless IRUSA's audit rights to ensure IRW's compliance with laws and with the agreement.

154. IRW's refusal to engage with IRUSA's efforts and denial that there is a dispute requiring resolution at all are in bad faith and breach the implied duty of good faith and fair dealing inherent in all contracts.

155. As a direct and foreseeable result of IRW's conduct, IRUSA has been injured and has suffered damages in an amount to be determined at trial.

**COUNT XI**
**UNJUST ENRICHMENT**

156. IRUSA re-alleges and incorporates by reference paragraphs 1 through 106.

157. By its wrongful actions, IRW has been unjustly enriched by its acceptance of donations intended for IRUSA, at IRUSA's expense.

158. It is against equity and good conscience to permit IRW to retain the benefits derived from its wrongful conduct.

159. As a direct and proximate result of the wrongful conduct of IRW, IRUSA is entitled to an accounting of IRW's financial records to determine the profits realized by IRW due to deliberate confusion created by IRW and by IRW's refusal to refund donors who requested refunds after they realized that they mistakenly donated to IRW instead of IRUSA. IRUSA is entitled to a recoupment of the amount by which IRW has been unjustly enriched.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff IRUSA respectfully requests this Court to enter judgment in his favor and against Defendant IRW and issue an Order:

1) Granting injunctive relief, including but not limited to enjoining IRW from enforcing the Members' Agreement and the License Agreement against IRUSA;

2) In the alternative to (1), granting a declaratory judgment, declaring that the Members' Agreement, License Agreement, OSP Agreement and Grant Agreements are null and void;

3) Awarding compensatory damages to IRUSA in connection with the damage to IRUSA's reputation, breach of the Members' Agreement, License Agreement, OSP Agreement and Grant Agreements and wrongful withholding of funds from IRUSA by IRW in an amount to be proven at trial, but in excess of $6,412,509;

4) Awarding punitive, special, and/or exemplary damages against IRW in an amount to be proven at trial, sufficient to prevent IRW from continuing its willful, wanton, intentional, and malicious conduct;

5) Awarding pre- and post- judgment interest;

6) Assessing costs and fees, including but not limited to reasonable attorneys' fees and expenses incurred in the prosecution of this action; and

7) Granting such other and further relief as this Court may deem just and proper.

Dated: March 23, 2026

Respectfully submitted,

LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC

/s/    *Arthur D. Middlemiss*

Arthur D. Middlemiss
arthur.middlemiss@lbkmlaw.com
Marc Frazier Scholl
marc.scholl@lbkmlaw.com
10 Grand Central
155 East 44th Street, 25th Floor
New York, New York 10017
(212) 826-7001

Eric L. Lewis
eric.lewis@lbkmlaw.com
1050 K Street NW, Suite 400
Washington, DC 20001
(202) 833-8900

*Counsel for Plaintiff Islamic Relief USA*