# EXHIBIT B

# ISLAMIC RELIEF WORLDWIDE

## - and -

# ISLAMIC RELIEF USA

---

# LICENSE AGREEMENT

---

THIS LICENSE AGREEMENT ("Agreement") is entered into and effective as of the 20 day of December 2020 and shall continue until the 19 December 2025 or continue until terminated in accordance with clause 1.25 of this Agreement (together known as the "Termination Date") whereupon it shall automatically continue for a further five year term ("Renewal Term") on the same terms unless either party gives to the other on or before the fourth anniversary of this Agreement notice to review the Agreement ("Review Notice") in which case the parties shall enter into good faith negotiations to review and amend the Agreement, and if successfully amended by the parties, the mutually executed amended Agreement will become effective. The same provisions shall apply to termination and renewal at the end of any Renewal Term.

**BETWEEN**

**Islamic Relief Worldwide**
a charitable company limited by guarantee and not having a share capital, incorporated under the laws of England and Wales under Company Number: 2365572 and registered under Charity Number 328158 whose registered office is 19 Rea Street South, Digbeth, Birmingham, B5 6LB (hereinafter referred to as "the Licensor")

**AND**

**Islamic Relief USA**
a non-profit and public benefit corporation organized under the laws of the State of California and granted tax exempt status under U.S. Internal Revenue Code Section 501(c)(3) as a charitable organization engaged in international humanitarian relief and development activities, whose principal office is located at 3655 Wheeler Avenue, Alexandria, VA 22304 (hereinafter referred to as "the Licensee")

(hereinafter collectively referred to as the "parties")

**WHEREAS** the Licensor began its charitable operations in 1984 and has since grown into an international humanitarian organization addressing the needs of the poor worldwide;

**AND WHEREAS** the Licensee began its charitable operations in USA at the initiative of the Licensor for the purpose of working in conjunction with the Licensor to alleviate human suffering and provide humanitarian aid to people in need;

**AND WHEREAS** the Licensor and the Licensee desire to carry out their collaborative Charitable Activities on an international basis in a spirit of co-operation and harmony, pursuant to the terms of this Agreement and the Members Agreement signed between the parties and dated the 21st December 2019;

**AND WHEREAS** the Licensor has formed a federation of which Licensee is a part pursuant to the Members Agreement executed on 14 December 2019;

**AND WHEREAS** the Licensee acknowledges that prior to the execution of this Agreement it has been using the Trademarks pursuant to a verbal agreement with Licensor and pursuant to agreements dated 19th December 2010 and 19th December 2015 between the parties and always subject to the control of the Licensor;

**AND WHEREAS** the Licensee wishes to conduct its charitable operations in the USA pursuant to the joint vision shared by the parties to alleviate the poverty and human suffering of the world's poorest people, regardless of race, gender or religious background;

**IN CONSIDERATION** of the mutual covenants, agreements and indemnities contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## BACKGROUND INFORMATION

1.01    The Licensor is the sole owner of and wishes to license the Trade-marks displayed on Exhibit 1, as well as any Trade-marks which it later may acquire during the term of this Agreement which are added to Exhibit 1 by mutual agreement, (the "Trade-marks").

1.02    The Licensee has and wishes to continue to make use of the Trade-marks as may be deemed appropriate by the Licensor from time to time.

1.03    The parties confirm and agree that any use of the Trade-marks by the Licensee prior to the execution of this Agreement incorporating this Trade-mark License was made by the Licensee pursuant to a verbal agreement between the parties, and that such use was always made subject to the control of the Licensor.

1.04    The Licensor and Licensee hereby agree to the terms and conditions of this Agreement.

## OWNERSHIP AND LICENSE OF TRADE-MARK

**1.05    The Licensee acknowledges the exclusive right, title, interest and goodwill of the Licensor in the Trade-marks, whether registered or not, and further acknowledges that any and all goodwill in the Trade-marks arising from the Licensee's use enures to the benefit of the Licensor.**

1.06    The Licensee agrees that it has no right, title, interest or goodwill in the Trade-marks and further agrees that nothing in the Agreement gives to the Licensee any right, title, interest or goodwill in the Trade-marks, except the right to use the Trade-marks in the geographical territory of USA and on the Internet to target a USA audience in accordance with the terms hereof.

1.07    Subject to the Licensor's right to use, advertise or display the Trade-marks, the Licensor hereby licenses to the Licensee an otherwise exclusive, non-transferable and non-assignable license, without the right to sub-license except with the prior written approval of the Licensor, to use, advertise or display the Trade-marks in the geographical territory of USA and on the internet to target a USA audience for uses that are substantially related to the tax-exempt purposes of Licensee. Notwithstanding the above, the Licensor grants Licensee an exclusive license to use, sub-license, advertise or display the Trade-marks on the Internet and/or on promotional materials, provided that such use is targeted towards a USA audience and the use is substantially related to the tax-exempt purposes of Licensee.

1.08    The Licensee agrees that should any right, title, interest or goodwill in the Trade-marks or any one or more of them become vested in the Licensee by operation of law or otherwise, it holds the same in trust for the Licensor and will, at the request of Licensor, forfeit or assign unconditionally any such right, title or interest to the Licensor.

1.09    The Licensee agrees to do and perform and cause to be done and performed such further and other acts and things as may be reasonably necessary or desirable in order to protect the Trade-marks or the right, title, interest or goodwill of the Licensor thereto.

1.10    The Licensee further agrees not to raise or cause to be raised any objection to the validity of the Trade-marks or to the right, title, interest or goodwill of the Licensor thereto on any ground whatsoever, whether directly or indirectly.

1.11    The Licensee further agrees that its use of the Trade-marks as a, or part of a, domain name, corporate name or trade name, if applicable, provides it with no legal or equitable rights separate and creates in the Licensee no right of ownership to the Trade-marks as a domain name, corporate name or trade name.

1.12    The current, continual and future use and/or registration of any domain names that are the same as, confusingly similar to, derivatives of or acronyms of the Trade-marks or the Licensor's corporate or business names is subject to the Licensor's approval.

1.13    Without prejudice to the exclusive grant of a license by the licensee to the Licensor, the parties acknowledge that the Licensor, or its successor, retains the right to use the Trade-Marks within the jurisdiction of the United States of America for the purpose of fulfilling its agreed mandate.


## USE OF TRADE-MARKS


1.14    The Licensee warrants and undertakes that the Trade-marks will be used only as may be deemed appropriate by the Licensor and only in accordance with the instructions, standards of quality and specifications set and approved by the Licensor from time to time and contained in a Brand Guide provided by the Licensor or upon written instruction from the Licensor from time to time, and that the Licensee will cease a particular use of a Trade-mark immediately if directed to do so by the Licensor where such particular use is in violation of Licensor's written instructions, standards of quality or specifications.

1.15    The Licensor has the right to inspect the premises of the Licensee as well as the goods and services with which the Licensee is making use of the Trade-marks pursuant to the terms of this Trade-mark License from time to time.

1.16    The Licensor has the right to request the Licensee to provide samples of any goods sold or to be sold or used by the Licensee in association with the Trade-marks pursuant to the terms of this Trade-mark License.

1.17    The Licensee will submit any promotional and advertising material displaying the Trade-marks to the Licensor within fourteen (14) business days of Licensor's written request for such materials.

1.18    The Licensee agrees and acknowledges that, for the purposes of any application for registration of a Trade-mark made by the Licensor, any use made by the Licensee of the Trade-marks pursuant to this

Trade-mark License is deemed to have been made by the Licensee to the primary benefit of the Licensor, and the Licensee will co-operate fully and in good faith with the Licensor to establish and protect its right, title, interest or goodwill in the Trade-marks.

1.19   The Licensee agrees that in the use of the Trade-marks, the Licensee will at all material times comply with the requirements of the Licensor as to the form and manner in which the Trade-marks are displayed or used, as well as to the character or quality of the goods or services of the Licensee and with which the Trade-marks are to be associated, and the Licensee will promptly effect any changes which the Licensor may require respecting the Licensee's display and usage of the Trade-marks upon receipt of written notification from the Licensor. Without limiting the foregoing, the Licensee will at all appropriate times display with the Trade-marks the following notice or legend to identify the Licensor as the owner of the Trade-marks, the Licensee as a Licensee of the Trade-marks and the use as a licensed use:

EXAMPLE OF REGISTERED TRADE-MARK:

Islamic Relief® is a registered Trade-mark of Islamic Relief Worldwide, used by Islamic Relief USA under exclusive license by Islamic Relief Worldwide.

EXAMPLE OF UNREGISTERED TRADE-MARK:

الإغاثة الإسلامية ™ is a Trade-mark of Islamic Relief Worldwide, used under license by Islamic Relief USA.

1.20   The Licensee agrees that it will not advertise, exploit, promote or otherwise deal the Trade-marks in any manner which, in the opinion of the Licensor, might adversely affect the goodwill attaching to and symbolized by the Trade-marks and the Licensee will not use, without Licensor's consent, any other trade-mark, trade name or corporate name that would, in the reasonable opinion of the Licensor, be confusingly similar to the Trade-marks of the Licensor.

1.21   The Licensee will not distribute or sell or offer the goods and services used in association with the Trade-marks in direct or indirect association with any third party or with any third party's goods or services, except as contained herein or with the Licensor's prior written consent.

1.22   The Licensee will not permit any trade-mark, trade name, emblem, logo or other marks denoting or identifying any third party or any third party's products or services to appear in or otherwise form a part of any promotional or advertising materials which display the Trade-marks, except as contained herein or with the Licensor's prior written consent.

**ENFORCEMENT OF TRADE-MARKS**

1.23   The Licensee agrees to give prompt notice to the Licensor of any conflicting use or any infringement, passing off or unfair competition by unauthorized persons which comes to its attention involving the Trade-marks or any claim or demand contrary to or in conflict with the Licensor's rights in connection therewith. The Licensor has the sole initial right to determine whether or not to engage in any infringement, passing off, unfair competition or other proceedings involving the Trade-marks, and to make all decisions respecting the conduct or opposition of any such action or proceeding or any settlement thereof or appeal there from, and the Licensee will provide such

cooperation and assistance as Licensor may reasonably require in connection with the prosecution or opposition of any such action or proceedings. If the Licensor chooses to engage in legal action against a third party engaging in any such wrongful acts involving the Trade-marks ("Infringer"), the Licensor shall bear the costs of such action and shall be entitled to retain all damages, settlement payments, or other recoveries resulting therefrom ("Damages"). If the Licensor declines to engage in legal action against any Infringer of a Trade-mark in the USA, the Licensee shall have the right, upon receipt of the written consent of the Licensor, to engage in such action at its own cost, and the Licensor will provide such cooperation and assistance as the Licensee may reasonably require in connection with the prosecution or opposition of any such action or proceedings. If the Licensee chooses to engage in such legal action against a third party at its own cost, the Licensee shall be entitled to retain all Damages.

1.24    The Licensee agrees and acknowledges that no right of action enures to it as a result of this Agreement and the failure by the Licensor to take necessary steps to restrict any conflicting use or any infringement, passing off, or unfair competition by any unauthorized persons which may come to the attention of the Licensor involving the Trade-marks or any claim or demand contrary to or in conflict with the Licensor's right in connection therewith.

**TERMINATION**

1.25    The license provided for in this Agreement shall automatically terminate upon the occurrence of one or more of the following events:

(a)    Upon the Members Agreement dated 21st December 2019 being terminated;

(b)    upon (i) the Licensor's written notice to the Licensee specifying a default by Licensee in its obligations and providing a reasonable cure period of not less than fifteen (15) business days, and (ii) the Licensor's subsequent written notice terminating this Agreement for Licensee's failure to cure the default to the reasonable satisfaction of the Licensor within the said cure period;

(c)    upon the Licensee losing its 501(c)(3) tax-exempt status with the U.S. Internal Revenue Service after the expiry of any applicable appeal period and/or the completion or denial of any appeal that the Licensee may have undertaken in that regard;

(d)    If the Licensor has given written notice to the Licensee terminating this Agreement based upon the reasonable opinion of the Licensor, that one or more of the following events has taken place or it is imminent that one or more of the following events will take place:

(i)    dissolution or winding up of the Licensee;

(ii)    the Licensee becomes bankrupt or insolvent, makes an assignment for the benefit of creditors, or takes the benefit of any statute relating to bankrupt or insolvent debtors, or upon a receiver having been appointed under a debt instrument passed for the winding up of the Licensee; or

(iii)    the Licensee engages in conduct that in the reasonable opinion of the Licensor causes irreparable harm to the Licensor, its name, good will, Trade-marks, or reputation, and the Licensee fails to cease such conduct to the satisfaction of the Licensor within fourteen (14) business days after receiving written notification of default from the Licensor.

## GEOGRAPHICAL TERRITORY

1.26    The geographical territory of the Licensee with respect to its rights under this Agreement shall encompass the United States of America, and it territories, within which Licensee shall have the exclusive right to use the Trade-marks covered hereunder.

## CONFLICT RESOLUTION

1.27    Any dispute or controversy between the parties arising out of or related to this Agreement shall first be referred to the Chief Executive Officer of the Licensee and the Chief Executive Officer of the Licensor. If such persons cannot resolve the dispute or controversy within thirty (30) business days, then either party may refer the matter to the board of Trustees of the Licensee and the Licensor, respectively, for resolution. In connection with the foregoing, the Licensor member designated by the Licensor BOT to serve as the liaison with the Licensee board of directors shall attempt to mediate the dispute or controversy.

1.28    In the event that a dispute or controversy between the parties arising out of or related to this Agreement is not resolved between the parties in accordance with the procedures outlined above, then without prejudice to or in any other way derogating from the rights of the parties as set out in this Agreement, and as an alternative to such party instituting a law suit or legal action in any jurisdiction, the following process shall be followed:

   (a)    The dispute or controversy shall first be submitted to a panel of mediators whereby the one party appoints one mediator, the other party appoints one mediator, and the two mediators so appointed jointly appoint a third mediator. The three mediators will then meet with the parties in question in an attempt to mediate a resolution between the parties.

   (b)    The number of mediators may be reduced from three to one or two upon written agreement of the parties.

   (c)    If the parties are not successful in resolving the dispute through mediation, then the parties agree that the dispute shall be referred to and finally resolved by arbitration under the London Court of International Arbitration Rules. The number of arbitrators shall be one and appointed in accordance with the said Rules, provided that such arbitrator shall not be any one of the mediators referred to above. The seat or legal place of arbitration shall be the City of Birmingham, in the United Kingdom. The language to be used in the arbitral proceedings shall be English. The parties agree that the arbitral proceedings shall be kept confidential and that there shall be no disclosure of any kind at any time except as required by law. The decision of the arbitrator shall be final and binding on the parties and shall not be subject to appeal on a question of fact, law, or mixed fact and law.

   (d)    All costs of the mediation and arbitration shall be borne equally by the parties to the dispute or the controversy.

   (e)    This Agreement shall be governed by the laws of United States of America.

## ASSIGNMENT

1.29    Neither party may assign its rights hereunder except with the prior written consent of the other party hereto, provided that the parties acknowledge and agree that the Licensor shall be entitled to assign its ownership and rights in any of the Trade-marks and this Agreement to a successor entity

Page **7** of **10**

established by the Licensor in the future. Upon the Licensor notifying the Licensee in writing of such assignment, the Licensee agrees that any use of the Trade-marks in accordance with this Agreement shall be done as if the assignee were the Licensor and the Licensee further agrees that the Licensor shall thereafter be free of any and all liability in relation thereto. Subject to this exception, any other assignment carried out without such consent is null and void.

**SURVIVAL**

1.30    Sections 1.03, 1.05, 1.06, 1.08, 1.09, 1.10, 1.11 and 1.12 of this Agreement shall survive the termination of the Agreement.

**MISCELLANEOUS**

1.31    This Agreement constitutes the final written expression of the terms of agreement between the parties relating to the subject matter contained herein and is the complete and truthful statement of those terms. This Agreement supersedes all prior agreements between the parties with respect to such subject matter. Neither Party shall be bound by any definition, condition, representation, warranty, covenant, term or other provision except as is expressly stated herein or as is set forth in writing and executed by the duly authorized officers of both parties.

1.32    In the event that any provision of this Agreement is rendered void, avoidable, unenforceable or otherwise ineffective by operation of law, such avoidance, avoidability, unenforceability or ineffectiveness shall not affect the enforceability of the remaining provisions of this Agreement.

1.33    Neither the failure of any Party to obtain the exact enforcement of any of the provisions hereof nor the granting of other indulgence shall constitute a waiver of such Party's right to obtain the exact enforcement thereof in the future or of such Party's right to obtain the exact enforcement of any other provisions of this Agreement.

**[Signature page follows.]**

**IN WITNESS WHEREOF, ISLAMIC RELIEF WORLDWIDE** has executed this Agreement this _____ day of__12th August_____, _2021_____, as attested to by its duly authorized signing officers.

Islamic Relief Worldwide

Per:_____
Name: Haroun Atallah
Position: Director/Trustee

Islamic Relief Worldwide

Per:_____
Name: Nurhayati Binti Hassan
Position: Director/Trustee
We have authority to bind the corporation.

**IN WITNESS WHEREOF, ISLAMIC RELIEF USA** has executed this Agreement this  26th  day of __July____, _2021_____, as attested to by its duly authorized signing officers.

Islamic Relief USA
DocuSigned by:
Per:| Hamadi Bengabsia _____
      1E80359B3A33493
Name: Hamadi Bengabsia
Position: Chair, Board of Directors

Islamic Relief USA

Sharif Aly
Per:_____
Name: Sharif Aly
Position: Chief Executive Officer
We have authority to bind the corporation.

Page **9** of **10**

Exhibit 1

| TRADE-MARKS OWNED BY ISLAMIC RELIEF WORLDWIDE |
|---|
| 1. Islamic Relief & Design:<br> |
| 2. ISLAMIC RELIEF |
| 3. ISLAMIC RELIEF USA |
| 4. ISLAMIC RELIEF WORLDWIDE |
| 5. IRW |
| 6. ISLAMIC RELIEF IS DEDICATED TO ALLEVIATING THE POVERTY AND SUFFERING OF THE WORLD'S POOREST PEOPLE. |
| 7. All translations of the Trade-marks listed above save for the translation of the Trade-mark 'ISLAMIC RELIEF' in French. |
| 8. All variations of the Trade-marks listed above containing the terms "Islamic Relief" or "IRW" |
| 9. IRUSA |