**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ISLAMIC RELIEF USA, | |
| *Plaintiff*, | Civil Action No. 1:26-cv-02367-PAE |
| *v.* | |
| ISLAMIC RELIEF WORLDWIDE, INC., | **Hearing Requested** |
| *Defendant*. | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTIONS TO COMPEL ARBITRATION OR DISMISS COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 3

    I.     The Parties ..................................................................................... 3

    II.    The Parties' Contracts...................................................................... 4

         A.     The Members' Agreement ........................................................ 4

         B.     The License Agreement ........................................................... 6

         C.     The Grant Agreements............................................................ 6

    III.   The Parties' Dispute........................................................................ 7

    IV.   IRUSA's Lawsuit........................................................................... 10

ARGUMENT.................................................................................................... 11

    I.     The Court Should Compel IRUSA to Arbitration in the United Kingdom .......... 11

         A.   The Parties Have a Valid Arbitration Agreement.................................... 12

         B.   The Parties Unambiguously Agreed to Arbitrate IRUSA's Claims ......... 14

    II.    The Court Lacks Personal Jurisdiction Over the Grant Agreement Claims ......... 17

    III.   This Court Should Dismiss for Failure to State a Claim ................................... 20

         A.   Tortious Interference................................................................ 20

         B.   New York General Business Law § 349...................................... 21

         C.   Breach of Contract ................................................................. 23

         D.   Implied Covenant of Good Faith and Fair Dealing ................................ 24

         E.   Unjust Enrichment ................................................................. 25

CONCLUSION.................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*16 Casa Duse, LLC v. Merkin*,
791 F.3d 247 (2d Cir. 2015) ........................................................................................ 20

*42-50 21st St. Realty LLC v. First Cent. Sav. Bank*,
No. 20-cv-5370, 2022 WL 1004187 (E.D.N.Y. Apr. 4, 2022) ..................................... 21

*Agency Dev., Inc. v. MedAmerica Ins. Co. of N.Y.*,
327 F. Supp. 2d 199 (W.D.N.Y. 2004) ........................................................................ 23

*Arroyo v. Mountain School*,
68 A.D.3d 603 (2009) ................................................................................................... 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................... 20

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ................................................................................................ 12, 13

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) ................................................................................................ 15, 17

*B & G Plastics, Inc. v Eastern Creative Industries, Inc.*,
269 F. Supp. 2d 450 (S.D.N.Y. 2003) .......................................................................... 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................................... 20

*Best Van Lines, Inc. v. Walker*,
490 F.3d 239 (2d Cir. 2007) ........................................................................................ 19

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
448 F.3d 573 (2d Cir. 2006) ........................................................................................ 25

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006) ...................................................................................................... 13

*Chambers v. HSBC Bank USA, N.A.*,
No. 19-cv-10436, 2020 WL 7261155 (S.D.N.Y. Dec. 10, 2020) ................................ 22

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ............................................................................. 12, 20, 23

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*,
58 F.3d 16 (2d Cir. 1995) ............................................................................. 11, 15, 16, 17

*Costoso v. Bank of Am., N.A.*,
    74 F. Supp. 3d 558 (E.D.N.Y. 2015) ................................................................. 21

*Creative Photographers, Inc. v. Grupo Televisa, S.A.B.*,
    763 F. Supp. 3d 618 (S.D.N.Y. 2025) ................................................................. 19

*Cruz v. FXDirectDealer, LLC*,
    720 F.3d 115 (2d Cir. 2013) ................................................................................. 24

*D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*,
    29 N.Y.3d 292 (2017) ........................................................................................... 18

*David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*,
    923 F.2d (2d Cir. 1991) ................................................................................. 15, 17

*Emirates Int'l Inv. Co. v. ECP Mena Growth Fund*,
    No. 11-cv-9227, 2012 WL 2198436 (S.D.N.Y. June 15, 2012) ............................. 14

*Ford v. Rensselaer Polytechnic Inst.*,
    507 F. Supp. 3d 406 (N.D.N.Y. 2020) ................................................................. 25

*Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*,
    680 F. Supp. 3d 322 (S.D.N.Y. 2023) ................................................................. 25

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) ............................................................................................. 18

*Guerrero v. GoPuff*,
    No. 24-cv-6727, 2025 WL 3539105 (S.D.N.Y. Dec. 10, 2025) ............................ 14

*Guzik v. Albright*,
    No. 16-cv-2257, 2018 WL 4386084 (S.D.N.Y. Sept. 14, 2018) ............................ 21

*Hadami, S.A. v. Xerox Corp.*,
    272 F. Supp. 3d 587 (S.D.N.Y. 2017) ................................................................. 21

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
    12 N.Y.3d 132 (2009) ........................................................................................... 25

*In re Am. Exp. Fin. Advisors Sec. Litig.*,
    672 F.3d 113 (2d Cir. 2011) ........................................................... 12, 14, 15, 17

*In re Generali COVID-19 Travel Ins. Litig.*,
    576 F. Supp. 3d 36 (S.D.N.Y. 2021) ................................................................... 25

*Laufer v. Ostrow*,
    55 N.Y.2d 305, 310 (1982) ................................................................................... 18

*Lavazza Premium Coffees Corp. v. Prime Line Distribs. Inc.*,
No. 20-cv-9993, 2021 WL 5909976  (S.D.N.Y. Dec. 10, 2021)............................................. 20

*Mayes v. Summit Ent. Corp.*,
287 F. Supp. 3d 200 (E.D.N.Y. 2018) .................................................................................. 23

*Mejia-Haffner v. Killington, Ltd.*,
119 A.D.3d 912 (N.Y. App. Div. 2014) ................................................................................ 18

*Merida Cap. Partners III LP v. Fernane*,
No. 25-cv-1235, 2025 WL 2531041 (S.D.N.Y. Sept. 3, 2025) ........................................ 11, 13

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) .................................................................................................. 12

*Mills v. Everest Reinsurance Co.*,
410 F. Supp. 2d 243 (S.D.N.Y. 2006) .................................................................................. 13

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) .................................................................................................. 12, 15, 17

*N.E. Mut. Life Ins. Co. v. Caruso*,
535 N.E.2d 270 (N.Y. 1989) ............................................................................................... 13

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) ............................................................................................... 12

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010) ............................................................................................................. 13

*Silverman v. Household Fin. Realty Corp. of N.Y.*,
979 F. Supp. 2d 313 (E.D.N.Y. 2013) .................................................................................. 23

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*,
450 F.3d 100 (2d Cir. 2006) ............................................................................................... 18

*Spagnola v. Chubb Corp.*,
574 F.3d 64 (2d Cir. 2009) ........................................................................................... 22, 23

*Spire Global Subsidiary, Inc. v. NorthStar Earth & Space, Inc.*,
768 F. Supp. 3d 546 (S.D.N.Y. 2025) .............................................................................. 11, 12

*United States ex rel. Taylor v. GMI USA Corp.*,
714 F. Supp. 3d 275 (S.D.N.Y. 2024) ......................................................................... 20, 23, 24

*Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund*,
661 F.3d 164 (2d Cir. 2011).............................................................................................. 12

iv

**Statutes**

9 U.S.C. §§ 2-4 ................................................................................................................ 11

9 U.S.C. §§ 201-08 ......................................................................................................... 11

CPLR 302(a) .............................................................................................................. 17, 18

N.Y. Gen. Bus. Law § 349 .............................................................................................. 21

**Other Authorities**

Restatement (Second) of Contracts § 178 ...................................................................... 13

**INTRODUCTION**

Plaintiff Islamic Relief USA ("IRUSA") brings this suit as part of a years-long smear campaign against Defendant Islamic Relief Worldwide ("IRW"). The parties' agreements require *confidential* arbitration. Instead, IRUSA uses this Court's docket to file a publicity stunt directed to Congress and the media, attempting to extract a renegotiation of IRUSA's agreements with IRW. IRW is an internationally respected, U.K.-based charitable organization undertaking critical, life-saving work in underserved communities around the world. IRUSA publicly regurgitates baseless allegations from a long-running misinformation campaign IRW has repeatedly refuted (with prior support from IRUSA). Because IRUSA cannot overcome its arbitration agreements, or the defects in its complaint, all its claims should be compelled to arbitration or, alternatively, dismissed.

In binding contracts, IRUSA agreed to bring these and other claims in confidential arbitration in the U.K. The Members' Agreement IRUSA entered with IRW, which set the framework for the parties' entire relationship, provides that any "dispute or difference between the Parties arising out of *or related* to this Agreement . . . shall be determined by arbitration." ECF 1-1 at 11, § 8.2 (emphasis added). That broad clause encompasses all IRUSA's claims. Some claims explicitly arise from the Members' Agreement or the parties' License Agreement, which also requires arbitration. And all claims *relate* to the Members' Agreement, which sets forth the basis on which the parties would "continue carrying out their collaborative Charitable Activities." *Id.* at 2.

IRUSA acknowledges its obligation to arbitrate but urges the Court to treat it as "void against public policy." Compl. ¶ 99. That argument is meritless. Well-established public policy favors arbitration. And IRUSA has not identified any defect that could "void" its agreements. It bases its argument on IRW's alleged conduct. But conduct can breach a contract. It does not void contract provisions the plaintiff dislikes. If threadbare allegations of fraud voided arbitration clauses, such clauses would become meaningless and unenforceable.

IRUSA's agreement to arbitrate is only the beginning of its problems. None of IRUSA's claims can survive dismissal. This Court lacks personal jurisdiction over IRUSA's claims relating to funds it donated to international projects, which have no connection to New York. IRUSA has also failed to allege breach of the Members' and License Agreements. IRUSA admits that it suspended the Members' Agreement *before* IRW engaged in the alleged conduct that supposedly breached that Agreement. And this Court can consider the plain terms of the parties' License Agreement, which provided that IRW owned and could continue using all trademarks associated with Islamic Relief. Finally, IRUSA's remaining claims are simply duplicative of its contract claims, arising from the same allegations and causing the same purported harm. New York law does not permit plaintiffs to repackage deficient contract claims as separate causes of actions.

The weakness of IRUSA's arguments against arbitration—and its claims more broadly— lay bare its motivation for filing this suit. IRUSA faces pressure from U.S. House of Representatives Ways and Means Committee (the "Committee") to disassociate from IRW. Compl. ¶¶ 36- 37. IRUSA thus seeks to publicly distance itself from IRW, something confidential arbitration would not permit. The gambit appears to have worked. On March 30, 2026, the Committee claimed credit for provoking this lawsuit.[1] But IRUSA also knows that IRW owns all trademarks associated with Islamic Relief, including IRUSA's own name. ECF 1-2. IRUSA thus seeks to create leverage for renegotiating its entire relationship to IRW. It insinuates that IRW has violated U.S. sanctions—even while itself admitting "there was no violation of U.S. law," Compl. ¶ 59— in an effort to wrest the mantle of Islamic Relief for itself. This Court should stop further misuse of its docket and compel this case to arbitration or dismiss it entirely.

---

[1] *Ways & Means Investigation Leads to Tax-Exempt Org. Cutting Ties with Terrorist-Affiliated Grp.*, U.S. House Comm. on Ways & Means (Mar. 30, 2026), https://perma.cc/E4BL-65T7.

**BACKGROUND**

### I.    The Parties

IRW was founded in the U.K. in 1984 as a charity to address the needs of vulnerable communities worldwide.  ECF 1-1 at 2.  As a practical manifestation of the humanitarian values inspired and guided by the Islamic faith, IRW seeks to alleviate human suffering and provide relief from poverty or financial hardship by providing humanitarian assistance, raising awareness, advocating for those in need, advancing conflict resolution, and promoting religious and human harmony.  IRW is the sole owner of all trademarks associated with "Islamic Relief," including "Islamic Relief USA."  ECF 1-2 at 3 § 1.01, 10.[2]

IRW has established and helped organize affiliates around the world that operate in different nations under the "Islamic Relief" brand and in support of IRW's charitable goals.  ECF 1-1 at 3-4.  In 1993, IRW members founded IRUSA in the U.S. to provide humanitarian aid in cooperation with IRW and IRW's other international affiliates.  *Id.* at 2; Compl. ¶ 10.  Between 1993 and 2025, IRW and IRUSA worked together to alleviate poverty and suffering.  *Id.*

IRW has a stellar reputation in the international community.[3]  To meet its partnership obligations to organizations such as the United Nations and key government donors, IRW has complied with rigorous audit requirements.  IRW is subject to annual statutory audits, the results of which are publicly available on a website administered by the Charity Commission of England &

---

[2] *See also*, ISLAMIC RELIEF, Registration Nos. 3,394,966; 3,302,265; 341,463; 3,302,270; 3,414,634; 3,394,967; 3,394,964; 3,492,705; 3,492,708; 3,492,706; 3,492,707; 3,492,703; 3,302,215; 3,492,704; 3,501,880; ISLAMIC RELIEF USA, Registration Nos. 3,882,395; 3,849,715; 3,849,712; 3,849,714; 3,999,005; 3,849,711; 3,849,713; 3,849,716; IRUSA, Registration Nos. 6,953,963; 6,953,977; 6,953,965; 6,953,966; 6,953,976; 6,953,978; 6,953,970; 6,953,971; 6,953,968; 6,953,975; 6,953,980.

[3] *See About Us*, Islamic Relief Worldwide, https://perma.cc/TSL3-KVB7 (describing IRW's adherence to the Red Cross Code of Conduct, the Core Humanitarian Standard on Quality and Accountability, and the INGO Accountability Charter).

Wales.[4]  Its partnerships with well-respected international institutions and governments require rigorous audits as well.  Those rigorous examinations of IRW have never found any evidence that IRW funds terrorism, has any connection to terrorism, or has failed to implement systems and processes required to prevent or respond to such allegations.  Any contrary allegations, such as the Israeli and UAE designations IRUSA alleges, Compl. ¶ 19, have since been thoroughly discredited.[5]  And IRUSA omits to reference that Israel's designation applied equally to IRUSA.

## II.    The Parties' Contracts

IRW and IRUSA have entered several contracts to formalize and structure their relationship and collaboration, all of which were negotiated by sophisticated parties with the benefit of independent legal advice.  The relevant contracts are as follows:

### A.  The Members' Agreement

In late 2019, IRW and IRUSA entered a Members' Agreement to implement an agreed upon international federation structure and carry out "their collaborative Charitable Activities on an international basis."  ECF 1-1 at 2.  Under the Members' Agreement, IRW is the overarching

---

[4] These audits by a leading, independent global audit firm ensure that IRW's work and activities are transparent to its U.K. regulator and open to public scrutiny.  The U.K. Charity Commission website shows five years of audited accounts, *see Islamic Relief Worldwide - 328158*, Charity Commission for England and Wales, https://perma.cc/9K97-A6A8, and the UK Companies House website has IRW's entire history, including its audited financial accounts from when it first registered in 1989, as well as complete details of all its directors, *see Islamic Relief Worldwide*, Gov't of the United Kingdom, https://perma.cc/A96Q-XQM6.

[5] *See* David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, The New Yorker (Mar. 27, 2023), https://perma.cc/ZK8A-B3L6 ("[N]obody has ever credibly identified any institutional ties between the charity and an Islamist movement.  In fact, Islamic Relief typically works in partnership with the U.N., U.S.A.I.D., and European governments."); Gerald T. FitzGerald, *Mapping Anti-Muslim Discrimination and Information Manipulation, and its Impact on Humanitarian Aid and Development*, George Mason Univ. 53-58 (Feb. 2024) (explaining the long-running and false attacks against IRW); Charlotte Tobitt, *GB News pays substantial damages to Islamic Relief over false terrorism claim*, Press Gazette (Dec. 3, 2025), https://perma.cc/6HDG-XT6J.

organization and shall be "responsible for coordinating the representation of IR globally at international conferences and forums." *Id.* at 7, § 5.2.5. It would "set a global strategy for Islamic Relief in collaboration and consultation with IR USA and all the other Members of IRW." *Id.* at 5, § 3.2. IRUSA would have, and continues to have, representation in the governance structure. *Id.* at 8-9. The parties agreed that "IR will have one presence/operation only in any national jurisdiction." *Id.* at 5, § 3.4. For the U.S., that presence would be IRUSA. *Id.* IRUSA agreed that it would spend most of its total annual income on charitable programs. *Id.* at 3 (defining "Financial Standards"). IRUSA could use "up to 30%" of its income on programs within the U.S. *Id.* Programs that IRUSA invested in outside the U.S.—up to 70% of its income—needed "to be delivered through IRW or another intermediary." *Id.* at 5-6, § 3.5. IRW agreed to ensure that programs "throughout Islamic Relief operations worldwide" operate "in a manner consistent with Applicable Laws," *id.* at 7, § 5.2.2, a term defined to include "all laws" that "apply to IRW or IR USA," *id.* at 3. And both parties agreed that they would comply with specified "Financial Standards," *id.* 7-8, §§ 5.2-3, which included an obligation to be "audited yearly," *id.* at 3.

The Members' Agreement set forth a process for resolving "[a]ny dispute or difference between the Parties arising out of or related to this Agreement." *Id.* at 10-11, § 8.1. First, the CEOs of IRW and IRUSA would confer. *Id.* If that process did not resolve the dispute, the parties agreed to refer the dispute to their respective Boards of Trustees, which would each designate representatives to mediate the issue. *Id.* If the trustees could not reach a resolution, then the International General Assembly would appoint a panel of independent mediators to attempt to do so. *Id.* at 11, § 8.2. If that process did not resolve the issue within 60 days, or if "either Party fails to participate . . . in the mediation," the dispute "shall be determined by arbitration administered by the International Centre for Dispute Resolution in accordance with its International Arbitration

Rules." *Id.* The place of arbitration would be "Birmingham, England," and the Agreement would be governed by English law. *Id.* The parties further agreed that the dispute resolution clause "shall survive the termination of the Agreement." *Id.* at 12, § 12.1.

### B. The License Agreement

In 2021, the parties entered an updated License Agreement concerning IRW's trademarks, which extended a license first granted in 2010. ECF 1-2. They agreed that IRW is the "sole owner" of all trademarks associated with Islamic Relief, including the trade name "Islamic Relief USA." *Id.* at 3, § 1.01, 10. IRUSA acknowledged IRW's "exclusive right," that "all goodwill in the Trade-marks" would inure to IRW's benefit, and that IRUSA "has no right, title, interest or goodwill in the Trade-marks." *Id.* at 3, §§ 1.05-06. Subject to IRW's "right to use, advertise or display the Trade-marks" that it owned, IRW granted to IRUSA "an *otherwise* exclusive, non-transferable and non-assignable license" to "use, advertise or display the Trade-marks in the geographical territory of USA." *Id.* at 3, § 1.07 (emphasis added).

The License Agreement continued until December 19, 2025, ECF 1-2 at 2, although it would automatically end upon termination of the Members' Agreement, *id.* at 6, § 1.25(a). It also contained a dispute resolution provision that was substantially similar to the Members' Agreement's, except that arbitration would occur before the London Court of International Arbitration Rules and the Agreement would be governed by U.S. law. *Id.* at 7, §§ 1.27-28.

### C. The Grant Agreements

Operating within the framework created by the Members' Agreement, IRW and IRUSA entered a series of Grant Agreements in which IRUSA funded IRW projects. *E.g.*, ECF 1-3. Each Grant Agreement specifies a "Grant Amount," a project for which the grant will be used, and a period during which the project will occur. *Id.* at 1. The Grant Agreements relate to the Members'

Agreement.  Each Grant Agreement covers one of the charitable programs the Members' Agreement envisioned.  ECF. No. 1-1 at 3, § 5.3.  Like the Members' Agreement, the Grant Agreements require IRW to "comply with all applicable laws" and to submit to audits concerning its use of funds.  *Compare* ECF 1-3 at 6, 8, §§ X & XII, *with* ECF 1-1 at 3, § 5.2.2, 7.  The Grant Agreements have a dispute resolution provision that requires negotiations by IRW's and IRUSA's CEOs and Boards but does not specify what happens if those efforts do not produce a settlement.  ECF 1-3 at 10, § XIX.

### III.    The Parties' Dispute

IRUSA alleges that the Ways and Means Committee asked the IRS to investigate whether it should revoke IRUSA's tax-exempt status based on its relationship with IRW, first in September 2024 and again in October 2025.  Compl. ¶¶ 36, 42.  IRUSA admits that the Committee's concern was unfounded, because "there was no violation of U.S. Law that occurred that required a report to OFAC or another U.S. enforcement agency."  Compl. ¶ 59.  Despite this, on October 18, 2024, IRUSA sent notices to IRW "to exercis[e] its right to commence good faith negotiations to review and amend" its License Agreement and Members' Agreement with IRW.  *See* Exs. A&B.  In response, the IRUSA and IRW Boards actively communicated with one another, meeting in October 2024, February, August, September, and December 2025, and January 2026.  Exs. C, D, E, N, U.

On July 10, 2025, IRW received a letter from IRUSA alleging that IRW exported goods from Iran, accusing IRW of procurement fraud, and suspending specific Grant Agreements relating to earthquake recovery and healthcare education projects implemented in Afghanistan.  Ex. F.  IRUSA's letter acknowledged, however, that "these [alleged] multiple breaches did not result in violations of relevant sanctions laws."  *Id*.  The letter requested that IRW return to IRUSA any funds spent on goods supposedly exported from Iran, as well as any unspent balance on the projects.  *Id*.  It did not request an audit but noted "IRUSA's hope" that IRW would conduct one.  *Id*.

7

at 3; *contra* Compl. ¶ 57.  IRW followed up the next day to request *any* information about the allegations, and assured IRUSA that it would "look into the matter immediately to assess a possible return of funds as well as ensuring IRW complies with its legal obligations including reporting requirements."  Ex. G.  IRUSA responded briefly, noting that its concerns focused on sewing machines that were allegedly "purchased and exported from sources in Iran."  Ex. H.

Over the next three months, IRW and IRUSA exchanged several letters.  On September 19, two months after terminating the Grant Agreements, IRUSA requested to exercise its audit rights.  Ex. J.  It reached out directly to IRW's staff in Afghanistan to begin the audit process.  Ex. P.  IRW responded, on October 30, requesting further information about the audit process before it could instruct its staff to comply.  *Id.*  IRW and IRUSA simultaneously negotiated the outstanding amounts owed by each party to the other under respective Grant Agreements.  Ex. K.  After receiving a memorandum in early September from IRUSA regarding outstanding balances, IRW responded with offsetting amounts owed by IRUSA and proposed terms for payment.  *Id.*  IRUSA ignored these communications.  Ex. S.

In response to IRUSA's concerns regarding the sewing machines, IRW investigated and determined that the sewing machines—purchased from an Afghanistan-based supplier—were of "Chinese origin," as IRUSA subsequently acknowledged.  Ex. I.  The entire issue arose because the machines may have mistakenly been "transshipped through Iran to Afghanistan" by the supplier.  *Id.*  IRW had no knowledge of that transshipment and subsequently refused delivery.  Ex. M.  It offered to refund IRUSA and to provide a joint notification to OFAC, should IRUSA believe it is necessary.  *Id.*  IRUSA declined both offers.  It sent an additional letter, requesting to engage in the dispute resolution process outlined in the Grant Agreements.  Ex. L.  Although it again

8

acknowledged that there was no "violation of sanctions laws," it contended that IRW had "subjected IRUSA to unacceptable reputational and legal risk." *Id.* IRW responded to those allegations, notified IRUSA that it had breached the License and Members' Agreements by operating outside the U.S., and requested further dialogue. Ex. N.

On October 12, IRUSA issued a letter suspending the Members' Agreement under Section 6.5 due to the Committee's ongoing investigation of its ties to IRW. Ex. O. Section 6.5, the clause of the Members' Agreement that IRUSA invoked, provides for immediate suspension of the Agreement in its entirety, not individual programs. ECF 1-1 at 9, § 6.5. Suspension of the Members' Agreement suspended IRW's commitment that "IR will have one presence/operation only" in the U.S., which unlike the dispute resolution clause, did not survive termination. *Id.* at 5, § 3.4, 12, § 12.1. It further suspended IRUSA's right to use any trademarks associated with Islamic Relief, which was always "[s]ubject to [IRW's] right to use, advertise, or display the Trademarks." ECF 1-2 at 3, § 1.07, 6, § 1.25(a).

Over the next two months, IRW and IRUSA continued negotiating over outstanding financial commitments, membership, and audits. On December 4, 2025, IRUSA abruptly terminated its participation in an orphan sponsorship program administered by IRW. Compl. ¶ 70. IRUSA complains that IRW did not "work[] with IRUSA to transfer the orphan sponsorships . . . to another entity" and instead created the impression that "IRUSA was taking the action to cancel all of the orphan sponsorships." *Id.* ¶ 73.[6] But any such impression was truthful, because IRUSA admits that it terminated its participation in the entire sponsorship program and, furthermore, had not made required contributions since the "second quarter of 2025," six months earlier. *Id.* ¶ 69.

---

[6] IRUSA's allegations regarding the Orphan Sponsorship Program misrepresent the underlying events. *See* Ex. W. Regardless, as these allegations are not relevant to *any* of IRUSA's claims, IRW does not respond to them in detail here.

Later in December, IRUSA issued letters requesting dispute resolution and stating that it intended to terminate all contractual relationships with IRW. Exs. Q&R. It requested return of at least $3.6 million for completed projects, a number that does not include the two Grant Agreements IRUSA claims IRW breached. *Id.*; Compl. ¶ 48. IRW reiterated that IRUSA still owed offsetting amounts and stated that it remained open to constructive negotiation based on agreed-upon terms. Ex. S. Counsel for IRUSA and IRW continued to correspond through January and February 2026, addressing payment of outstanding monies owed by both parties, as well as IRUSA's allegations that IRW impersonated an IRUSA employee (by using an administrator account in a system owned by IRW), which IRW refuted in detail. Exs. T, U, V, W.

## IV.     IRUSA's Lawsuit

IRUSA initiated this lawsuit on March 23, 2026. IRUSA's complaint rehashes the disputes described above and further alleges that in November 2025, one month after IRUSA suspended the Members' Agreement, Meta and Google began to show online advertisements for IRW in the U.S. *Id*. ¶¶ 87-88. In December 2025, a New York resident purportedly searched for "Islamic Relief," a trademark IRW owns, and donated about $10,000 to IRW. *Id.* ¶¶ 90-91. IRUSA does not explain why IRW's use of its own trademark could be misleading, particularly when IRUSA agreed that any goodwill created by IRUSA's use of the trademark would inure to IRW's benefit.

Based on the allegations in its complaint, IRUSA asserts eleven claims. First, it contends that IRW's solicitation of donors in the U.S., under the "Islamic Relief" trademark that IRW exclusively owns, (1) tortiously interfered with IRUSA's prospective business advantage with those donors (Claim I), (2) constituted deceptive marketing under N.Y. Gen. Bus. Law § 349 (Claim II), (3) breached the License Agreement and Members' Agreement (Claims III & V), (4) breached the implied covenant of good faith and fair dealing (Claims IV & VI), and (5) unjustly enriched IRW (Claim XI). Second, even though IRUSA admits that IRW did not violate U.S. law, Compl. ¶ 59,

and that IRUSA terminated the Grant Agreements relating to health education and earthquake recovery in July 2025, *id.* ¶ 60, it asserts that IRW breached those two Grant Agreements and the implied covenant of good faith and fair dealing by "failing to comply with applicable laws," "refusing to cooperate with" audits requests, and "failing to return any unused funds" (Counts VII through X), *e.g. id.* ¶ 149.

## ARGUMENT

### I.    The Court Should Compel IRUSA to Arbitration in the United Kingdom

IRUSA and IRW agreed that "all disputes arising under or related to" the Members' Agreement "shall be determined by arbitration" in "Birmingham, England."  ECF 1-1 at 10-11, §§ 8.1-2.  That is the "paradigm of a broad clause."  *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995).  It covers every claim in this lawsuit.  Plaintiff's counterarguments—that the arbitration clause violates public policy and that IRW cannot enforce it—contradict well-established precedent.  Under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 2-4, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201-08 ("New York Convention"), this Court should order the parties to arbitration in the U.K.  *See Spire Global Subsidiary, Inc. v. NorthStar Earth & Space, Inc.*, 768 F. Supp. 3d 546, 554 (S.D.N.Y. 2025) (applying New York Convention).[7]

The standard for deciding a motion to compel arbitration is well-established.  The FAA states that contractual arbitration provisions "shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2; *see id.* § 202 (incorporating § 2).  That provision reflects a "'liberal federal policy

---

[7] Some courts in this District have held that § 4 of the FAA "authorizes courts to compel arbitration only within their own districts."  *Merida Cap. Partners III LP v. Fernane*, No. 25-cv-1235, 2025 WL 2531041, at *4 (S.D.N.Y. Sept. 3, 2025).  That reasoning does not apply to IRW's motion, because the New York Convention explicitly permits the Court to compel international arbitration of agreements between U.S. and foreign citizens.  9 U.S.C. § 206; *see id.* § 202.

favoring arbitration,'" which "displace[s]" any "conflicting rule" of state law. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). This broad policy extends to commercial agreements requiring arbitration abroad. *Spire*, 768 F. Supp. 3d at 554. Because the FAA compels arbitration whenever parties have agreed to it, courts apply a "two-part test," asking "(1) whether the parties have entered into a valid agreement to arbitrate," and "(2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).

The evidentiary standard on a motion to compel arbitration is " 'similar to that applicable for a motion for summary judgment.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). The Court considers "'all relevant, admissible evidence submitted by the parties'" and "draws all reasonable inferences in favor of the non-moving party." *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law," courts "rule on the basis of that legal issue and 'avoid the need for further court proceedings.'" *Id.* (quoting *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund*, 661 F.3d 164, 172 (2d Cir. 2011)).

### A.  The Parties Have a Valid Arbitration Agreement

IRUSA and IRW "have entered into a valid agreement to arbitrate." *In re Am. Exp.*, 672 F.3d at 128. There is no dispute that IRUSA and IRW entered the Members' Agreement and the License Agreement. The complaint alleges the parties entered into those agreements, Compl. ¶¶ 21-23, attaches them as exhibits, *see* ECF 1-1 and 1-2, and seeks to enforce their provisions against IRW, *id.* ¶¶ 116-35. It even acknowledges that the agreements "contain clauses that favor arbitration when dispute resolution has not resulted in an agreed-upon result." *Id.* ¶ 99.

12

IRUSA argues that the arbitration clauses "should be found to be void against public policy and nullified," apparently because IRW allegedly sought donations in New York without registering as a charity and supposedly created a misimpression that IRUSA terminated funding for orphans. Compl. ¶¶ 99-102. That is wrong several times over. First, the Supreme Court's repeated recognition of a "'federal policy favoring arbitration'" forecloses any argument that the arbitration clauses in the Members' and License Agreements are void on public policy grounds. *Concepcion*, 563 U.S. at 339 (quoting *Moses H. Cone*, 460 U.S. at 24). Second, IRUSA cannot challenge the "validity" of the contracts themselves, because any such challenge must be "considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444-46 (2006); *accord Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). The Members' Agreement reinforces the point. The parties selected the "domestic law of the seat of arbitration," *i.e.*, the U.K. ECF 1-1 at 11, § 8.4. It would make little sense to have a New York court decide the Members' Agreement's validity under U.K. law.

IRUSA also misunderstands the validity analysis. Even assuming New York law applied, courts "will enforce . . . agreements" unless their "*promises*" are contrary to a state's "Constitution, statutes or decisions of the courts." *N.E. Mut. Life Ins. Co. v. Caruso*, 535 N.E.2d 270, 274 (N.Y. 1989) (emphasis added); *Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 253 (S.D.N.Y. 2006); *see* Restatement (Second) of Contracts § 178. IRUSA identifies no contractual "promise" that contradicts any law. Its allegations focus on IRW's supposed conduct. But conduct can breach a contract; it does not render the contract void. Fraud is indisputably "against United States law and public policy." Compl. ¶ 100. But claims of fraud are still subject to arbitration unless the "challenge [is] directed specifically to the agreement to arbitrate," rather than the contract as a whole. *Rent-A-Ctr.*, 561 U.S. at 71; *accord Merida Cap.*, 2025 WL 2531041 at *4. There is no

allegation nor any basis in fact to suggest that the contracts (or their arbitration clauses) were procured by fraud. Finally, IRUSA's argument contradicts its own claims. IRUSA cannot seek to enforce the Members' and License Agreements, *see* Compl. ¶¶ 116-35, while also arguing those Agreements are "void," *id.* ¶ 99. A "void" contract " 'never came into legal existence,' " *Guerrero v. GoPuff*, No. 24-cv-6727, 2025 WL 3539105, at *11 (S.D.N.Y. Dec. 10, 2025), and is unenforceable for any purpose.

IRUSA next contends that enforcement of the arbitration clause would leave it with "no realistic remedies." Compl. ¶ 104. But an "arbitral tribunal" can "plainly" provide an "adequate remedy," should IRUSA prove any entitlement. *Emirates Int'l Inv. Co. v. ECP Mena Growth Fund*, No. 11-cv-9227, 2012 WL 2198436, at *5 (S.D.N.Y. June 15, 2012); *see also* Int'l Ctr. for Disp. Resol., *Int'l Disp. Resol. Proc.*, Int'l Arb. Rules art. 27 & 34 (Mar. 1, 2021) (addressing availability of injunctive and monetary relief). Having explicitly agreed to a specific arbitral forum, IRUSA cannot turn around and deny that that forum provides acceptable remedies. Nor can IRUSA complain that "IRW has flatly refused to engage" in dispute resolution. Compl. ¶ 106. The Members' Agreement specified what should happen if "either Party fails to participate . . . in mediation." ECF 1-1 at 11, § 8.2.2. In that scenario, the parties agreed the dispute "shall be determined by arbitration." *Id.*

### B. The Parties Unambiguously Agreed to Arbitrate IRUSA's Claims

Each of IRUSA's claims falls "within the scope of the arbitration agreement." *In re Am. Exp.*, 672 F.3d at 128. The Members' and License Agreements provide that "[a]ny dispute or difference between the Parties arising out of or related to this Agreement shall," if not resolved by informal negotiations or mediation, "be determined by arbitration" in "Birmingham, England." ECF 1-1 at 10-11, §§ 8.1-2; ECF 1-2 at 7, §§ 1.27-28. A clause "submitting to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad

clause." *Collins*, 58 F.3d at 20. And the federal policy favoring arbitration requires that courts "construe arbitration clauses as broadly as possible." *In re Am. Exp.*, 672 F.3d at 128 (quoting *Collins*, 58 F.3d at 19). Any "'doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Id.* (quoting *Moses H. Cone*, 460 U.S. at 24-25). Courts compel arbitration unless the "'arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Id.* (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).

Second Circuit precedent requires arbitration of claims that "relate to" a contract with the broad arbitration clause at issue, even if those claims arise under a separate contract that has no arbitration clause. In *Collins*, the parties entered "1977 Contracts" establishing that one would act as the other's "sales representative," and a separate "confidentiality agreement" in 1988. 58 F.3d at 18. The plaintiff alleged that the sales representative engaged in fraud in connection with the 1988 agreement to misappropriate proprietary information. *Id.* at 19. Even though those claims arose "under the 1988 Agreement, which ha[d] no arbitration clause," the Second Circuit compelled arbitration because the "claims (no matter how they are labeled) allege conduct that violated the 1977 Contracts," which had an arbitration clause. *Id.* at 21. The Court reached a similar result in *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245 (2d Cir. 1991). There, the parties entered "forward contracts" to exchange a "particular commodity on a specified date at a predetermined price," as well as a "collateral agreement" under which one party valued the forward contracts for the other. *Id.* at 246-48. The collateral agreement did not contain an arbitration clause. *Id.* at 251. But the Second Circuit still compelled arbitration of claims under that agreement because they related to the "forward contracts" that were the "genesis of the parties' relationship," and which the collateral agreement sought to value. *Id.* at 251.

15

Each of IRUSA's claims arises out of or *relates to* the Members' and License Agreements under the approach set forth in *Collins* and *Threlkeld*.  Claims III through VI allege that IRW breached the Members' and License Agreements, and the duty of good faith implied in those Agreements, by "seeking to raise funds (illegally) in the United States."  Compl. ¶¶ 119, 123, 129, 133.  Those claims explicitly arise under the Members' and License Agreements and fall within their arbitration clauses.  Claims I, II, and XI allege that IRW interfered with IRUSA's prospective business advantage, violated N.Y. Gen. Bus. Law § 349, and was unjustly enriched by "(illegally) soliciting donations" in the U.S.  *Id.* ¶¶ 109, 112 ("IRW's illegal solicitation of funds in the State of New York and in the United States is likely to cause and is causing confusion"), 157 ("IRW has been unjustly enriched by its acceptance of donations intended for IRUSA.").  Those claims "allege conduct that violated" the Members' and License Agreements and thus "relate to" those Agreements "no matter how [the claims] are labeled."  *Collins*, 58 F.3d at 21.  Indeed, IRUSA specifically alleges that the same conduct that gives rise to Counts I, II, and XI, "(illegally) soliciting donations in the United States," Compl. ¶¶ 109, 112, 157, violates the Members' and License Agreements, *id.* ¶¶ 119 ("seeking to raise funds (illegally) in the United States"), 123, 129, 133.

Similar analysis shows that Claims VII through X "relate to" the Members' Agreement. Those claims allege that IRW violated the Grant Agreements, or the duty of good faith implied in those Agreements, by "failing to comply with applicable U.S. laws" and "refusing to cooperate with IRUSA's audit request."  *Id*. ¶¶ 139, 143, 149, 153.  But the Members' Agreement also required IRW to conduct its charitable activities "in a manner consistent with Applicable Laws," including U.S. law.  ECF 1-1 at 7, § 5.2.2.  The Agreement even demanded IRW's "compliance" with "Financial Standards," a term defined to require that "all accounts" be "audited yearly by a professional and recognized independent body."  *Id.*; *see also id.* at 3.  The same alleged conduct

16

that IRUSA contends breached the Grant Agreements would also breach the Members' Agreement.  Claims VII-X thus "relate to" the Members' Agreement, "no matter how they are labeled." *Collins*, 58 F.3d at 21.  That relation is not surprising.  The Members' Agreement set the terms on which IRW and IRUSA would "continue carrying their collaborative Charitable Activities on an international basis."  ECF 1-1 at 2.  It was thus the "genesis of the parties' relationship" and set the framework for the Grant Agreements that followed.  *Threlkeld*, 923 F.2d at 251-52.

Even if there were a doubt about whether IRUSA agreed to arbitrate the claims it asserts, that doubt "'should be resolved in favor of arbitration.'"  *In re Am. Exp.*, 672 F.3d at 128 (quoting *Moses H. Cone*, 460 U.S. at 24-25).  It cannot " 'be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers'" disputes about the parties' joint charitable activities, their financial conduct, or the territories where they may raise funds, all of which the Members' Agreement explicitly addresses.  *Id.* (quoting *AT&T*, 475 U.S. at 650).  Accordingly, this Court should compel the parties to arbitration in the U.K.

## II.    The Court Lacks Personal Jurisdiction Over the Grant Agreement Claims

Even if the claims arising from the Grant Agreements (Claims VII-X) could proceed in *some* court given those Agreements' lack of a mandatory arbitration clause, *this* Court would still have to dismiss those claims for lack of personal jurisdiction over IRW.  The Grant Agreement claims concern donations by a "citizen of Virginia and California" to a "citizen of the United Kingdom" for use abroad.  Compl. ¶ 12.  They have no connection at all to New York.

IRUSA attempts to invoke New York's long-arm statute, CPLR 302(a)(1) and (a)(3), alleging that IRW transacted business and committed torts when "soliciting donations from individuals in the State."  Compl. ¶¶ 13-15.  Under CLPR 302(a)(1), "two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450

17

F.3d 100, 103 (2d Cir. 2006).  Similarly, CPLR 302(a)(3) permits jurisdiction only if the entity has committed a tort that affects residents of New York *and* "regularly does or solicits business, or engages in any other persistent course of conduct" in New York or "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  *Id.*[8]

IRUSA cannot show jurisdiction under CPLR 302(a)(1) or (3) because no part of the Grant Agreements was transacted in New York.  On their face, the Grant Agreements are transactions between parties in Virginia and the U.K. to provide services internationally.  ECF 1-3; ECF 1-4.  Transacting business must occur on a business's "*own* initiative," where "the non-domiciliary projects [itself] into [New York] state to engage in a sustained and substantial transaction of business.'"  *D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 298 (2017).  "Mere solicitation of business within New York will not subject a defendant to New York's jurisdiction."  *Mejia-Haffner v. Killington, Ltd.*, 119 A.D.3d 912, 913 (N.Y. App. Div. 2014).  Rather, a plaintiff must show "solicitation plus," which is a showing of "'activities of substance in addition to solicitation.'"  *Arroyo v. Mountain School*, 68 A.D.3d 603, 604 (2009) (quoting *Laufer v. Ostrow*, 55 N.Y.2d 305, 310 (1982)).  IRUSA does not even *allege* that any part of the Grant Agreements occurred in New York.  Its sole basis for personal jurisdiction, alleged solicitation in New York, concerns its claims under the Members' and License Agreements.  Compl. ¶¶ 13-15, 83-85, 87-88, 90-91.  Because IRUSA has failed to show that any part of the Grant Agreements was transacted in New York under CPLR 302(a)(1), it has necessarily also failed to show a "persistent course of conduct" in New York under CPLR 302(a)(3).  *Sole Resort*,

---

[8] IRUSA does not allege that IRW is within New York's general jurisdiction.  Nor could it, as IRW is based in the U.K., and IRUSA has not alleged "continuous and systematic" ties to New York.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

450 F.3d at 103.

Next, even if IRW had transacted business in New York, IRUSA does not establish that its Grant Agreement claims "arise from" such transactions. "'[A] suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York.'" *See Creative Photographers, Inc. v. Grupo Televisa, S.A.B.*, 763 F. Supp. 3d 618, 631 (S.D.N.Y. 2025) (*quoting Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007)). To avoid arbitration of its Grant Agreement claims, IRUSA must argue that those claims do not "relate to" the Members' Agreement. But any such argument would demonstrate a lack of personal jurisdiction on those claims. The only connection IRUSA alleges to New York is IRW's alleged solicitation of donations, Compl. ¶¶ 13-15, which IRUSA alleges breached the Members' Agreement, *id.* ¶ 129. IRUSA cannot simultaneously argue that the Grant Agreement claims do not "relate to" the Members' Agreement for purposes of arbitration, and that they have a "substantial relationship" to the solicitation that supposedly breached the Members' Agreement for purposes of determining personal jurisdiction over IRW. The contradiction is plain. The Court should thus dismiss these four claims for lack of specific jurisdiction if it declines to compel them to arbitration.

Dismissal of these four counts for lack of personal jurisdiction would have the further consequence of stripping this Court of diversity jurisdiction. IRUSA alleges that IRW holds $6 million in funds under the Grant Agreements. Compl. ¶ 52. Without that allegation, the only damages that remain "in controversy" under 28 U.S.C. § 1332(a) are IRW's alleged U.S. solicitations. But IRUSA alleges, on information and belief, that IRW's "annual gross contributions from New York residents," which began in November 2025, "exceed $25,000." Compl. ¶¶ 81, 87. That meager amount does not satisfy the threshold required for diversity jurisdiction. 28 U.S.C. § 1332(a).

19

### III.    This Court Should Dismiss for Failure to State a Claim

If this Court declines to compel arbitration, it should dismiss most of IRUSA's claims for failure to state a claim under Rule 12(b)(6).  "[A] complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When deciding a motion to dismiss, a court may consider the complaint, documents it attaches, documents "incorporated in it by reference," and documents on which the complaint "relies heavily," such that they become "integral" to it.  *Chambers*, 282 F.3d at 153 (quotation marks omitted).  If "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control[s], and the court need not accept the allegations in the complaint as true."  *United States ex rel. Taylor v. GMI USA Corp.*, 714 F. Supp. 3d 275, 285-86 (S.D.N.Y. 2024).

### A.  Tortious Interference

IRUSA's tortious interference claim (Claim I) is duplicative of its breach of contract claims.  "As a general rule, tortious interference claims that are duplicative of contract claims are precluded."  *Lavazza Premium Coffees Corp. v. Prime Line Distribs. Inc.*, No. 20-cv-9993, 2021 WL 5909976, at *15 (S.D.N.Y. Dec. 10, 2021).  To plead tortious interference, IRUSA must demonstrate "a duty that springs from circumstances extraneous to and not constituting elements of the parties' contract." *Id.* (cleaned up).  It does not do so.  IRUSA's claim arises out of IRW's purported solicitation of donations in New York and use of IRW's trademarks.  Compl. ¶¶ 108-09.  But those duties arise from the Members' and License Agreements, as IRUSA's allegations make clear.  *See id.* at ¶¶ 119; 129.  The tortious interference claim is thus duplicative.

Moreover, IRUSA has failed to state a claim of tortious interference, which requires that IRW "acted for a wrongful purpose or used dishonest, unfair, or improper means." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015).  "[C]laims for tortious interference with business

20

relations face a higher burden than . . . claim[s] of interference with an existing contract, as a plaintiff must show 'more culpable conduct on the part of the defendant.'" *Guzik v. Albright*, No. 16-cv-2257, 2018 WL 4386084, at \*5 (S.D.N.Y. Sept. 14, 2018) (quoting *Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 602 (S.D.N.Y. 2017) (citation omitted)). IRUSA must show "that the action complained of was motivated solely by malice or to inflict injury by unlawful means rather than by self-interest or other economic considerations." *B & G Plastics, Inc. v Eastern Creative Industries, Inc.*, 269 F. Supp. 2d 450, 468 (S.D.N.Y. 2003) (quotation marks omitted). IRUSA cannot do so. IRUSA alleges that it suspended the Members' Agreement, Compl. ¶ 43; Ex. O, which had the further effect of suspending the License Agreement, ECF 1-2 at 6. The Members' and License Agreements show that, following that suspension, IRW could resume marketing in the U.S., using trademarks that always belonged to it. *See supra* p. 9. At most, IRUSA's allegations show a good-faith dispute over the effect of IRUSA's suspension of the Members' Agreement. They do not show "malice" or intent "to inflict injury by unlawful means." *B & G Plastics*, 269 F. Supp. 2d at 468.

### B. New York General Business Law § 349

IRUSA's claim under N.Y. Gen. Bus. Law § 349 claim is also duplicative of its breach of contract claims and inadequately pled. IRUSA fails to allege that IRW "went beyond simply breaching a contract, to committing a 'practice that was misleading in a material respect.'" *42-50 21st St. Realty LLC v. First Cent. Sav. Bank*, No. 20-cv-5370, 2022 WL 1004187, at \*10 (E.D.N.Y. Apr. 4, 2022); *see also Costoso v. Bank of Am., N.A.*, 74 F. Supp. 3d 558, 575 (E.D.N.Y. 2015) (dismissing Section 349 claim when it was "essentially that the [d]efendant failed to satisfy its contractual duties, not that it concealed or misrepresented any contractual terms").

IRUSA bases its § 349 claim on its allegation that IRW breached the License and Members' Agreements by soliciting donations in New York, thereby creating confusion among donors

21

about IRW's affiliation with IRUSA. Compl. ¶ 112. But those same allegations form the basis of its breach of contract claims. *See id.* ¶¶ 119 ("IRW has breached the contract by seeking to raise funds (illegally) in the United States. IRW's violation and breach of the License Agreement has damaged and injured IRUSA in its competition for the same pool of donors within the United States."); 129 (same). "In such a situation, dismissal is appropriate." *Chambers v. HSBC Bank USA, N.A.*, No. 19-cv-10436, 2020 WL 7261155, at *6 (S.D.N.Y. Dec. 10, 2020).

IRUSA has also failed to state a claim under § 349, because it cannot plausibly allege that IRW's conduct was "misleading in a material respect" or that IRUSA was "injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009). First, IRUSA does not allege an act or practice that is materially misleading. IRW owns all trademarks associated with Islamic Relief, as IRUSA repeatedly agreed. ECF 1-2 at 3, §§ 1.05-06. IRUSA's right to use those trademarks was always subject to IRW's own usage right. *Id*. at 3, § 1.07. IRW cannot have misled consumers by using trademarks it owned. And IRUSA's allegation that IRW's use of the "Islamic Relief" brand might "deceive the public into believing" that the services were "endorsed by IRUSA," Compl. ¶ 112, flies in the face of its contractual promise that "any and all goodwill in the Trademarks arising from [IRUSA's] use enures to the benefit of the Licensor," ECF 1-2 at 3, § 1.05. Simply put, any association created by IRUSA's use of the Islamic Relief trademarks was always and only for IRW's benefit. IRUSA cannot agree that IRW owns the goodwill associated with its trademark and then allege that IRW's use of that goodwill is "deceptive." Even if some members of the public were unaware of the License Agreement and believed that IRUSA owned trademarks associated with Islamic Relief, the License Agreement always established the true relationship between the parties. IRW's use of its own intellectual property, in reliance on that true relationship, cannot be "deceptive," regardless of what others may have mistakenly believed. For the

22

same reason, IRUSA cannot allege that it suffered any harm from IRW's use of the Islamic Relief trademarks, much less a harm "independent of the loss caused by the alleged breach of contract." *Spagnola*, 574 F.3d at 74.

Moreover, IRUSA does not allege actual harm to the general public, "which is an essential element of a § 349 claim." *Agency Dev., Inc. v. MedAmerica Ins. Co. of N.Y.*, 327 F. Supp. 2d 199, 207 (W.D.N.Y. 2004), *aff'd*, 142 F. App'x 545 (2d Cir. 2005). It has alleged harm only to itself (which is not cognizable under the License Agreement). *See* Compl. ¶ 109. Even assuming IRUSA could base a claim on IRW's use of the Islamic Relief trademarks, "consumer confusion" arising out of trademark usage "is not a harm to the public interest sufficient to support a claim under [§ 349]." *Mayes v. Summit Ent. Corp.*, 287 F. Supp. 3d 200, 210 (E.D.N.Y. 2018) (collecting cases). IRUSA can point to only one consumer, "Donor A", who was allegedly harmed by mistaking IRW for IRUSA. A single mistaken transaction does not establish harm to the "consuming public," much less that IRW intended such harm. *Silverman v. Household Fin. Realty Corp. of N.Y.*, 979 F. Supp. 2d 313, 317 (E.D.N.Y. 2013).

### C. Breach of Contract

For similar reasons, IRUSA has failed to plausibly allege that IRW breached the Members' and License Agreements (Claims III and V). IRUSA attaches those Agreements to its complaint, allowing their consideration on a motion to dismiss. *Chambers*, 282 F.3d at 153. Because the Agreements contradict IRUSA's allegations of breach, the Court need not accept those allegations as true. *GMI USA Corp.*, 714 F. Supp. 3d at 285-86.

IRUSA alleges that IRW breached the Members' and License Agreements by soliciting donations in the U.S. Compl. ¶¶ 119, 129. But IRUSA admits that it suspended the Members' Agreement on October 12, 2025. Ex. O; Compl. ¶ 43. That suspension applied to the Members' Agreement in its entirety, ECF 1-1 at 9, § 6.5, including the provision agreeing that "IR will have

23

one presence/operation only" in the U.S., *id.* at 5, § 3.4.  The complaint does not allege that IRW solicited donations in the United States until November 2025, one month after IRUSA suspended the Members' Agreement.  Compl. ¶¶ 87-88, 129.  IRUSA cannot allege that IRW breached an obligation that IRUSA admits it had suspended.

Nor did any purported solicitation by IRW breach the License Agreement.  While IRUSA alleges that it had the "exclusive right to use the 'Islamic Relief' name recognition umbrella to raise charitable donations in the United States," Compl. ¶ 117, the License Agreement contradicts that allegation.  It makes IRUSA's license "[s]ubject to the Licensor's right to use, advertise or display the Trade-marks."  ECF 1-2 at 3, § 1.07(b).  IRUSA's license is only "*otherwise* exclusive"—that is, exclusive except as to IRW.  *Id.* (emphasis added).  The License Agreement thus explicitly permitted IRW to continue to "use, advertise or display the Trade-marks."  *Id.*  That explicit permission controls, not the complaint's contrary allegation.  *GMI USA Corp.*, 714 F. Supp. 3d at 285-86.  Even if that were not alone dispositive, IRUSA's suspension of the Members' Agreement also suspended its exclusive right to any Islamic Relief trademarks.  ECF 1-2 at 6, § 1.25(a).  IRUSA thus both misunderstands the License Agreement and overlooks its suspension.

### D.  Implied Covenant of Good Faith and Fair Dealing

The Court should also dismiss IRUSA's claims for breach of the implied covenant of good faith and fair dealing (Claims IV, VI, VIII, and X).  Where "a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 124 (2d Cir. 2013) (quotation marks omitted).  IRUSA's four claims for breach of the implied covenant of good faith and fair dealing are expressly tied to each respective contract and arise out of the same facts.  *Compare* Compl. ¶¶ 116-20, 126-30, 136-40, 146-50, *with id.* ¶¶ 121-25, 131-35, 141-45, 151-55.  They should be dismissed.

### E.  Unjust Enrichment

IRUSA's unjust enrichment claim (Claim XI) must also be dismissed as improperly duplicative of its breach of contract claims.  "It is black letter law that '[w]here the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded.'"  *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322, 337-38 (S.D.N.Y. 2023) (quoting *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009)); *Ford v. Rensselaer Polytechnic Inst.*, 507 F. Supp. 3d 406, 419-20 (N.D.N.Y. 2020) (unjust enrichment is "'not available where it simply duplicates, or replaces, a conventional contract or tort claim.'") (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006)).  IRUSA bases its unjust enrichment claim on the same alleged solicitation that underlies its claims for breach of the Members' and License Agreements.  *Compare* Compl. ¶ 157, *with id.* ¶¶ 119, 129.  Because "there is no dispute as to the validity of the agreement," the unjust enrichment claims should be dismissed as duplicative.  *In re Generali COVID-19 Travel Ins. Litig.*, 576 F. Supp. 3d 36, 50 (S.D.N.Y. 2021).

### CONCLUSION

For the reasons detailed in this Memorandum, IRW respectfully requests that this Court compel this dispute to arbitration or, alternatively, dismiss the complaint.

25

Dated: April 23, 2026                    Respectfully Submitted,

                                         */s/ Abbe D. Lowell*
                                         Abbe David Lowell
                                         Caleb Hayes-Deats
                                         LOWELL & ASSOCIATES, PLLC
                                         1250 H Street, N.W., Suite 250
                                         Washington, DC 20005
                                         T: (202) 964-6110
                                         F: (202) 964-6116
                                         ALowellpublicoutreach@lowellandassociates.com
                                         CHayes-Deats@lowellandassociates.com

                                         *Attorneys for IRW*

## CERTIFICATE OF COMPLIANCE

I, Abbe D. Lowell, certify that Defendant IRW's Memorandum of Law in Support of its Motion to Compel Arbitration or Dismiss Complaint complies with the requirements of Local Rule 7.1(c), as modified by § 3(D) of this Court's Individual Practices in Civil Cases.

I further certify that this memorandum of law was prepared with a computer.

I further certify that this memorandum of law is 25 pages and 8,343 words, including any footnotes or endnotes and excluding only those sections of the brief that are exempted under Local Rule 7.1(c). In preparing this certificate of compliance, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: April 23, 2026

/s/ Abbe D. Lowell
Abbe David Lowell