UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISLAMIC RELIEF USA,<br><br>     Plaintiff,<br><br> - against -<br><br>ISLAMIC RELIEF WORLDWIDE, INC.,<br><br>     Defendant. | Civil Action No.: 1:26-cv-2367<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Islamic Relief USA ("IRUSA") for its Amended Complaint against Islamic Relief Worldwide, Inc. ("IRW") alleges and states as follows:

## NATURE OF THE ACTION

1. IRUSA is the largest and leading Muslim charity in the United States. It provides emergency relief assistance and implements development projects that deliver immediate, long-term, and sustainable solutions to humanitarian crises in the U.S. and in 60 countries across the world. IRUSA provides help to people who need it around the world without regard to race, religion, belief, or any requirement other than need. As a 501(c)(3) non-profit organization, IRUSA does not participate in partisan politics or religious proselytization, nor does it endorse any political party or religious organization. As with any significant 501(c)(3) non-profit organization, the maintenance of its tax-exempt status with the Internal Revenue Service ("IRS") is essential to its ability to carry out its mission. To maintain that status, IRUSA rigorously complies with the

1

relevant law and regulations, both state and federal, and is committed to applying global best practices to all its endeavors.

2.      IRUSA is a donor-driven institution, committed to full transparency and accountability. It holds the 2025 GuideStar Gold Seal of Transparency[1] and a four-star ranking from Charity Navigator,[2] the largest charity evaluator in the U.S. It is also on the U.S. government's Combined Federal Campaign charity list (CFC number 10154), which means that the U.S. government permits federal employees to contribute to IRUSA through automatic payroll deductions.

3.      Defendant IRW is a charity registered in the United Kingdom. It is the head office of an organization that operates through offices and partners in multiple countries as part of an overall "Islamic Relief" umbrella. IRW set up the Islamic Relief structure in 1984, and IRUSA was established in 1993. Over time, IRUSA has grown substantially and became a much larger organization and, as discussed in further detail below, developments have required major structural changes over time.

4.      Until in or around December 2019, IRUSA was an "independent partner of IRW," and IRUSA sought to exercise certain prerogatives with respect to strategic initiatives and project management. In December 2019, however, IRUSA and IRW memorialized their relationship in writing to establish and make clear IRUSA's absolute right and obligation to be completely independent and autonomous from IRW. IRW may not and does not control IRUSA's operations and has no influence over what projects IRUSA chooses to fund (or not to fund), or over who implements such projects. Similarly, IRUSA exercises no control or influence over IRW.

---

[1] *Islamic Relief USA*, Candid, https://app.candid.org/profile/8460202/islamic-relief-usa-95-4453134 (last visited May. 14, 2026).
[2] *Islamic Relief USA*, Charity Navigator, https://www.charitynavigator.org/ein/954453134 (last visited May. 14, 2026).

5.      In September 2024, the Chairman of the United States House of Representatives Ways and Means Committee (the "House Ways and Means Committee") asked the IRS to "investigat[e]" IRUSA for possible termination of its "tax-exempt status." The only reasons given for this request for investigation were allegations relating to IRW's purported support for terrorism and antisemitic statements, and concerns relating to IRUSA's possible connections to IRW. There was no suggestion of any improper conduct whatsoever by IRUSA. IRUSA was specifically told, and understood, that the House Ways and Means Committee had serious concerns about IRUSA sending any money to IRW, and that the Committee intended to take up these concerns with the IRS. These warnings deepened IRUSA's existing concerns about the risk IRW posed to IRUSA (described below) and called into further question any continued relationship of IRUSA with IRW.

6.      IRUSA met with the House Ways and Means Committee and was assured at that meeting that its investigation, and its view that IRUSA's tax-exempt status could be stripped, was based solely on IRW's conduct as stated in its letter to the IRS and the Committee's assumptions regarding the relationship between IRUSA and IRW.

7.      Given this clear and present existential danger to IRUSA if its tax exemption was jeopardized, IRUSA sought to engage in discussions with IRW, with the aim to sever its relationship with IRW. IRW refused to engage in any good-faith discussions.

8.      As a provider of critical philanthropic relief in high-risk jurisdictions like Syria, Yemen, and Sudan, IRUSA always faces inherent risk in its relations with grant recipients, including IRW, that its funds could be used by a grantee in violation of laws and regulations promulgated by the U.S. Office of Foreign Assets Control ("OFAC") and by other federal entities. Any OFAC-related investigation or news account involving an IRUSA-funded project, even if it did not involve an allegation that IRUSA itself violated OFAC sanctions, would be potentially devastating not only

to IRUSA's status as a registered tax-exempt entity, but also more broadly to IRUSA's reputation and operations, including its ability to maintain banking relationships and its ability to maintain the confidence of its donors.

9.      As a risk mitigant, IRUSA requires IRW and other grant recipients to authorize IRUSA to have unfettered audit rights with respect to all IRUSA-funded projects. These audit rights are the keystone that enables IRUSA to deliver charitable services in high-risk environments with necessary transparency and oversight. Operating in high-risk environments requires a level of accountability that builds trust with U.S. donors, U.S. regulators, and U.S. partners, including banking partners, and with international and other organizations with whom IRUSA partners. IRUSA relies on its audit rights to ensure that IRUSA's funds are traceable and used as intended, and to verify compliance, deter misuse, and respond swiftly to irregularities. The practice creates a foundation of credibility and operational integrity that IRUSA communicates to its regulators, donors, and partners. It is a material reason why donors trust and choose to donate to IRUSA. If IRUSA's grant recipients deny IRUSA such rights, it creates unacceptable risk that IRUSA's grant recipients may be taking unknown actions that will be attributed to IRUSA as the funder of the grant recipient's activity, and threatens the integrity of the statements IRUSA makes to its donors, regulators, and partners, including banking partners.

10.     In July 2025, IRUSA learned of extremely troubling conduct by IRW in relation to an earthquake disaster relief project in Afghanistan that raised an OFAC-related concern. IRUSA promptly sought additional information about the incident from IRW and initiated an audit. IRW refused to engage with the auditor and has remained uncooperative with IRUSA's requests for information. IRW's refusal to permit an audit and its recalcitrance regarding IRUSA's requests for information increased IRUSA's concerns about IRW's overall transparency, IRW's capacity to

recognize and react appropriately to risk, and the increasing reputational risk IRW posed to IRUSA. As a result, IRUSA demanded to audit additional IRUSA-funded projects with IRW. IRW refused to engage or cooperate with those audits as well – an action that compounded IRUSA's existing concerns about IRW's transparency and integrity.

11.    IRW's refusal to answer meaningfully IRUSA's inquiries and participate in the audits cast doubt on IRW's public statements to their donors that "You can … trust that your money goes where we say it is going" and that "You can trust that we follow the Islamic, legal and good practice standards you would expect of the world's largest independent Muslim charity."[3] IRUSA relies on IRW's accuracy in those statements in assessing the risk associated with IRW and, in turn, IRUSA's reliance on and ability to confirm IRW's representations informs the accuracy of IRUSA's own representations to its U.S. donors and regulators, including its donors and regulators in New York. In short, IRW's resistance to IRUSA's inquiries called into question IRW's representations and exposed IRUSA to material and unacceptable reputational risk.

12.    While IRUSA has no affirmative knowledge of illegal conduct by IRW in connection with any project, the September 2024 House Ways and Means Committee communications, the emergence of the OFAC issue, and IRW's refusal to cooperate with IRUSA's inquiries about the OFAC issue and permit auditing of projects created grave concerns that IRW posed unacceptable risk to IRUSA.

13.    On October 6, 2025, the Chairman of the House Ways and Means Committee sent a further letter to the IRS Commissioner, who was appointed by the new administration, reiterating the request for an investigation. The new administration had made multiple statements about its priority to scrutinize tax exemptions of 501(c)(3) organizations, including Islamic organizations.

---

[3] *Where Your Donation Goes*, Islamic Relief Worldwide, https://islamic-relief.org/where-your-donation-goes/ (last visited May 14, 2026).

The second letter referenced the Committee's view that IRW had taken actions that it viewed as supporting terrorism and antisemitism, and did not reference any specific conduct engaged in by IRUSA.

14.    On October 12, 2025, having lost faith in IRW's commitment to transparency and having been made aware of the second request for an investigation by the House Ways and Means Committee by the new IRS Commissioner, IRUSA took necessary affirmative action to distance itself from IRW by suspending all existing IRUSA-funded projects that were administered by IRW. IRUSA made clear to IRW that IRUSA was at grave risk of losing its tax-exempt status, that the proposed U.S. government investigation was based on IRW's conduct, and that, indeed, IRW itself faced significant risk if the U.S. government took regulatory or legal action. As a result, IRUSA advised IRW that a complete severance of ties was imperative for the sake of both organizations' ongoing operations.

15.    IRUSA thereafter sought to engage with IRW on multiple occasions to engage in the necessary dialogues to effect separation. In a number of those conversations, representatives of IRW conceded that the U.S. governmental threats to IRUSA were serious and created significant and ongoing risk for IRUSA. Nevertheless, IRW chose to substitute aggression for common sense, all to the detriment of IRUSA's donors and beneficiaries, as discussed below.

16.    In retaliation for IRUSA's suspension of activities with IRW, IRW thereafter engaged in a continuous course of tortious conduct by which IRW tried to sabotage IRUSA's reputation and relationships with its donors.

17.    After the suspension, IRW instructed its offices and affiliates not to cooperate in any way with IRUSA, which further impaired IRUSA's ability to monitor past projects funded by IRUSA,

impeded IRUSA's ability to transition projects to new partners not subject to these risks, and further increased IRUSA's reputational risk.

18.    IRW also undertook unregistered and illegal efforts to solicit donations from U.S. persons in multiple U.S. states, including New York. New York and approximately 40 other U.S. states require organizations that solicit donations from residents to register with and be subject to the regulatory authority of the individual state. To the best of IRUSA's knowledge, IRW is not registered to solicit donations from donors in *any* U.S. state, including New York.

19.    IRW's illegal fundraising in New York and other U.S. states enables it to take money from the U.S., but bypass both IRUSA's demands for accountability and U.S. regulation. It also had the foreseeable effect of causing confusion among long-time IRUSA donors, including IRUSA donors in New York. Apart from the recklessness of these actions by IRW, this also increased the risk to IRUSA of legal and regulatory scrutiny.

20.    As a result of IRW's illegal fundraising efforts, multiple U.S. donors, including donors in New York, donated mistakenly to IRW, thinking that they were donating to IRUSA – the only "Islamic Relief" organization that is a registered 501(c)(3) organization in the U.S. Even after donors contacted IRW to inform IRW that they had intended to donate to IRUSA, and not IRW, IRW refused to issue refunds to some donors. This includes prior IRUSA donors. IRW also failed to inform donors of the fact, on information and belief, that such donors would not receive tax deductions for their contributions because it is not a U.S.-registered tax-exempt organization. This leads IRUSA to conclude that IRW is intentionally and in bad faith confusing donors and taking donations that are meant for IRUSA. Such post-suspension tortious conduct has caused and continues to cause harm to IRUSA.

21.     IRW also unilaterally canceled sponsorships of hundreds of orphans, sponsorships which had been accomplished through donations to IRUSA, including from New York donors. IRW made it appear as if it was IRUSA's decision to cancel the sponsorships by impermissibly using the login credentials of an IRUSA employee. These actions compromised the accuracy of IRUSA's representations to its donors regarding the orphan sponsorships, and damaged IRUSA's relationships with its donors, including its donors in New York.

22.     IRW's actions jeopardize IRUSA's reputation as a respected U.S. charity subject to rigorous financial and compliance controls, and thus its ability to fulfill its humanitarian mission. IRW is misleading donors in the U.S., including New York, into conflating the identities of IRW and IRUSA, erroneously trying to create the imputation of IRUSA's 501(c)(3) status and reputation to itself, and obtaining donations to IRW on the basis of those misrepresentations, all to the detriment of IRUSA.

### THE PARTIES

23.     IRUSA is a California not-for-profit corporation with its principal place of business in Alexandria, Virginia. IRUSA is a 26 U.S.C. 501(c)(3) non-profit organization. It has operated in the U.S. since 1993. IRUSA is registered in all states in the U.S. where registration is required to solicit and receive charitable donations from residents located in those jurisdictions (about 40 states and the District of Columbia require such registration). IRUSA maintains a humanitarian and development portfolio surpassing $350 million of domestic and international programs.[4]

24.     IRW is a United Kingdom-based organization with head office in Birmingham, England, registered as a charity only in the United Kingdom. It also has various affiliates and offices in other

---

[4] *See* Islamic Relief USA, https://irusa.org/ (last visited May 14, 2026).

8

countries. It is, on information and belief, *not* registered as a 501(c)(3) charity in the U.S., nor, on information and belief, has it registered in any U.S. state to solicit or receive charitable donations.

## JURISDICTION AND VENUE

25.     Jurisdiction is proper under 28 U.S.C. § 1331 because this matter involves claims arising under federal law.

26.     Jurisdiction is proper under 28 U.S.C. § 1367 over claims arising out of state law because such claims are so related to claims in this action within the Court's subject matter jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

27.     Jurisdiction is proper under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the suit is between IRUSA, which is a citizen of Virginia and California, and IRW, which is a citizen of the United Kingdom.

28.     This Court has personal jurisdiction over IRW pursuant to CPLR 302(a)(1) because IRW transacted business within the State of New York by operating without registration, failing to make required disclosures, unlawfully soliciting donations from individuals located in the State, receiving donations from individuals located in the State properly intended for IRUSA through misleading representations, and cancelling sponsorships of orphans which were funded by individuals or entities located in the State. IRW intentionally confused New York-located donors, including donors in the Southern District of New York, through its unregistered and thus unlawful New York activities.

29.     This Court has personal jurisdiction over IRW pursuant to CPLR 302(a)(3)(i) because IRW committed tortious acts outside the State of New York causing injury to persons within New York,

9

and because IRW regularly does and solicits business and engages in other persistent courses of conduct or derives substantial revenue from services rendered in New York.

30.    This Court has personal jurisdiction over IRW pursuant to CPLR 302(a)(3)(ii) because IRW committed tortious acts outside New York causing injury to persons within New York, and because IRW expected or should reasonably expect the acts to have consequences in the State and derives substantial revenue from interstate or international commerce.

31.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District, and because a defendant not resident in the U.S. may be sued in any judicial district. 28 U.S.C. § 1391(c)(3).

## FACTUAL ALLEGATIONS

### A.  IRUSA'S PRIOR RELATIONSHIP WITH IRW

32.    IRW and IRUSA have had various agreements over the years. The only one relevant hereto is the December 14, 2019 Members' Agreement between IRW and IRUSA, which specifically recognizes IRUSA to be an "independent and autonomous entity" from IRW. The Members' Agreement provided that there should only be one Islamic Relief entity operating in any geographic territory, and that IRUSA would operate exclusively within the U.S. It also provided that IRUSA, "in its sole discretion," agreed to "adopt and implement the principles of [IRW's global] strategy *to the extent permitted by their fiduciary duties and by Applicable Laws and the capacity and strategic objectives of IR USA.*" IRW has stated that the invocation of the Suspension Clause under this Agreement discharged any further substantive obligations. That is not what the Suspension Clause says, but, in any event, the tortious conduct at issue all post-dates the invocation of the Suspension Clause and gives rise to claims not under the suspended Members' Agreement or any other contract but for post-suspension bad-faith tortious conduct.

10

33.    IRUSA frequently acts through partners in various high-risk conflict zones and requires that the partners it uses to implement philanthropic projects – including IRW – are operating lawfully and honestly and do not jeopardize IRUSA's status and reputation. The grant agreements governing these projects are standalone agreements that have nothing to do with any other agreement, such as the Members Agreement.

34.    A typical IRUSA grant agreement is designed to govern the funding and execution of a specific philanthropic project. These agreements contain multiple provisions to ensure IRUSA's ability to monitor whether its funds are being used consistently with IRUSA's intended purpose and that IRUSA's project partners act in compliance with all applicable laws, rules, regulations, decrees, or official government orders, including but not limited to U.S. law. These requirements are integral to IRUSA's ability to communicate honestly with its donors, regulators, and banking partners. IRUSA cannot, consistent with its mission, tax-exempt status, and legal obligations in the U.S. and the individual U.S. states where it is authorized to solicit donations, including New York, continue to work with third-party partners that are non-compliant with these requirements.

35.    With respect to project monitoring, the grant agreements require IRUSA's partners, including IRW, to submit to IRUSA periodic financial and program reports detailing the expenditures made with grant funds at various stages of the project. They also authorize IRUSA to conduct its own independent review of the partner's program activities, including the right to audit such programs.

36.    With respect to compliance with laws, the grant agreements contain a provision that requires IRUSA's partners to warrant that they shall comply with all applicable laws, rules, regulations, decrees or official government orders. Further, the grant agreements prohibit partners from making corrupt payments and requires them to warrant that (using a grant agreement with

11

IRW as an example) "[a]ll payments by IRUSA to IRW will be received by IRW on its own account for the sole purpose of meeting its obligations under th[e] Agreement." Any partner, including IRW, is required immediately to notify IRUSA if that partner discovers any instance where it fails to comply with the compliance with laws provision.

37.    With respect to audits, the grant agreements specifically provide that, with respect to the particular grant, "IRUSA has the discretion to conduct an audit at any time upon reasonable notice to [the partner]," that "[the partner] shall facilitate any audit conducted by IRUSA," and that the partner must provide "any assistance or cooperation requested by any authorized representative of IRUSA." The grant agreements specify further that "[the partner's] failure to assist or fully cooperate with any audit conducted by IRUSA hereunder shall be construed as a material breach of this Agreement." This is a standard provision in IRUSA grant agreements irrespective of the partner and it is included in IRUSA's grant agreements with IRW.

38.    With respect to anti-terrorist financing, the grant agreements contractually require partners, including IRW, to take precautions that no funds will be used to "support or promote violence, terrorist activity or related training, whether directly through its own activities and programs, or indirectly through its support of or cooperation with any third parties." Further, the grant agreements contain the following provision (using a grant agreement with IRW as an example):

> IRW is specifically reminded that U.S. Executive Orders, statutes and regulations prohibit transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism. It is the legal responsibility of IRW to ensure compliance with these U.S. Executive Orders and laws. This anti-terrorism provision must be included in any sub-contracts or sub-grants that IRW may enter into in fulfilling its obligations under this Agreement. For further information, see http://sdnsearch.ofac.treas.gov.

39.    The grant agreements further require partners, including IRW, within ten business days of an IRUSA request, to submit to IRUSA details about any anti-terrorist financing screening conducted by the partner, and to confirm that, if positive matches are identified to lists of

designated individuals and entities, such positive matches were not the recipients of IRUSA funding. Regardless of whether the positive match received IRUSA funds, the grant recipient partner must confirm that it immediately terminated any relationship with any such individual or entity. These provisions are essential given the high-risk jurisdictions where aid is provided, and to ensure IRUSA's compliance with OFAC-promulgated laws and regulations.

40.     IRUSA's ability to require that partners, including IRW, submit to project monitoring, cooperate with audits, and comply with U.S. law, including but not limited to laws and regulations promulgated by OFAC, and IRUSA's ability to exercise audit rights to ensure that its partners, including IRW, comply with U.S. law, are critical to IRUSA's ability to maintain its reputation and communicate honestly with its donors, regulators, and banking partners; manage its risks, maintain its 501(c)(3) status; and ensure that donor money is used for its intended philanthropic purpose.

### B. REGULATORY SCRUTINY OF IRW AND IRW'S REFUSAL TO ENGAGE WITH IRUSA'S AUDITS

41.     In recent years, various governmental agencies, both in and outside the U.S., have raised significant concerns about IRW, which has contributed to IRUSA's view of the risks associated with IRW. Both Israel and the United Arab Emirates have issued sanctions targeting IRW. For example, in 2014, Israel banned IRW from operations in Israel and the Palestinian Territories, citing its alleged ties to Hamas. Israel did not ban IRUSA, or otherwise name it in its designation, but the Israeli designation did refer to "any other name by which [IRW] is called, including its branches" in several countries, including the U.S. Ironically, IRW has asserted, falsely, that IRUSA was "also" designated by Israel. Such "you too-ism" is both misplaced and inaccurate. IRUSA was never designated independently. IRUSA is not a "branch" of IRW, but rather an independent operating entity subject to U.S. law. The Israeli designation of IRW, however,

highlights the risk that the two organizations' identities can be conflated and confused, with IRW's actions and statements mistakenly attributed to IRUSA. This risk is at the core of IRUSA's October 2025 suspension of activities with IRW and underlines the unjustified post-suspension tortious conduct, which in turn has served only to increase further the risk to IRUSA.

42.    IRUSA has received inquiries from individual U.S. state regulators and from its banking partners that seek information about IRUSA's relationship with IRW, materially increasing the risk that IRW's reputation and conduct may have the effect of IRUSA not being permitted to operate in individual U.S. states, including New York, or losing its banking relationships. But rather than acknowledge those risks and work with IRUSA to mitigate them, IRW has instead increased them through its tortious post-suspension conduct.

43.    As a 501(c)(3) nonprofit registered and regulated in multiple states, including New York, IRUSA is subject to stringent regulatory reporting requirements. These include a requirement under New York Executive Law 172-b(1) to file an annual financial statement, along with an independent certified public accountant's audit report. IRUSA's board, or a designated audit committee of the board, is required to review the scope and planning of the audit with the independent auditor, and, upon completion of the audit, to review and discuss with the independent auditor (A) any material risks and weaknesses in internal controls identified by the auditor; (B) any restrictions on the scope of the auditor's activities or access to requested information; (C) any significant disagreements between the auditor and management; and (D) the adequacy of the corporation's accounting and financial reporting processes. New York Not-for-Profit Corporation Law § 712-a(b)(2). In any solicitation used by or on behalf of IRUSA within New York, IRUSA is mandated to include specific disclosures including a "clear description of the programs and activities for which it has requested and has expended or will expend contributions" or provide

such information upon request. New York Executive Law 174-b(2)(a). IRUSA complies fully with all such requirements and remains an organization in good standing in New York.

44.    As noted above, on September 24, 2024, the Chairman of the House Ways and Means Committee requested that the IRS "investigat[e]" IRUSA for possible termination of its "tax-exempt status." **Exhibit A** at 1. The reasons for that request had to do *solely* with the history of IRW and IRW's alleged statements and actions in support of purported terrorist organizations. Regarding IRUSA, the governmental suspicions were due solely to the fact that, as part of its charitable operations, IRUSA had provided funds to IRW to advance humanitarian projects. There was no suggestion that IRUSA had advanced funds to IRW for projects that IRUSA had not subjected to appropriate due diligence and determined were legitimate, or that any such projects were involved in any way with the actions or statements allegedly made by IRW. But IRUSA was nevertheless at grave risk because of allegations against IRW which, whether accurate or not, threatened its tax-exempt status, and if the tax exemption were removed, it would be impossible to maintain IRUSA's existence while the removal was challenged.

45.    IRUSA was told, and understood, that the House Ways and Means Committee had investigated the previous funding of projects and, given the negative view it expressed regarding IRW, had serious concerns about IRUSA sending any money to IRW. Effectively, IRUSA was told and understood that it was to send no more funds to IRW even for redirection to charitable programs, and that doing so would jeopardize its tax-exempt status. These warnings from the House Ways and Means Committee intensified even further IRUSA's significant existing concerns about IRW.

46.    On or about October 18, 2024, IRUSA notified IRW of its intent to renegotiate its relationship with IRW.

47.    IRW did not engage in any meaningful negotiations with IRUSA.

48.    As noted above, to ensure that IRUSA can monitor and ensure that its project partners abide with U.S. laws and regulations and spend project funds consistent with their stated purpose, IRUSA's grant agreements – including those with IRW – impose requirements on its project partners to follow U.S. law. Specifically, IRUSA's project partners are required to abide by OFAC laws and regulations as if they were U.S. persons, and to take reasonable precautions to ensure that none of the grant funds have been raised for or used to "support or promote violence, terrorist activity or related training." IRUSA is empowered to conduct an audit at IRUSA's discretion of its project partner's financial records, its activities under the project, and its compliance with the agreements.

49.    IRUSA entered into two such grant agreements with IRW to administer projects in Afghanistan, including a project to provide aid to victims of a horrific earthquake.

50.    In or about July 2025, IRUSA learned from IRW that IRW had exported certain sewing machines from Iran for purposes of implementing the earthquake relief project.

51.    The importation of sewing machines from Iran is a serious event that implicated a potential violation of OFAC laws and regulations. IRUSA immediately sought additional information about the event and invoked its audit rights under the relevant grant agreements. To maintain its own reputation, it was critical that IRUSA assess whether a potential violation of U.S. law occurred that IRUSA would have to report to OFAC, and how the incident should inform IRUSA's view of the risks associated with IRW, e.g., whether the incident revealed a serious deficiency in IRW's control infrastructure and understanding of OFAC-related requirements that required enhanced IRUSA scrutiny of other IRW-related projects. IRUSA also sought the return of unspent funds provided by IRUSA to IRW in connection with the projects.

52.    IRW responded in writing to subsequent IRUSA inquiries about the event and admitted that the sewing machines had been exported from Iran. In a letter dated July 31, 2025, IRW admitted that the sewing machines had been received in Herat, Afghanistan, on June 24, 2025, and that IRW personnel had asked IRUSA for permission to distribute the machines. **Exhibit B.** The IRW letter emphasized that the machines were "Chinese-made," and "imported from China via Iran." *Id.* To the extent IRW believed that mere transshipment of Chinese-made goods through Iran cured any potential OFAC violation, it was mistaken, under 31 C.F.R. § 560.403, as IRUSA's response to IRW made clear. Further, the IRUSA response to IRW's letter told IRW that it had provided no supporting evidence to support its claims, thus underscoring the insufficiency of IRW's responses to requests for information and the need for an audit.[5]

53.    To IRUSA's knowledge, neither IRUSA nor any U.S. person, associated with IRUSA or otherwise, had any dealings associated with purchase of the sewing machines. As a result, IRUSA determined that there was no violation of U.S. law that required a report to OFAC or another U.S. enforcement agency. It was clear, however, that the episode subjected IRUSA to significant reputational risk with its donors, regulators, and banks. It also provided evidence that IRW did not understand or take adequate measures to ensure compliance with the OFAC-related laws and regulations that it had agreed to uphold in the grant agreements. Further, IRW's refusal to cooperate with IRUSA's inquiries suggested that IRW was not, despite its representations to the public and to IRUSA, a transparent partner upon which IRUSA could rely.

---

[5] In October 2025, IRW stated that it had not taken delivery of the machines. *See* **Exhibit C**. This statement seemingly contradicts IRW's July 2025 statement that it had received the machines and sought IRUSA's permission to distribute the machines – the implication of the July 2025 statement being that IRW had taken delivery of the machines. Regardless, the apparent contradiction establishes that, if IRW cooperated with the initial inquiry, much less IRUSA's attempt to audit the project, the matter could have been readily resolved.

54. On August 7, 2025, IRUSA retained an accounting and consulting firm to conduct an audit of the Afghanistan projects. The accounting and consulting firm was unable to proceed with the audit due to a lack of cooperation from IRW.

55. On September 19, 2025, with no funds, unused equipment, or supplies returned to IRUSA, and with no independent audit undertaken of the Afghanistan projects, IRUSA invoked its rights to conduct additional audits under various other projects. **Exhibit D.** This was a critical step: IRW's refusal to comply with IRUSA's inquiries and audit demands about the sewing machines incident had increased the risk that IRW may have engaged in problematic conduct in other projects and required enhanced scrutiny of those other projects. But IRW also ignored this demand, a decision that exacerbated even further IRUSA's compliance-related concerns about IRW's operational integrity.

56. On October 2, 2025, IRW declared that it rejected IRUSA's claims. **Exhibit C; Exhibit E.** IRW repeated this position on October 10, 2025. **Exhibit F.** IRW insisted that there was corruption in Afghanistan, which should be considered an acceptable risk, and that this would not constitute negligence or recklessness if it had occurred. **Exhibit E** at 1. Such a view, i.e., that corruption was a fact of life in Afghanistan that IRUSA should simply learn to live with, was and is anathema to the values, policies, and procedures of IRUSA. It is not an acceptable statement of an organization dedicated to transparency and that has committed itself to following U.S. law, and thus it further increased IRUSA's concerns about IRW and the danger IRW posed to IRUSA's reputation.

57. On October 6, 2025, the House Ways and Means Committee repeated its request to the IRS to investigate whether IRUSA's tax-exempt status should be revoked, stating the same reasons – i.e., solely due to IRUSA's relationship with IRW. **Exhibit G.** With the change in administration

and the new administration's stated priorities regarding tax-exempt organizations, such requests took on additional significance and signaled increased risk.

58.    On October 12, 2025, having lost faith in IRW, IRUSA invoked its rights under the Members' Agreement to suspend participation in all programs executed by IRW. **Exhibit H.** The suspension notice sought to engage in prompt, good-faith negotiations to resolve the situation, without permanent and complete severance of any possible informal relationship between IRUSA and IRW, that could be acceptable to U.S. authorities.

59.    As the October 12, 2025 letter communicating the suspension indicates, the Suspension Clause dealt with precisely this situation, where a continued relationship created unacceptable reputational, legal, regulatory, or operational risk. It is in effect a safety valve that allows adaptation to changing circumstances. But IRW appeared unwilling to confront reality and was willing to sacrifice IRUSA's continued functioning to gain some sort of illusory benefit or leverage. IRW well knew and had admitted in conversations that the U.S. government warnings in the current political environment created a serious and acute problem.

60.    On October 30, 2025, IRW formally advised IRUSA that it would not permit IRUSA to conduct the demanded audits of the Afghanistan projects. **Exhibit I.**

61.    In response, on December 7, 2025, IRUSA again raised IRW's lack of cooperation with the audits, and asked that IRW discuss the matter to seek resolution. **Exhibit J.** IRW again refused.

62.    IRW's intentional refusal to cooperate with any of IRUSA's audits casts serious doubt on the veracity of IRW's public-facing statements about transparency and accountability. For example, IRW's website assures donors – including donors it affirmatively solicits in the U.S. – that "Your donation is safe in our hands because we are transparent about how much we raise and

where it is spent."[6] This statement is at best materially misleading, based on IRW's refusal post-suspension to engage with IRUSA's attempts to seek transparent disclosures regarding its programmatic spending. IRW's conduct further gravely jeopardizes IRUSA's reputation as a trusted and responsible aid organization and damages IRUSA's relationships with its donors, who rely on IRUSA's disclosures and reputation in giving donations.

### C. IRW'S TORTIOUS RESPONSE TO THE SEVERANCE

63.    IRW responded with ongoing hostility to IRUSA's decision to sever its relationship with IRW.

64.    IRW directed its offices and affiliates not to cooperate in any way with IRUSA, thus cutting off in whole part IRUSA's ability to monitor IRUSA-funded projects operationalized by those offices and affiliates.

65.    On December 4, 2025, IRUSA formally notified IRW, as stated further below, that as a result of the continuing concerns of the U.S. government about the affairs of IRW, it was necessary for IRUSA and IRW to discuss the transfer of sponsored orphans to a new administrator, i.e., to replace IRW as the administrator for IRUSA-sponsored orphans. IRUSA made clear that its overarching objective was to maintain support of the orphans without interruption of the necessary relief, but that the parties needed to cooperate in good faith with a transfer to an administrator that was not the focus of governmental scrutiny for alleged terrorist links or statements supportive of terrorism. Upon receipt of this notice, IRW refused to engage substantively in such discussions. Instead, it tried to create a fraudulent narrative that IRUSA had initiated a decision to simply cut off aid to orphans, rather than seeking to maintain such aid through the transfer to acceptable partners.

---

[6] *Where Your Donation Goes*, Islamic Relief Worldwide, https://islamic-relief.org/where-your-donation-goes/ (last visited May 14, 2026).

66.     On December 7, 2025, IRUSA provided another notice to initiate dispute resolution discussions with IRW, advising IRW specifically that continued association with IRW "presents an immediate threat to the reputation, integrity or operation" of IRUSA. **Exhibit J** at 2**.** IRUSA again explained that the U.S. government was actively considering removing IRUSA's tax-exempt status if it continued to be associated with IRW. This was a result of U.S. governmental entities indicating their concern IRW and its leadership were connected to "terror finance, associations with alleged terrorist organizations, and/or antisemitic actions or statements." *Id.* IRUSA further advised IRW that the refusal to discuss separation of IRUSA from IRW would end up only hurting the beneficiaries of IRUSA's humanitarian endeavors and would draw negative attention to IRW. In other words, IRUSA told IRW that not only both parties, but the beneficiaries of IRUSA-funded aid, had an overarching incentive to resolve these issues. Yet IRW not only refused to engage meaningfully with IRUSA, it escalated the situation aggressively to the detriment of IRUSA, its donors, and its beneficiaries.

67.     The December 7, 2025 correspondence listed a number of specific issues that IRUSA had previously raised and where IRW had refused discussion and dispute resolution. These included: (1) IRW's refusal to permit audit processes of the Afghanistan projects and the orphans' program; (2) return of funds in connection with terminated Afghanistan projects; and (3) return of $3.6 million in excess funds provided by IRUSA in connection with certain completed projects. *Id.* at 4.

68.     On or about December 24, 2025, good-faith negotiations having failed to take place in connection with the October 2025 notices, and as a result of several continuing unresolved disputes between IRUSA and IRW, as well as the continuing concerns of the House Ways and Means Committee (including the fact that "IRW has been the subject of severe and escalating scrutiny by

21

authorities in the United States"), IRUSA provided IRW notice seeking to "sever any existing contractual obligations or relationship to maintain continuity of independent operations and protect the interests of beneficiaries." **Exhibit K** at 2**.** It sought an immediate meeting no later than January 8, 2026, at a location in Europe of IRW's choosing. *Id.* at 5. IRW declined to commit to such a meeting, and it continues to do so to this day. It claimed it needed more time, but instead it used this time to initiate more tortious acts to harm IRUSA.

69.    On February 3, 2026, counsel for IRUSA wrote to counsel for IRW, again seeking to engage in discussions. **Exhibit L.** In that communication, IRUSA advised IRW that there was information showing that IRW was conducting fundraising in the U.S. Again, IRW refused to engage in meaningful negotiations. During IRUSA's repeated efforts to pursue dialogue with IRW, IRW thwarted efforts to resolve the issues, many of which had arisen by virtue of U.S. legal requirements. Because it suited IRW's interests to do so, it simply refused, over the course of many months and many disputes, to engage in a mechanism that required dialogue between CEOs of both organizations, then the Boards of both companies, then mediation, and finally arbitration. The conduct alleged in this Amended Complaint all relates to post-suspension tortious conduct, not to contractual breaches. But in any event, IRW, by its bad-faith refusal to participate from as early as October 2025 in requests to begin the dialogue specified in the Dispute Resolution Mechanism provision of the Members' Agreement, has renounced any alleged right to invoke such procedure at this juncture. In any event, this dispute does not arise out of the Members Agreement – it arises out of post-suspension conduct when, as IRW itself asserts, any obligations of IRW under the Members' Agreement do not apply. Such tactical maneuvering in bad faith should not be countenanced by this Court in any event.

70.     IRW's conduct and the regulatory scrutiny on IRW has resulted in other humanitarian entities seeking to disengage from their partnerships with IRW as well. As an example, in March 2026, USA for UNHCR, the UN Refugee Agency, wrote to IRUSA to request that it "disengage" from Islamic Relief Jordan, in light of the fact that there was a compliance hold placed on a wire transfer initiated by USA for UNHCR to fund Islamic Relief Jordan through a bank account registered under IRW's name. USA for UNHCR requested to work directly with IRUSA to adjust the funding program so that it was no longer providing funds to Islamic Relief Jordan, which USA for UNHCR was concerned was a part of IRW.

### D. IRW'S ILLEGAL SOLICITATION OF DONATIONS FROM U.S. PERSONS AND CONFLATION OF IDENTITIES BETWEEN IRW AND IRUSA

71.     Rather than engage in constructive dialogue with IRUSA to discuss the mechanics of the separation, IRW exploited the confusion regarding IRW and IRUSA's identities – the very confusion that IRUSA sought to remedy through the separation – to unlawfully solicit and collect donations from U.S. persons who thought they were donating to IRUSA.

72.     Charities must register in multiple U.S. states (approximately 40 of the 50 states), including New York, before soliciting charitable donations within those states. IRUSA is registered in all states that require registration. IRW is not registered with the New York State Attorney General as a charity and, on information and belief, IRW is not registered to solicit donations in any U.S. state – nor is it registered in the U.S. as a 501(c)(3) organization.

73.     In New York, under Executive Law Article 7-A § 171-a(10), "solicit" means "[t]o directly or indirectly make a request for a contribution, whether express or implied, through any medium." For such solicitations to be lawful, New York requires that the organization making the solicitation be registered.

74.     According to the New York State Attorney General's Office (the "NYAG"), the NYAG "regulates nonprofit organizations and fundraisers and provides them with helpful resources. In addition, [the NYAG] protect[s] nonprofits and their donors from fraud and ensure[s] that charitable donations are used as the donor intended."[7]

75.     IRW maintains a website, https://islamic-relief.org/, accessible to people within the U.S., including the State of New York. The top of the home page seen upon opening the website only identifies the organization as Islamic Relief. At the bottom of the page, the entity is identified as "Islamic Relief Worldwide" and the webpage states that it is "Registered Charity No. 328158." IRW's website also states that it "works with the Fundraising Regulator,"[8] an "independent regulator of charitable fundraising in England, Wales and Northern Ireland."[9]

76.     There is a bright red "Donate" button on the initial website page. Clicking the "Donate" button brings the user to a page permitting both "one-off" and monthly donations. Selecting a program to donate affords the user the option of donating by credit card in U.S. dollars as well as Euros and British pounds. In addition, depending on how the user accesses the website (e.g., from an Apple device), there is the option to make payment via Apple Pay or Google Pay, i.e., via U.S.-based payment processors.

77.     Such payment options are available on other sections of the website, including donation pages for specific projects, such as "Orphans and Children":

---

[7] *Charities, Nonprofits & Fundraisers*, N.Y. State Off. of the Att'y Gen., https://ag.ny.gov/resources/government-organizations/charities-nonprofits-fundraisers (last visited May 14, 2026).
[8] *Our Supporter Promise*, Islamic Relief Worldwide, https://islamic-relief.org/our-supporter-promise/ (last visited May 14, 2026).
[9] *About Us*, Fundraising Regulator, https://www.fundraisingregulator.org.uk/about-us (last visited May 14, 2026).



78.    Before a donation is consummated, the user is presented with and required to complete a series of form fields. Among the required fields for the user to enter information are name, physical address (including street, state, and zip code), and email address.



79.     After the user completes the required fields, including physical address, the site requires the user to click through to the payments page, thereby submitting the donor's information, including their physical address, to IRW. As detailed below, IRW collects the information and then issues direct email solicitations for donations to the user, including but not limited to users who tell IRW that they are located in New York.

80.     Based on internet analytics research, for the period from November 20, 2025 to February 18, 2026, 25% of IRW's internet traffic was from internet addresses based in the U.S.

81.     The above allegations do not simply present hypothetical possibilities. Internet analysis shows that IRW paid for advertisements seeking donations within the U.S. on Meta and on Google, and that these advertisements increased significantly after October 2025. These advertisements specifically targeted U.S. persons, including persons in New York, for the purpose of seeking donations.

82.     IRW solicited, and received, charitable donations from individuals in the U.S., including in the State of New York, that were intended for IRUSA. IRUSA provides one example below.

83.     On or about December 16, 2025, using IRW's web site, Donor A, a resident of Scarsdale, New York, made an online donation in the amount of $10,140 to IRW.

84.     Donor A is a frequent donor to IRUSA and was accustomed to making donations to IRUSA through IRUSA's website. Donor A knew that IRUSA was a 501(c)(3) nonprofit and was accustomed to receiving a 501(c)(3) donation receipt from IRUSA for the donations she made. As was her typical custom, she searched for "Islamic Relief" on Google, expecting to see IRUSA's website appear as the top search result. Instead, IRW's website was the first search result, and Donor A clicked on the website believing it to be IRUSA's. Upon information and belief, IRW's website was the top search result because of sponsored advertisements paid for by IRW on Google.

26

In light of the similarity in the style of IRW's website to IRUSA's, Donor A proceeded with her donation through IRW's website, believing that the donation was being made to IRUSA and that her donation would be tax-deductible given IRUSA's status as a 501(c)(3).

85.    Donor A, when she became aware of her mistake, contacted IRW to inform them that she had intended the donation to go to IRUSA, and asked that the funds be rerouted to IRUSA. She included her contact information, including her mailing address in New York, in her correspondence.

86.    Donor A did not hear back from IRW for several months, and not until after IRUSA filed the initial Complaint in this matter, referring to her mistaken donation. In late April 2026, IRW reached out to Donor A and processed a refund. Since her mistaken donation, Donor A has received almost daily emails from IRW soliciting donations. Hyperlinks in the emails are directed to IRW's website.

87.    Numerous donors aside from Donor A have contacted IRUSA in recent months to inform IRUSA that they had mistakenly donated to IRW rather than IRUSA, to follow up regarding the status of a matching donation offer, or to request from IRUSA a 501(c)(3) receipt for their donation or other service related to their donation when they had in fact donated to IRW. These donors have donated more than $120,000 annually combined (accounting for recurring daily or monthly donations), and several of these donors are located in the State of New York – including two donors who contacted IRUSA to request a receipt for their donation when they had in fact made a donation to IRW, and six donors who contacted IRUSA to change their monthly recurring donation when in fact their donation was made to IRW. In light of the volume of internet traffic routed to IRW from the U.S. with the aid of sponsored searches and advertisements, IRUSA reasonably believes that these donors who contacted IRUSA represent just a fraction of the hundreds, if not thousands

of U.S. persons who have been subject to IRW's purposeful solicitations of donations, and that the total amount of donations that IRW has received from U.S. donors far exceeds $120,000, although the exact number will be within IRW's knowledge and easily accessible to IRW. The number of donors located in the U.S. that have contacted IRUSA who mistakenly donated to IRW when intending to donate to IRUSA has increased in the past year.

88.     IRUSA also became aware that, in early 2026, IRW solicited donations from a New York-based university student organization through an Australian organization named Project Blackseed, with which IRW is partnered. Upon information and belief, IRUSA alleges that IRW is also actively soliciting donations from other individuals and organizations located in New York and in the U.S. through channels other than its website, and that these donations also well exceed $75,000. Again, this is an entirely logical and supportable assumption, but the total amount of U.S. donations in New York and elsewhere is "peculiarly within the possession and control" of IRW.

89.     Such solicitations are illegal under New York law, and the laws of the various states where registration is required to solicit residents of those states. Moreover, IRW intentionally used the similarity in name, logo, and website design to mislead donors into making donations to IRW when, as IRW surely knew and intended, they intended to make such donations to IRUSA. Because IRUSA is a registered 501(c)(3) nonprofit, donors were misled into making donations to IRW believing that they were donating to IRUSA to support IRUSA's mission, and that their donation would be tax deductible. IRW's conduct has jeopardized IRUSA's valued relationships with its donors and – through its illegal actions in New York and other states – threatens IRUSA's reputation.

90.     Upon information and belief, IRW's purposeful – and illegal – solicitation of donors in the U.S. increased dramatically in late 2025 and early 2026, after the notice of suspension, and

precisely as IRUSA notified IRW of its concerns regarding IRW's conduct and its intent to distance itself from IRW. Upon information and belief, IRW increasingly targeted Google advertisements to the U.S. during these months, soliciting donations. IRW's unlawful actions caused further confusion among donors as to the identities of IRW and IRUSA and have negatively impacted IRUSA's fundraising efforts and ability to carry out its humanitarian mission. Ramadan is historically an important period for fundraising for IRUSA, as IRW well knows, and web donations constitute the vast majority of IRUSA's fundraising. The amount of donations IRUSA received during Ramadan in 2026 decreased by almost $2 million compared to last year, which is especially significant given that, historically, IRUSA's fundraising amounts during Ramadan have increased year over year. This was precisely the time period of IRW's increased and illegal solicitation of donors in the U.S., including the solicitation of donors in New York.

### E. IRW'S FURTHER ATTEMPTS TO TARNISH IRUSA'S REPUTATION THROUGH UNAUTHORIZED CANCELLATION OF ORPHAN SPONSORSHIPS

91. As indicated above, one of the charitable projects in which IRUSA has participated in with IRW – indeed the largest – is the Orphan Sponsorship Programme ("OSP"). Under that program, which originated in 2022, IRUSA transmitted funds to IRW as administrator to distribute the funds to orphans in various locations around the world for "improving the health, nutrition, education, mental and physical wellbeing of orphans and their families." Every donor who donates to the OSP is assigned to a specific orphan and receives regular updates from IRUSA on the use of their funds. Donors often commit to sponsoring specific orphans for several years, sometimes until the orphan ages out of the program, and as such cultivate valued and important relationships with the orphans they sponsor through letter exchanges.

92. On December 4, 2025, IRUSA gave notice to IRW that it was forced to terminate the OSP with IRW but emphasized that the orphans were to continue to be supported with IRUSA funds

29

through a different partner, which should be onboarded without delay. IRUSA stated that, to avoid any of the orphans in the program suffering a loss of support, IRUSA would transfer all IRUSA-sponsored orphans to non-government organizations vetted by IRUSA (other than IRW). The letter notice called for termination of certain limited country programs – those in South Africa, Chechnya, and Afghanistan – due to issues specific to each program, including low sponsorship volume and IRUSA's concerns with lack of transparency with respect to certain country program partners. It did not request or suggest the termination of any other orphan sponsorships, and IRW still had funds it had received from IRUSA to support orphans in its other country programs. It simply needed to cooperate in transferring IRUSA's orphan sponsorships to a different administrator to continue to support orphans without disruption.

93.    As indicated above, on December 24, 2025, IRUSA gave notice to IRW that it was forced to terminate all existing contractual relationships with IRW because of the numerous risks posed by continuing the program through IRW administration but emphasized again that the orphans should continue to be supported. **Exhibit K.**

94.    IRW, however, refused to work with IRUSA to transfer the orphan sponsorships maintained under the OSP to another entity to provide funding continuity for the orphans affected.

95.    On or about January 15, 2026, IRW unilaterally and maliciously cancelled the sponsorship of hundreds of orphans and did so through the unauthorized use of an IRUSA employee's credentials to create a record that falsely suggested that IRUSA was initiating the action to cancel the orphan sponsorships. Such action was unjustified, unnecessary, malicious, and intended to harm IRUSA and its reputation, and its relationship with its donors, via unnecessary and unacceptable collateral damage to orphans worldwide. As IRW is well aware, supporting orphans is a cornerstone of Islamic faith, which focuses on compassion, protection, and financial care, with

the Prophet Muhammad (saw) promising that caretakers of orphans will be close to him in Paradise. It is a collective responsibility, with orphans mentioned 22 times in the Qur'an and care for them deemed a high act of righteousness. Thus, the allegation that support for orphans has been taken away is one of unusual seriousness for Islamic charities.

96.     Due to IRW's conduct, a total of 645 orphans from Albania, Bangladesh, Bosnia, Ethiopia, Indonesia, Iraq, Malawi, Mali, and Pakistan, previously sponsored through IRUSA and its donors, had their humanitarian benefits cancelled upon false statements by IRW that there was no donor available or, in some cases, that the donor had cancelled participation in the OSP. As a result, 645 orphan sponsorships, funded by donors who had made donations to IRUSA with the expectation and intent to sponsor orphans in need, were abruptly terminated without any justification, including 71 sponsorships funded by donors located in the State of New York. The total value of annual sponsorships canceled by IRW in this manner was approximately $774,000 for the year 2025, with approximately $85,200 of that amount from donors located in the State of New York.

97.     These cancellations occurred without IRUSA's knowledge and led IRUSA to inadvertently make representations to OSP donors about who their donations were benefitting that were no longer correct. IRUSA subsequently notified its donors after it became aware of the event, but such abrupt and arbitrary cancellations damaged IRUSA's valued relationships with the OSP donors.

98.     On February 12, 2026, having discovered IRW's actions, counsel for IRUSA demanded from counsel for IRW an explanation for IRW's conduct in creating records that made it "falsely appear that IRUSA had proactively cancelled hundreds of orphans." IRUSA requested that the false entries be reversed. IRUSA further demanded that the credentials of an IRUSA employee not

be used to communicate cancellations, as neither the employee nor IRUSA had authorized the wrongful use of an IRUSA employee's credentials.

99.     IRW refused to reverse the false OSP entries or inform donors that the initiative had been taken by IRW. As a result, IRW allowed false business records to remain in the OSP's records that stated (a) that 645 orphans had had their sponsorships terminated; (b) that the reason for the terminations was a lack of donors; and (c) that an IRUSA employee had entered and created the false terminations and the false justifications.

100.    After creating the false OSP records, IRW cut off IRUSA's access to the software that identified the orphans in the OSP, whether they were receiving benefits, and through which entities such benefits were being provided. Thus, IRUSA has no way of knowing whether IRW has also cut off benefits to numerous other orphans that had been funded by IRUSA and its donors and lacked the necessary information to effectively transfer the sponsorships and reinstate the program. Again, IRUSA alleges that such actions were malicious and intended to harm IRUSA and its relationships with donors.

## CAUSES OF ACTION

### COUNT I
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

101.    IRUSA re-alleges and incorporates by reference paragraphs 1 through 100.

102.    IRUSA has a valid business expectancy to be able to raise funds in the U.S. under its name and reputation, unimpeded by competitors seeking to raise funds by abusing similarities in names in order to confuse donors and without legal permission to do so. IRUSA has been operating in the U.S. for more than 30 years and has valuable business relationships with frequent donors located in the U.S., like Donor A and many others, who are committed to supporting IRUSA's mission and obtaining tax deductibility of their contributions. Many of these donors specifically provide

32

donations to IRUSA with the intention of sponsoring a specific orphan in need and expect that the funds would be used to sponsor that orphan.

103.    IRW knew this and, in fact, was well aware of IRUSA's business expectancy to raise funds and IRUSA's business relationships with frequent donors in the U.S., including Donor A.

104.    However, IRW intentionally interfered with these relationships by refusing to cooperate with IRUSA's requests for audits, unlawfully soliciting donations in the U.S. without proper registration and collecting and retaining donations intended for IRUSA, and unilaterally cancelling sponsorship of hundreds of orphans and making it appear as if it was IRUSA's decision to do so. In the alternative, IRW acted solely out of malice, to damage IRUSA's relationships with its donors and its reputation. These actions by IRW have further caused IRUSA to suffer material reputational damage, and to defend itself from inquiries by government and business partners that seek explanations about the connection between the two entities.

105.    As a direct and foreseeable result of IRW's conduct, IRW has damaged IRUSA's relationships and business expectancy to raise donations from the  donor base that it has cultivated over three decades, as well as caused injuries to IRUSA's reputation, including costs incurred in defending its reputation, in an amount to be determined at trial, plus punitive damages.

## COUNT II
## FALSE AND MISLEADING REPRESENTATIONS IN VIOLATION OF
## 15 USC § 1125(A)

106.    IRUSA re-alleges and incorporates by reference paragraphs 1 through 105.

107.    IRW has made material misleading representations regarding the nature, characteristics, and/or qualities of IRUSA's services or commercial activities by implying to the marketplace that IRW and IRUSA are one and the same, and/or that donating to IRW is equivalent to donating to IRUSA.

108.    IRW has further made material misleading representations regarding the nature, characteristics, and/or qualities of IRW's services or commercial activities by implying to the marketplace that IRW is authorized to solicit donations from U.S. donors, and that IRW is a "transparent" and "accountable" organization where donors can trust that their donations are being used in the most effective way. IRW has made material misleading omissions by failing to inform donors that donors to IRW are not eligible for tax deductions. IRUSA is the authorized charity with the right to raise funds and, as a qualified charity, can accept tax-deductible contributions.

109.    IRW placed these misrepresentations in interstate commerce by publishing the statements on their website, which is accessible to U.S. individuals, and failing to disclose the fact that it was not authorized to solicit or to grant tax deductibility in soliciting donations, including them in targeted advertisements to U.S. individuals on platforms such as Google and Meta, and making them in one-on-one outreach to individuals and organizations in the U.S.

110.    IRW's misleading descriptions and representations of fact are material because they are likely to influence donors' decisions to make or not make financial contributions to IRW and to IRUSA. Numerous donors, the quantity and donation amounts to be proven at trial, donated to IRW relying on IRW's representations about transparency and accountability, and thinking that they were donating to IRUSA, a registered 501(c)(3) nonprofit, when they were actually donating to IRW.

111.    As a direct and foreseeable result of IRW's conduct, IRUSA has been injured and has suffered damages in an amount to be determined at trial, but in no event less than $ 75,000, as well as punitive damages and attorneys' fees.

34

## COUNT III
## UNLAWFUL DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF
## NEW YORK GENERAL BUSINESS LAW § 349

112.    IRUSA re-alleges and incorporates by reference paragraphs 1 through 111.

113.    IRW's illegal solicitation of funds in the State of New York and in the U.S. is likely to cause and is causing confusion, mistake, and deception among the general public. Such acts are also likely to deceive the public into believing that IRW is authorized to solicit funds from individuals in U.S. and New York, and that the services offered by IRW originate from, are associated with, or are otherwise endorsed by IRUSA.

114.    IRW's deceptive acts and practices involve public sales activities of a recurring nature, are consumer-oriented, and are materially misleading.

115.    As a direct and foreseeable result of IRW's conduct, donors across the U.S., including in New York, were and continue to be misled into thinking that IRW is a transparent, duly licensed charitable organization when in fact it is not, and are misled into thinking that IRW is associated with, or the same as, IRUSA, and that their donations to IRW will be tax-exempt in light of IRUSA's status as a 501(c)(3) nonprofit.

116.    As a direct and foreseeable result of IRW's conduct, IRUSA has been injured and has suffered damages in an amount to be determined at trial.

## COUNT IV
## UNJUST ENRICHMENT

117.    IRUSA re-alleges and incorporates by reference paragraphs 1 through 116.

118.    By its wrongful actions, IRW has been unjustly enriched by its acceptance of donations intended for IRUSA, at IRUSA's expense.

119.    It is against equity and good conscience to permit IRW to retain the benefits derived from its wrongful conduct.

120.    As a direct and proximate result of the wrongful conduct of IRW, IRUSA is entitled to an accounting of IRW's financial records to determine the amounts realized by IRW due to deliberate confusion created by IRW and by IRW's refusal to refund donors who requested refunds after they realized that they mistakenly donated to IRW instead of IRUSA. IRUSA is entitled to a recoupment of the amount by which IRW has been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff IRUSA respectfully requests this Court to enter judgment in its favor and against Defendant IRW and issue an Order:

1) Awarding compensatory damages to IRUSA in connection with the damage to IRUSA's reputation and business relationships and the amounts wrongfully collected in the U.S. by IRW, in an amount to be proven at trial;

2) Awarding punitive, special, and/or exemplary damages against IRW in an amount to be proven at trial, sufficient to prevent IRW from continuing its willful, wanton, intentional, and malicious conduct;

3) Awarding pre- and post- judgment interest;

4) Assessing costs and fees, including but not limited to reasonable attorneys' fees and expenses incurred in the prosecution of this action; and

5) Granting such other and further relief as this Court may deem just and proper.

Dated: May 14, 2026

Respectfully submitted,

LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC

/s/    *Arthur D. Middlemiss*
Arthur D. Middlemiss
arthur.middlemiss@lbkmlaw.com

36

Marc Frazier Scholl
marc.scholl@lbkmlaw.com
10 Grand Central
155 East 44th Street, 25th Floor
New York, New York 10017
(212) 826-7001

Eric L. Lewis
eric.lewis@lbkmlaw.com
1050 K Street NW, Suite 400
Washington, DC 20001
(202) 833-8900

*Counsel for Plaintiff Islamic Relief USA*