**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ISLAMIC RELIEF USA,<br><br>             *Plaintiff,*<br><br>      *v.*<br><br>ISLAMIC RELIEF WORLDWIDE, INC.,<br><br>             *Defendant*. | Civil Action No. 1:26-cv-02367-PAE<br><br>**Hearing Requested** |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S RENEWED MOTION TO COMPEL ARBITRATION

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 3

    I.     The Parties ............................................................................................................ 3

    II.    The Parties' Contracts........................................................................................ 4

        A.   The Members' Agreement.......................................................................... 4

        B.   The License Agreement.............................................................................. 6

        C.   The Grant Agreements ............................................................................... 7

    III.   The Parties' Dispute........................................................................................... 7

    IV.   IRUSA's Lawsuit............................................................................................. 10

ARGUMENT.................................................................................................................... 12

    I.     The Members' and License Agreements Contain Binding Arbitration Clauses............ 14

    II.    IRUSA's Claims Fall Squarely Within the Parties' Agreement to Arbitrate. ............... 16

CONCLUSION.................................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
  600 U.S. 412 (2023)............................................................................................................. 22

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011)............................................................................................................. 13

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986)............................................................................................................. 23

*Barrios-Contreras v. Big Fish Ent. LLC*,
  No. 25-cv-3203, 2026 WL 621576 (S.D.N.Y. Mar. 5, 2026)................................................ 16

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
  448 F.3d 573 (2d Cir. 2006)................................................................................................. 23

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)................................................................................................. 14

*Chanel, Inc. v. RealReal, Inc.*,
  449 F. Supp. 3d 422 (S.D.N.Y. 2020).................................................................................. 23

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*,
  58 F.3d 16 (2d Cir. 1995) ............................................................................................. passim

*David L. Threlkeld Co. v. Metallgesellschaft Ltd.*,
  923 F.2d 245 (2d Cir. 1991)......................................................................................... passim

*Green Tree Fin. Corp. Alabama v. Randolph*,
  531 U.S. 79 (2000)............................................................................................................... 14

*In re Am. Exp. Fin. Advisors Sec. Litig.*,
  672 F.3d 113 (2d Cir. 2011)............................................................................... 13, 14, 16, 23

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017)................................................................................................... 14

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983).................................................................................................. 13, 17, 23

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016)................................................................................................. 14

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
   369 F.3d 645 (2d Cir. 2004)..................................................................................... 13

*Seabury Constr. Corp. v. Jeffrey Chain Corp.*,
   289 F.3d 63 (2d Cir. 2002)........................................................................................ 15

*Spire Global Subsidiary, Inc. v. NorthStar Earth & Space, Inc.*,
   768 F. Supp. 3d 546 (S.D.N.Y. 2025)....................................................................... 13

*Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund*,
   661 F.3d 164 (2d Cir. 2011)...................................................................................... 14

*Walker Wear LLC v. Off-White LLC*,
   624 F. Supp. 3d 424 (S.D.N.Y. 2022)....................................................................... 22

**Statutes**

15 U.S.C. § 1125............................................................................................................ 20, 22

9 U.S.C. § 2.......................................................................................................................... 13

9 U.S.C. § 3.......................................................................................................................... 13

9 U.S.C. § 4.......................................................................................................................... 13

9 U.S.C. § 201...................................................................................................................... 13

N.Y. Gen. Bus. Law § 349.............................................................................................. 10, 22

iii

**INTRODUCTION**

Plaintiff Islamic Relief USA ("IRUSA") brings this suit as part of a years-long smear campaign against Defendant Islamic Relief Worldwide ("IRW").  As IRW demonstrated in its first motion to compel, ECF 13, the parties' agreements require *confidential* arbitration.  Instead, IRUSA again uses this Court's docket to file a publicity stunt directed to Congress and the media, attempting to extract a renegotiation of IRUSA's agreements with IRW.  IRW is an internationally respected, U.K.-based charitable organization undertaking critical, lifesaving work in underserved communities around the world.  IRUSA publicly regurgitates baseless allegations from a long-running misinformation campaign IRW has repeatedly refuted (with prior support from IRUSA). Because IRUSA cannot overcome its arbitration agreements, all its claims should be compelled to arbitration.

The Members' Agreement IRUSA entered with IRW, which set the framework for the parties' entire relationship, provides that any "dispute or difference between the Parties arising out of *or related* to this Agreement . . . shall be determined by arbitration."  Ex. 1 at 11, § 8.2.2 (emphasis added).[1]  The parties' License Agreement governing IRUSA's use of IRW's trademarks has a substantially similar clause.  Ex. 2 at 7, §§ 1.27-1.28.  IRUSA's original complaint asserted that IRW breached the Members' and License Agreements by soliciting donations in the U.S.  It acknowledged the arbitration clauses but asserted that they were void as contrary to public policy. After IRW filed a motion to compel arbitration explaining the strong public policy in favor of arbitration, IRUSA completely changed its strategy.  Its Amended Complaint continues to rely on

---

[1] Numbered exhibits are attached to the accompanying Declaration of Caleb Hayes-Deats in Support of Defendant's Renewed Motion to Compel.

IRW's alleged U.S. solicitations, but now contends they "post-date[d]" IRUSA's suspension of the Agreements, such that its claims do not arise from those Agreements.  ECF 16 ("AC") ¶ 32.

IRUSA's new attempt to avoid its agreement to arbitrate fails several times over.  Whether or not IRUSA's claims arise out of the Members' and License Agreements, they are plainly "related to" those Agreements.  The Members' and License Agreements both explicitly govern the parties' rights to the trademarks IRUSA alleges IRW misused in U.S. solicitations.  The Members' Agreement also governs each party's right to operate in different jurisdictions and each party's obligations upon suspension and termination of their contractual relationships.  The Amended Complaint's claims require consideration of *all* those rights.  They thus fall well within the scope of what the Second Circuit has held is covered by materially identical arbitration clauses.

The weakness of IRUSA's arguments against arbitration lay bare its motivation for filing this suit.  IRUSA faces pressure from the U.S. House of Representatives Ways and Means Committee (the "Committee") to disassociate from IRW.  AC ¶¶ 44, 57.  IRUSA seeks to placate its critics by attempting to publicly distance itself from IRW, something confidential arbitration would not permit.  The gambit appears to have worked.  On March 30, 2026, the Committee claimed credit for provoking this lawsuit.[2]  IRUSA also knows that IRW owns all trademarks associated with Islamic Relief, including IRUSA's own name.  Ex. 2.  Termination of the parties' Agreements requires IRUSA to both change its name and transfer its assets to another charity that works with IRW.  Ex. 1 at 9-10, §§ 6.6.2 & 6.6.7.  IRUSA thus seeks to create leverage for renegotiating its entire relationship with IRW.  It insinuates that IRW has violated U.S. sanctions— even while admitting "there was no violation of U.S. law," AC ¶ 53—in an effort to wrest the

---

[2] *Ways & Means Investigation Leads to Tax-Exempt Org. Cutting Ties with Terrorist-Affiliated Grp.*, U.S. House Comm. on Ways & Means (Mar. 30, 2026), https://perma.cc/E4BL-65T7.

mantle of Islamic Relief for itself.  This Court should stop further misuse of its docket and compel this case to arbitration.

## BACKGROUND

### I.    The Parties

IRW was founded in the U.K. in 1984 as a charity to address the needs of vulnerable communities worldwide.  Ex. 1 at 2.  As a practical manifestation of the humanitarian values inspired and guided by the Islamic faith, IRW seeks to alleviate human suffering and provide relief from poverty or financial hardship by providing humanitarian assistance, raising awareness, advocating for those in need, advancing conflict resolution, and promoting religious and human harmony.  IRW is the sole owner of all trademarks associated with "Islamic Relief," including "Islamic Relief USA."  Ex. 2 at 3 § 1.01; *id.* at 10, Ex. 1.[3]

IRW has established and helped organize affiliates around the world that operate in different nations under the "Islamic Relief" brand and in support of IRW's charitable goals.  Ex. 1 at 3-4.  In 1993, IRW members founded IRUSA in the U.S. to provide humanitarian aid in cooperation with IRW and its other international affiliates.  *Id.* at 2; AC ¶ 23.  Between 1993 and 2025, IRW and IRUSA worked together to alleviate poverty and suffering.

IRW has a stellar reputation in the international community.[4]  To meet its partnership ob-

---

[3] *See also* ISLAMIC RELIEF, Registration Nos. 3,394,966; 3,302,265; 3,414,633; 3,302,270; 3,414,634; 3,394,967; 3,394,964; 3,492,705; 3,492,708; 3,492,706; 3,492,707; 3,492,703; 3,302,215; 3,492,704; 3,501,880; ISLAMIC RELIEF USA, Registration Nos. 3,882,395; 3,849,715; 3,849,712; 3,849,714; 3,999,005; 3,849,711; 3,849,713; 3,849,716; IRUSA, Registration Nos. 6,953,963; 6,953,977; 6,953,965; 6,953,966; 6,953,976; 6,953,978; 6,953,970; 6,953,971; 6,953,968; 6,953,975; 6,953,980.

[4] *See About Us*, Islamic Relief Worldwide, https://perma.cc/TSL3-KVB7 (describing IRW's adherence to the Red Cross Code of Conduct, the Core Humanitarian Standard on Quality and Accountability, and the INGO Accountability Charter).

ligations to organizations such as the United Nations and key government donors, IRW has complied with rigorous audit requirements. IRW is subject to annual statutory audits, the results of which are publicly available on a website administered by the Charity Commission of England & Wales.[5] Its partnerships with well-respected international institutions and governments require rigorous audits as well. Those rigorous examinations have never found any evidence that IRW funds, supports, or has any connection to terrorism or terrorist organizations, or that it has failed to implement systems and processes required to prevent or respond to such allegations.[6]

## II.    The Parties' Contracts

IRW and IRUSA entered two primary contracts to formalize and structure their relationship and collaboration, both of which were negotiated by sophisticated parties with the benefit of independent legal advice. Both contain broad, binding arbitration clauses.

### A.  The Members' Agreement

In late 2019, IRW and IRUSA entered a Members' Agreement to implement an agreed-upon international federation structure and carry out "their collaborative Charitable Activities on an international basis." Ex. 1 at 2. Under the Members' Agreement, IRW is the overarching organization and shall be "responsible for coordinating the representation of IR globally at international conferences and forums." *Id.* at 7, § 5.2.5. It would "set a global strategy for Islamic

---

[5] These audits by a leading, independent global audit firm ensure that IRW's work and activities are transparent to its U.K. regulator and open to public scrutiny. The U.K. Charity Commission website shows five years of audited accounts, *see Islamic Relief Worldwide - 328158*, Charity Commission for England and Wales, https://perma.cc/V8V7-5H4C, and the U.K. Companies House website has IRW's entire history, including its audited financial accounts from when it first registered in 1989, as well as complete details of all its directors, *see Islamic Relief Worldwide*, Gov't of the United Kingdom, https://perma.cc/A96Q-XQM6.

[6] *See* David Kirkpatrick, *The Dirty Secrets of a Smear Campaign*, New Yorker (Mar. 27, 2023), https://perma.cc/ZK8A-B3L6 ("[N]obody has ever credibly identified any institutional ties between the charity and an Islamist movement. In fact, Islamic Relief typically works in partnership with the U.N., U.S.A.I.D., and European governments.").

Relief in collaboration and consultation with IR USA and all the other Members of IRW." *Id.* at 5, § 3.2. The parties agreed that "IR will have one presence/operation only in any national jurisdiction." *Id.* at 5, § 3.4. IRUSA further agreed that it would spend most of its total annual income on charitable programs. *Id.* at 3 (defining "Financial Standards"). IRUSA could use "up to 30%" of its income on programs within the U.S. *Id.* Programs that IRUSA invested in outside the U.S.—70% or more of its income—needed "to be delivered through IRW or another intermediary." *Id.* at 5-6, § 3.5. IRW agreed to ensure that programs "throughout Islamic Relief operations worldwide" operate "in a manner consistent with Applicable Laws," *id.* at 7, § 5.2.2, a term defined to include "all laws" that "apply to IRW or IR USA," *id.* at 3. And both parties agreed that they would comply with specified "Financial Standards," *id.* 7-8, §§ 5.2-3, including "yearly" audits, *id.* at 3.

The Members' Agreement also governed IRW's trademarks and the parties' rights upon suspension or termination of their contractual relationship. IRW would "register, own and protect usage of the Trademarks," Ex. 1 at 7, § 5.2.3, including " 'Islamic Relief', 'Islamic Relief USA,' " and " 'IRW,' " *id.* at 5. IRUSA acknowledged the "exclusive right, title, interest and goodwill of IRW in the Trademarks," including "any and all goodwill in the Trademarks arising from IR USA's use of the Trademarks." *Id.* at 7-8, § 5.3.4. If either party suspended the Agreement, the "rights of the other party" would be governed by "the Rules" set by IRW and "ratified by the International General Assembly." *Id.* at 9, § 6.5. And in the event of termination, the Agreement set forth both parties' duties, including IRUSA's obligations to "change its name to exclude use of the Trademark" and to transfer its "property and assets" to "another charity" that had "entered into a membership agreement with IRW." *Id.* at 9-10, §§ 6.6.2 & 6.6.7.

5

The Members' Agreement set forth a process for resolving "[a]ny dispute or difference between the Parties arising out of or related to this Agreement." *Id.* at 10-11, § 8.1. First, the CEOs of IRW and IRUSA would confer. *Id.* If that process did not resolve the dispute within "thirty (30) business days," the parties agreed to refer the dispute to their respective Boards of Trustees, which would each designate representatives to mediate the issue. *Id.* If the trustees could not reach a resolution "within 30 business days," then the International General Assembly would appoint a panel of independent mediators to attempt to do so. *Id.* at 11, § 8.2. If that process did not resolve the issue within 60 days, or if "either Party fails to participate . . . in the mediation," the dispute "shall be determined by arbitration administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules." *Id.* The place of arbitration would be "Birmingham, England," and the Agreement would be governed by English law. *Id.* The parties further agreed that the dispute resolution clause "shall survive the termination of the Agreement." *Id.* at 12, § 12.1.

### B.  The License Agreement

In 2021, the parties entered an updated License Agreement concerning IRW's trademarks, which extended a license first granted in 2010. Ex. 2. They agreed that IRW is the "sole owner" of all trademarks associated with Islamic Relief, including the trade name "Islamic Relief USA." *Id.* at 3, § 1.01; *id.* at 10, Ex. 1. IRUSA again acknowledged IRW's "exclusive right," that "all goodwill in the Trade-marks" would inure to IRW's benefit, and that IRUSA "has no right, title, interest or goodwill in the Trade-marks." *Id.* at 3, §§ 1.05-1.06. The License Agreement preserved IRW's "right to use, advertise or display the Trade-marks" that it owned, and granted IRUSA "an *otherwise* exclusive" license to use the marks within the U.S. *Id.* at 3, § 1.07 (emphasis added).

6

The License Agreement continued until December 19, 2025, Ex. 2 at 2, although it would automatically end upon termination of the Members' Agreement, *id.* at 6, § 1.25(a).  It also contained a dispute resolution provision that was substantially similar to the Members' Agreement's, except that arbitration would occur under the London Court of International Arbitration Rules and the Agreement would be governed by U.S. law.  *Id.* at 7, §§ 1.27-28.

### C.  The Grant Agreements

Operating within the framework created by the Members' Agreement, IRW and IRUSA entered a series of Grant Agreements through which IRUSA funded IRW projects.  *E.g.*, ECF 1-3.  Each Grant Agreement covers one of the charitable programs the Members' Agreement envisioned. Ex. 1 at 3, § 5.3.

### III.    The Parties' Dispute

IRUSA alleges that, in September 2024, the Committee issued a letter to the IRS requesting an investigation of IRUSA and possible revocation of its 501(c)(3) status based on its affiliation with IRW.  AC ¶ 44; AC Ex. A (ECF 16-1).  The allegations in that letter were a decade old and facially meritless.  *See, e.g.*, AC Ex. A (ECF 16-1) at 9 (citing investigation by Swiss authorities that concluded IRW "management" had "reacted quickly and distanced itself from antisemitic statements" made in "2014/15").  For example, IRUSA invokes sanctions that Israel imposed in 2014 on IRW and its "branches," including its U.S. branch.  AC ¶ 41.  IRUSA insists that it is not a "branch" of IRW and could not be the U.S. branch that Israel sanctioned.  *Id.*  But it identifies no other entity that Israel could have meant.  *Id.*  Those allegations show, at a minimum, that the

7

sanctions reflected a lack of knowledge of IRW's basic structure. But IRW has also long discredited the allegations underlying those sanctions and any similar accusations.[7] IRW and its affiliates have even recovered substantial damages for libel from media outlets that have falsely claimed they have connections to terrorists.[8] IRW's refutations apparently persuaded IRUSA. It entered the Members' and License Agreements five years *after* the Israeli sanctions issued.

Rather than explain to the Committee that its allegations lacked merit, however, IRUSA "notified IRW of its intent to renegotiate its relationship with IRW." AC ¶ 46. IRUSA's and IRW's Boards actively communicated with one another, culminating in IRW inviting IRUSA's Board to meet with them in the United Kingdom in February 2025. Ex. 3 (ECF 14-5). Subsequently, the parties held several virtual and in-person meetings through September 2025. On July 10, 2025, IRW received a letter from IRUSA alleging that IRW exported goods from Iran, accusing IRW of procurement fraud, and suspending specific Grant Agreements relating to earthquake recovery and healthcare education projects implemented in Afghanistan. AC ¶ 50-51; Ex. 4 (ECF

---

[7] Matthew Price, *Audit 'clears Islamic Relief' of terror funding claim*, BBC News (Dec. 12, 2014), https://perma.cc/EWZ8-5QXQ; *see also* Gerald T. FitzGerald, *Mapping Anti-Muslim Discrimination and Information Manipulation, and its Impact on Humanitarian Aid and Development*, George Mason Univ. 53-58 (Feb. 2024) (explaining the long-running and false attacks against IRW); Kirkpatrick, *supra* n.6, ("[N]obody has ever credibly identified any institutional ties between the charity and an Islamist movement. In fact, Islamic Relief typically works in partnership with the U.N., U.S.A.I.D., and European governments.").

[8] *See* Charlotte Tobitt, *GB News pays substantial damages to Islamic Relief over false terrorism claim*, Press Gazette (Dec. 3, 2025), https://perma.cc/6HDG-XT6J; Shanifa Nasser, *Canadian Muslim charity wins 'milestone' settlement after being falsely accused of funding terrorism*, CBC (June 9, 2023), https://perma.cc/4SRU-294W; *Corrections and clarifications*, Daily Mail (Apr. 2, 2025) ("An article on 16 February reported a television interview which suggested it had been found that Islamic Relief Worldwide, a UK-registered charity, had sent money to terrorist groups in the Middle East. In fact, this is untrue and we apologise to the charity and its trustees for the contrary impression given."); *GB News apologises and pays substantial damages to Islamic Relief over false allegations of terror funding*, Carter-Ruck, https://perma.cc/B4B6-WTPX (last visited June 3, 2026) (explaining broadcast apology and "substantial damages" received by IRW resulting from GB News "allegations . . . that Islamic Relief had funded terrorist groups in the Middle East and is part of a greater agenda promoting extremism and radicalisation.").

14-6).  IRUSA's letter acknowledged, however, that "these [alleged] multiple breaches did not result in violations of relevant sanctions laws."  *Id.*; AC ¶ 53.  IRW's response confirmed no violation had occurred.  AC Ex. B (ECF 16-2).  In October 2025, IRW offered to refund IRUSA for the products and jointly report the issue to OFAC.  AC Ex. C (ECF 16-3).  IRUSA declined.

Four days later, the Committee issued a second letter requesting that the IRS investigate IRUSA's tax exemption.  AC ¶ 57.  The Committee's five-page letter mentioned IRUSA *once*, in a list of other organizations, and did not mention IRW at all.  AC Ex. G (ECF 16-7).  Nonetheless, on October 12, 2025, IRUSA "invoked its rights under the Members' Agreement to suspend participation in all programs executed by IRW."  AC ¶ 58.  IRUSA then sought to have an audit firm examine IRW's Afghanistan operations, without involving IRW.  AC Ex. I (ECF 16-9).  After IRW objected that the parties' Agreements required cooperation on audits, *id.*, IRUSA invoked the dispute resolution provisions of the parties' Agreements and stated that "continued connections to IRW directly threaten" IRUSA's "continued existence," AC Ex. J (ECF 16-10 at 3).

IRUSA alleges that, in response to "IRUSA's decision to sever its relationship with IRW," IRW engaged in two tortious acts.  AC ¶ 63.  First, IRUSA asserts that IRW began advertising in the U.S. on Meta and Google.  *Id.* ¶ 81.  Because IRW and IRUSA both used "Islamic Relief" trademarks, IRUSA alleges that IRW's U.S. advertisements "mis[led] donors into making donations to IRW when . . . they intend[] to make such donations to IRUSA."  AC ¶ 89.  Second, IRUSA asserts that IRW "falsely suggested that IRUSA was initiating action to cancel . . . orphan sponsorships."  AC ¶ 95.  IRUSA admits that, on December 4, 2025, it terminated its participation in an Orphan Sponsorship Program administered by IRW.  AC ¶ 92.  Even though the Members' Agreement provides that, upon termination, IRUSA will transfer its "assets" to a charity that "has entered into a membership agreement with IRW," Ex. 1 at 9, § 6.6.2, IRUSA alleges that IRW had

9

to "transfer all IRUSA-sponsored orphans to non-government organizations vetted by IRUSA (other than IRW)," AC ¶ 92. IRUSA gave notice that it would terminate the Members' Agreement and all other contractual relationships on December 24, 2025. *Id.* ¶ 93. It alleges that IRW then terminated IRUSA's sponsorships and, where available, transferred the orphans IRUSA had funded to other members of the Islamic Relief family to sponsor. *Id.* ¶¶ 94-95; Ex. 5 (ECF 14-23). IRUSA claims that cancellation harmed its relationships with U.S. donors who had sponsored those orphans, because "supporting orphans is a cornerstone of the Islamic faith." AC ¶ 95.

## IV.    IRUSA's Lawsuit

IRUSA filed this lawsuit on March 23, 2026. ECF 1. Its original complaint alleged that IRW solicited donations in New York in violation of the Members' and License Agreements, refused to submit to audits and return funds in violation of two Grant Agreements, and created a false impression that IRUSA had withdrawn support for the Orphan Sponsorship Program. *Id.* ¶¶ 69-73, 87-91, 149. IRUSA acknowledged the arbitration clauses in the Members' and License agreements, but asserted they "should be found to be void against public policy and nullified" because IRW had engaged in conduct that was "against United States law and public policy." *Id.* ¶¶ 99-102. It then asserted eleven claims. First, it contended that IRW's solicitations in New York (1) breached the Members' and License Agreements and the covenant of good faith and fair dealing; (2) tortiously interfered with IRUSA's prospective business advantage with donors; (3) constituted deceptive marketing under N.Y. Gen. Bus. Law § 349; and (4) unjustly enriched IRW. Second, IRUSA further alleged that IRW's failure to permit audits breached the Grant Agreements as well as the covenant of good faith and fair dealing.

IRW moved to compel arbitration and dismiss the complaint. ECF 13. It explained that federal public policy favors arbitration, even where plaintiffs allege that a defendant engaged in illegal conduct. *Id.* at 11-14. That longstanding policy doomed IRUSA's voidness argument. *Id.*

10

IRW further explained that the Second Circuit interprets clauses that provide for arbitration of any claims "related to" a contract to reach any claim based on conduct covered by the contract. *Id.* at 14-17. Because IRUSA asserted that the Members' and License Agreements prohibited IRW's alleged solicitation in New York, it conceded that the conduct "related to" those agreements. *Id.* Any claim based on that conduct fell within the arbitration clause, "no matter how [the claims] are labeled." *Id.* at 16 (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 21 (2d Cir. 1995)). Finally, IRW pointed out that IRUSA fundamentally misconstrued the Agreements, which provided that IRW alone owned any "Islamic Relief" trademarks and retained its right to use them. *Id.* at 23-24.

Recognizing the merits of IRW's motion, IRUSA amended its complaint on May 14. The Amended Complaint alleges the same conduct, but radically reinvents IRUSA's theory of why the Members' and License Agreements do not compel arbitration. IRUSA continues to fault IRW for allegedly soliciting donations in New York, AC ¶¶ 71-90, refusing to submit to audits, *id.* ¶¶ 54-55, and creating the misimpression that IRUSA had withdrawn support for the Orphan Sponsorship Program, *id.* ¶¶ 91-100. But whereas IRUSA's original complaint alleged that this conduct breached the parties' agreements, including the Members' and License Agreements, the Amended Complaint now asserts that the alleged conduct "post-dates [IRUSA's] invocation of the Suspension Clause and gives rise not to claims under the suspended Members' Agreement or any other contract but for post-suspension bad-faith tortious conduct." *Id.* ¶ 32; *see also id.* ¶ 69. IRUSA appears to have abandoned its prior contention that the arbitration clauses "should be found to be void against public policy." ECF 1 ¶¶ 99-102. The Amended Complaint does not mention voidness at all.

11

The Amended Complaint asserts four claims. Claim 1 alleges that IRW's use of the "Islamic Relief"—which IRW exclusively owns under the Members' and License Agreements—"abus[ed] similarities in" the parties' names and thus interfered with IRUSA's potential business relationships with donors. AC ¶¶ 102-05. Claim 2 alleges that IRW violated the Lanham Act by "implying to the marketplace that IRW and IRUSA are one and the same." *Id.* ¶¶ 107-11. Claim 3 asserts that IRW violated New York General Business Law § 349 by allegedly attempting to "deceive the public into believing that . . . services offered by IRW originate from, are associated with, or are otherwise endorsed by IRUSA." *Id.* ¶¶ 113-16. Finally, Claim 4 alleges that "IRW has been unjustly enriched by its acceptance of donations intended for IRUSA." *Id.* ¶¶ 118-20.

## ARGUMENT

IRUSA's second attempt to avoid arbitration has no more merit than the first attempt it has now abandoned. IRUSA and IRW agreed that "all disputes arising under or related to" the Members' Agreement "shall be determined by arbitration" in "Birmingham, England." Ex. 1 at 10-11, §§ 8.1-8.2; Ex. 2 at 7, §§ 1.27-1.28. That is the "paradigm of a broad clause." *Collins*, 58 F.3d at 20. It covers every claim in the Amended Complaint. IRUSA's attempt to rework its claims and invoke "post-suspension" conduct, AC ¶ 32, falters at the outset. If the Court must analyze the suspension of the Members' Agreement to understand the parties' respective rights, then the legal claims at issue necessarily "relate to" the Members' Agreement. *Collins*, 58 F.3d at 21. And the claims "relate to" the Members' and License Agreements on their face, which perhaps explains why IRUSA admits that the Members' Agreement is "relevant" to the dispute. AC ¶ 32. IRUSA's claims concern the parties' respective use of trademarks explicitly covered by the Members' and License Agreements. They ask what obligations each party had to the other when conducting and terminating the charitable operations for which the Members' Agreement provided the framework.

12

IRUSA's characterization of conduct as "tortious" does not allow it to ignore the contracts that governed the parties' entire relationship. That is clear from *Collins* and other binding precedent described at length in IRW's prior motion. ECF 13 at 11-17. Under that precedent, claims "must be arbitrated" if the "allegations underlying the claims *touch* matters covered by the parties' agreements." *See Collins*, 58 F.3d at 20-21 (emphasis added). This Court should thus compel arbitration in the U.K. under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 2-4, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201-08 (the "New York Convention"). *See Spire Global Subsidiary, Inc. v. NorthStar Earth & Space, Inc.*, 768 F. Supp. 3d 546, 554 (S.D.N.Y. 2025) (applying New York Convention).

The standard for deciding a motion to compel arbitration is well established. The FAA states that contractual arbitration provisions "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2; *see id.* § 202 (incorporating § 2). That provision reflects a "'liberal federal policy favoring arbitration,'" which "displace[s]" any "conflicting rule" of state law. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 341 (2011) (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). That policy "applies with particular force in international disputes," *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 654 (2d Cir. 2004); *see also Spire*, 768 F. Supp. 3d at 554, because it "promotes the smooth flow of international transactions," *David L. Threlkeld Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 248 (2d Cir. 1991). Because the FAA compels arbitration whenever parties have agreed to it, courts apply a "two-part test," asking "(1) whether the parties have entered into a valid agreement to arbitrate," and "(2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).

13

The evidentiary standard on a motion to compel arbitration is "'similar to that applicable for a motion for summary judgment.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). The Court considers "'all relevant, admissible evidence submitted by the parties'" and "draws all reasonable inferences in favor of the non-moving party." *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law," courts "may rule on the basis of that legal issue and 'avoid the need for further court proceedings.'" *Id.* (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund*, 661 F.3d 164, 172 (2d Cir. 2011)). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

## I.    The Members' and License Agreements Contain Binding Arbitration Clauses.

IRUSA and IRW are bound by two "valid agreement[s] to arbitrate." *In re Am. Exp.*, 672 F.3d at 128. The Members' and License Agreements both provide that "[a]ny dispute or difference between the Parties arising out of or related to this Agreement shall" be "determined by arbitration" in the U.K. Ex. 1 at 10-11, § 8.1, Ex. 2 at 7, §§1.27-1.28. The Amended Complaint admits that the parties have entered "various agreements" and describes the Members' Agreement as "relevant" to its claims. AC ¶ 32. It further acknowledges that the parties had a dispute resolution "mechanism that *required* dialogue between CEOs of both organizations, then the Boards of both companies, then mediation, and finally *arbitration*," an obvious reference to the Members' and License Agreements' dispute resolution clauses. AC ¶ 69 (emphasis added); *see* pp. 5-6, *supra*. The Amended Complaint thus admits that IRUSA and IRW entered "valid agreement[s] to arbitrate." *In re Am. Exp.*, 672 F.3d at 128.

14

IRUSA urges that IRW has "renounced any alleged right to invoke" the Agreements' arbitration clauses through its alleged "bad-faith refusal to participate from as early as October 2025 in requests to begin the dialogue" envisioned by the dispute-resolution procedures. AC ¶ 69. That argument runs headlong into the Agreements' express language. IRW and IRUSA anticipated that CEO discussions, Board discussions, and mediation might fail to resolve disputes. Ex. 1 at 10-11, §§ 8.1-8.2, Ex. 2 at 7, §§ 1.27-1.28. They subjected each phase of the dispute-resolution process to a time limit, "thirty (30) business days" for CEO negotiations, "30 business days" for Board negotiations, and "60 days" following the meeting of mediators. Ex. 1 at 10-11, §§ 8.1-8.2, Ex. 2 at 7, §§ 1.27-1.28. They also envisioned "either Party" might "fail[] to participate or to continue to participate in the mediation." Ex. 1 at 10-11, §§ 8.1-8.2. If the time limits passed, or a party refused to participate, then the dispute "shall be determined by arbitration." Ex. 1 at 11, § 8.2; *see* Ex. 2 at 7, § 1.28 ("If the parties are not successful in resolving the dispute through mediation, then the parties agree that the dispute *shall be referred to and finally resolved by arbitration*." (emphasis added)). Had the parties wished to provide that a breakdown in the initial stages of the dispute-resolution procedure "renounced" the arbitration agreement, they could have said so. They said the exact opposite, and "courts must effectuate [that] plain language." *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002).

IRUSA's renunciation argument also contradicts the Members' and License Agreements' waiver provisions. The parties agreed in the Members' Agreement that "[n]o delay or omission by any Party to this Agreement in exercising any right, power or remedy provided . . . under this Agreement shall affect that right, power or remedy or operate as a waiver of it." Ex. 1 at 12, § 10.3. The License Agreement further provides that "the failure of any Party to obtain the exact enforcement of any of the provisions hereof" shall not "constitute a waiver" of "such Party's right to

15

obtain the exact enforcement of any other provisions of this Agreement." Ex. 2 at 9, § 1.33. Those provisions could not be clearer. IRW's alleged "delay," "omission," or "failure" to participate in the initial procedures envisioned by the parties' dispute-resolution clause did not waive its right to insist on arbitration.

IRUSA formally invoked the dispute-resolution mechanism in the Members' Agreement on December 7, 2025. AC ¶ 66; AC Ex. J (ECF 16-10). IRUSA agrees that these disputes were "not resolved" by the parties' CEOs within 30 business days, *i.e.*, by January 21, 2026. Nor were they resolved by the parties' Boards within 30 business days after that, *i.e.*, by March 3, 2026. Nor were they resolved by mediation within 60 days after that, *i.e.*, by May 2, 2026. The Members' and License Agreements are clear about what must happen next. The disputes "shall be determined by arbitration." Ex. 1 at 11, § 8.2.2.; Ex. 2 at 7, § 1.28(c). The parties' "valid agreement[s] to arbitrate" thus satisfy the first element of the two-part test. *In re Am. Exp.*, 672 F.3d at 128.

## II.    IRUSA's Claims Fall Squarely Within the Parties' Agreement to Arbitrate.

The Members' and License Agreements provide that "[a]ny dispute or difference between the Parties *arising out of or related to* this Agreement shall" ultimately "be determined by arbitration" in "Birmingham, England." Ex. 1 at 10-11, §§ 8.1-8.2 (emphasis added); Ex. 2 at 7, §§ 1.27-1.28. That is the "paradigm of a broad clause." *Collins*, 58 F.3d at 20. Such a clause triggers "a presumption of arbitrability," meaning that "arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Barrios-Contreras v. Big Fish Ent. LLC*, No. 25-cv-3203, 2026 WL 621576, at *3 (S.D.N.Y. Mar. 5, 2026) (citing *Collins*, 58 F.3d at 23). Arbitration must be compelled "unless it may be said with positive assurance that the arbitration clause" does not cover the dispute. *Collins*, 58 F.3d at 19 (quoting *Threlkeld*, 923 F.2d at 250).

16

In assessing the coverage of such broad arbitration clauses, courts "look to the conduct alleged and determine whether or not that conduct is within the reach of the . . . arbitration clause." *Id.* at 20. The plaintiff's framing of the claims does not control. "If the allegations underlying the claims touch matters covered by the parties' agreements, then those claims must be arbitrated, whatever the legal labels attached to them." *Id.* at 21; *see also id.* at 20 (asking whether "*allegations* embedded within the claims have potential bearing on a" contractual violation (emphasis in original)). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25. IRUSA thus bears the burden of proving that its claims do not even arguably "touch matters covered by" or have a "potential bearing" on breaches of the Members' and License Agreements. *Collins*, 58 F.3d at 21. The history of the parties' dispute makes that burden impossible.

Start with the allegations in IRUSA's original complaint. IRUSA initially claimed that IRW's supposed solicitation of U.S. donors—the allegations at the heart of *all* claims in the Amended Complaint—violated the Members' Agreement and License Agreement. ECF 1 ¶¶ 119, 123, 129, 133. Under *Collins*, if "claims (no matter how they are labeled) allege conduct that violated" the Members' and License Agreements, then they "would be arbitrable" because "*allegations* embedded within the claims have potential bearing on" the Agreements. 58 F.3d at 21 (emphasis original). IRUSA effectively conceded that the alleged U.S. solicitation "related to" the Members' and License Agreements when it asserted that the solicitation breached those Agreements. ECF 1 ¶¶ 119, 123, 129, 133. It cannot escape that concession now.

IRUSA's attempted about-face fails. The Amended Complaint seeks to withdraw IRUSA's past allegations of breach and replace them with an assertion that, because IRUSA suspended the Members' Agreement in October 2025, its claims arise only from "post-suspension

17

bad-faith tortious conduct." AC ¶ 32; *see id.* ¶ 58. But even if IRUSA's claims no longer explicitly "arise from" the Agreements, they still "relate to" them under *Collins* and fall within the scope of what the parties agreed to arbitrate. Ex. 1 at 10-11, §§ 8.1-8.2; Ex. 2 at 7, §§ 1.27-1.28. IRUSA urges that the suspension "discharged any further substantive obligations." AC ¶ 32. To even consider that assertion, the Court must examine the Members' Agreement. The Members' Agreement shows that IRUSA is wrong. The suspension clause provides that the "rights of the other party during such period of suspension shall be as determined by the Rules" set by IRW and the "International General Assembly." Ex. 1 at 9, § 6.5.[9] Even on termination, the parties had extensive obligations set forth in § 6.6, including, for example, IRUSA's duty to "change its name to exclude use of the Trademark." *Id.* §§ 6.6 & 6.6.7. Other obligations survived termination altogether, including the obligation to submit disputes to arbitration. *Id.* § 12.1; *see also id.* § 6.6.1. The Court must consider these provisions to decide, for example, whether IRW's use of its own trademarks qualifies as "tortious conduct." AC ¶ 32. Thus, even if limited to post-suspension conduct, Plaintiffs' claims still "touch matters covered by the parties' agreements" and "must be arbitrated, whatever the legal labels attached to them." *Collins*, 58 F.3d at 21.

The Amended Complaint admits as much when it describes the Members' Agreement as "relevant" to its claims. AC ¶ 32. The Members' Agreement is the foundational document of the Parties' relationship. It set the terms on which IRW and IRUSA would "continue carrying out

---

[9] IRUSA asserts that "IRW has stated that the invocation of the Suspension Clause under this Agreement discharged any further substantive obligations." AC ¶ 32. That too is wrong. IRW simply made the commonsense point that IRUSA could not suspend the parties' contractual relationships while simultaneously claiming the benefits of those relationships, such as a contractual right to an exclusive presence in the U.S. or a license to IRW's trademarks. ECF 13 at 23-24. IRW never suggested that suspension relieved the parties of their obligations upon termination or of the obligations that survived termination. To the contrary, it asserted that the parties had an ongoing contractual obligation to arbitrate. *Id.* at 11-17.

their collaborative Charitable Activities on an international basis." Ex. 1 at 2. It was thus the "genesis of the parties' relationship" and set the framework for the Grant Agreements that followed. *Threlkeld*, 923 F.2d at 251. It covers the parties' rights to use and benefit from the Trademarks (§§ 5.2.3, 5.3.4, 11.2); IRUSA's rights and financial obligations as a member of the Islamic Relief federation (§§ 5.2.2, 5.3.2; § 1 (defining "Financial Standards")); the parties' mutual obligations to comply with applicable laws (§§ 5.2.2, 5.3.2); the parties' territorial limitations (§§ 3.4, 3.5); and the effect of suspension or termination of the Agreement (§§ 6.5, 6.6). Those provisions cover the entirety of the parties' relationship and relate to IRUSA's claims.

If there were any doubt about whether the Amended Complaint's claims "relate to" the Members' and License Agreements, analysis of the claims resolves it:

**Claim 1**: IRUSA first alleges that IRW tortiously interfered with its prospective donor relationships by (a) "abusing similarities in names in order to confuse donors" and (b) "unilaterally cancelling sponsorship of hundreds of orphans and making it appear as if it was IRUSA's decision to do so." AC ¶¶ 102, 104. Those allegations plainly "relate to" the Members' and License Agreements. IRUSA's and IRW's names are not just "similar"; they are trademarks that IRW owns. The Members' Agreement defines "Trademarks" to include " 'Islamic Relief', 'Islamic Relief USA', 'IR', 'IRW,' " and other similar names. Ex. 1 at 5. The Members' Agreement acknowledges the "exclusive right, title, interest and goodwill of IRW in the Trademarks" and that "all goodwill in the Trademarks arising from IRUSA's use of the Trademarks is to the benefit of IRW." *Id.* at 7-8, § 5.3.4. The License Agreement does the same. Ex. 2 at 3, § 1.05. It explicitly preserves IRW's "right to use, advertise or display the Trade-marks," including IRUSA. *Id.* at 3, § 1.07. One cannot evaluate whether IRW "abus[ed]" similarities between the names IRW and IRUSA, AC ¶ 102, without considering that IRW owned "all goodwill" in the trademarks covering both

19

and retained a "right to use" both.  IRUSA's contrary suggestion is akin to a tenant suing its landlord for adverse possession and arguing that its claims do not "relate to" the parties' lease.

The Lanham Act makes the relevance of the Members' and License Agreements clearer still.  It provides that the "ownership by a person of a valid registration" for a trademark "shall be a complete bar to an action against that person" that arises under State law and "asserts any claim of actual or likely damage or harm to the distinctiveness or reputation of a mark."  15 U.S.C. § 1125(c)(6).  "Islamic Relief USA" and "IRUSA" are registered trademarks.  *See* n.3, *supra*.  The Members' and License Agreements make clear that IRW owns both trademarks.  Ex. 1 at 7-8, § 5.3.4; Ex. 2 at 3, § 1.05.  The Agreements thus relate to the question of whether the Lanham Act bars any State law claim alleging "harm to the . . . reputation of" the IRUSA "mark."  15 U.S.C. § 1125(c)(6).

The Court can stop the analysis there.  Under *Collins*, once a court determines that a "claim alleged implicates issues of contract construction or the parties' rights and obligations under it," then the claim "falls within the scope of the arbitration agreement."  58 F.3d at 23.  Only "claims that present no question involving construction of the contract, and no questions in respect of the parties' rights and obligations under it, are beyond the scope of the arbitration agreement."  *Id.* Claim 1's allegation regarding "abusing similarities in names," AC ¶ 102, implicates the Members' and License Agreements.  That "pave[s] the way for arbitration."  *Collins*, 58 F.3d at 21.

But if the Court goes further, IRUSA's allegations concerning the cancellation of the Orphan Sponsorship Program are equally "related to" the Members' Agreement.  IRUSA alleges, in substance, that after IRUSA terminated the Orphan Sponsorship Program on December 4, 2025, and "all existing contractual relationships" on December 24, 2025, IRW had to transfer the sponsored orphans to another entity that would administer the program on IRUSA's behalf, rather than

transfer IRUSA's sponsorship to another entity that would fund IRW's work for those orphans. AC ¶¶ 91-100.[10]  But that question is governed by the Members' Agreement's termination clause. Ex. 1 at 9-10, § 6.6.  That clause states, contrary to IRUSA's allegations, that "IR USA's property and assets . . . shall be transferred as soon as reasonably possible to another charity . . . which has entered into a membership agreement with IRW."  *Id.* at 9, § 6.6.2.  In other words, IRUSA explicitly agreed to the transfer of its assets—including sponsorships—that IRUSA now characterizes as an act of "malice."  AC ¶ 104.  Whether or not IRUSA disagrees with that interpretation of § 6.6.2, its allegations about the Orphan Sponsorship Program still implicate the "parties' rights and obligations under" the Members' Agreement, requiring arbitration.  *Collins*, 58 F.3d at 23.

Even if IRUSA's allegations were considered under the specific Grant Agreement that governed the Orphan Sponsorship Program, arbitration would still be required.  In *Threlkeld*, the parties entered "forward contracts" to exchange a "particular commodity on a specified date at a predetermined price," as well as an alleged "collateral agreement" under which one party valued the forward contracts for the other.  923 F.2d at 246-48.  The Second Circuit compelled arbitration of claims under the collateral agreement, which did not contain an arbitration clause, because they related to the "forward contracts," which did.  *Id.* at 251-52.  The claims related to the forward contracts because those contracts provided the "genesis of the parties' relationship," and the collateral agreement sought to value those contracts.  *Id.* at 251.  The same is true of the Members' Agreement here.  That Agreement set the terms on which IRW and IRUSA would "continue carrying out their collaborative Charitable Activities on an international basis."  Ex. 1 at 2.  It thus relates to any Grant Agreements, including the Orphan Sponsorship Program Grant Agreement,

---

[10] These allegations cannot be reconciled with IRUSA's argument that its October 2025 suspension "discharged any further substantive obligations."  AC ¶ 32.  IRUSA's inconsistent account of the parties' contractual obligations highlights the weakness of its overall position on arbitration.

that governs a specific charitable activity IRUSA and IRW undertook. *See Threlkeld*, 923 F.2d at 251-52.

**Claim 2**: The Amended Complaint's second claim arises under the Lanham Act and alleges that IRW "made material misleading representations regarding the nature, characteristics, and/or qualities of IRUSA's services or commercial activities by implying to the marketplace that IRW and IRUSA are one and the same." AC ¶ 107. IRUSA relies on 15 U.S.C. § 1125(a), one of "two provisions of the Lanham Act that prohibit trademark infringement." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 415 (2023). The Amended Complaint makes clear that the alleged misleading representations are IRW's use of its trademark, "Islamic Relief," which purportedly caused donors to "mistakenly donate[] to IRW rather than IRUSA." AC ¶¶ 75, 84, 87. Because the Members' and License Agreements explicitly govern each party's rights to IRW's trademarks, the Lanham Act claim "implicates issues of contract construction or the parties' rights and obligations under it," requiring arbitration. *Collins*, 58 F.3d at 23.

**Claim 3**: IRUSA next alleges that IRW violated N.Y. General Business Law § 349 by "causing confusion, mistake, and deception among the general public" about whether "services offered by IRW originate from, are associated with, or are otherwise endorsed by IRUSA." AC ¶ 113. These allegations again rely on the similarities between IRW's and IRUSA's names and implicate the Members' and License Agreements, which establish each party's rights to the IRW and IRUSA trademarks. *See* pp. 19-20, *supra*. Because IRW owns both trademarks, IRUSA's claim under § 349 is barred under 15 U.S.C. § 1125(c)(6). And it is "well settled that trademark infringement claims are not cognizable under [S]ection 349" absent some alleged public injury that surpasses "confusion and deception of the consuming public." *Walker Wear LLC v. Off-White LLC*, 624 F. Supp. 3d 424, 432 (S.D.N.Y. 2022) (internal quotation marks omitted); *Chanel, Inc.*

22

*v. RealReal, Inc.*, 449 F. Supp. 3d 422, 447 (S.D.N.Y. 2020).  Because Claim 3 implicates and requires consideration of each party's rights to IRW's trademarks, it falls within the scope of the arbitration clauses in the Members' and License Agreements.  *Collins*, 58 F.3d at 23.

**Claim 4**: Finally, the Amended Complaint asserts a claim for unjust enrichment, alleging that IRW accepted "donations intended for IRUSA, at IRUSA's expense."  AC ¶ 118.  But IRUSA "clearly may not recover under a theory of unjust enrichment" where a "valid and enforceable written" contract governs the "particular subject matter."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006).  To determine whether IRUSA can assert an unjust enrichment claim, the Court must first determine whether the Members' Agreement specifically governs the claim's "particular subject matter."  The Members' Agreement addresses IRW's right both to operate in the U.S. and to benefit from goodwill in the IRUSA trademark.  *See* pp. 4-6, *supra*.  The unjust enrichment claim thus requires interpretation of the Members' Agreement and falls within the Agreement's arbitration clause.  *Collins*, 58 F.3d at 23.

*    *    *

Even if there were a doubt about whether IRUSA agreed to arbitrate the claims it asserts, that doubt "'should be resolved in favor of arbitration.'"  *In re Am. Exp.*, 672 F.3d at 128 (quoting *Moses H. Cone*, 460 U.S. at 24-25).  It cannot " 'be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers' " disputes about the parties' use of trademarks, their joint charitable activities, their financial conduct, or the territories where they may raise funds, all of which the Members' Agreement explicitly addresses, and some of which are further addressed by the License Agreement.  *Id.* (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).  Accordingly, this Court should compel the parties to arbitration in the U.K.

23

**CONCLUSION**

For the reasons detailed in this Memorandum, IRW respectfully requests that this Court compel this dispute to arbitration.

Dated: June 4, 2026                                Respectfully Submitted,

                                                    */s/ Caleb Hayes-Deats*
                                                    Abbe David Lowell
                                                    Caleb Hayes-Deats
                                                    LOWELL & ASSOCIATES, PLLC
                                                    1250 H Street, N.W., Suite 250
                                                    Washington, DC 20005
                                                    T: (202) 964-6110
                                                    F: (202) 964-6116
                                                    ALowellpublicoutreach@lowellandassociates.com
                                                    CHayes-Deats@lowellandassociates.com

                                                    *Attorneys for IRW*

24

## CERTIFICATE OF COMPLIANCE

I, Caleb Hayes-Deats, certify that Defendant IRW's Memorandum of Law in Support of its Motion to Compel Arbitration or Dismiss Complaint complies with the requirements of Local Rule 7.1(c), as modified by § 3(D) of this Court's Individual Practices in Civil Cases.

I further certify that this memorandum of law was prepared with a computer.

I further certify that this memorandum of law is 24 pages and 7,650 words, including any footnotes or endnotes and excluding only those sections of the brief that are exempted under Local Rule 7.1(c). In preparing this certificate of compliance, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

Dated: June 4, 2026

*/s/ Caleb Hayes-Deats*
Caleb Hayes-Deats

25