UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISLAMIC RELIEF USA,<br><br>                              Plaintiff,<br><br>        -   against   -<br><br>ISLAMIC RELIEF WORLDWIDE, INC.,<br><br>                              Defendant. | Civil Action No.: 1:26-cv-2367 |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION TO COMPEL ARBITRATION**

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................ iii

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................................... 3

    I.    The Parties ....................................................................................................................... 3

    II.    The Prior Agreements Between the Parties .................................................................. 4

        A.    The Members' Agreement ........................................................................................ 4

        B.    The License Agreement ............................................................................................. 5

    III.    Increasing Regulatory Scrutiny of IRW and IRW's Refusal to Engage With IRUSA ... 5

ARGUMENT ............................................................................................................................... 11

    I.    Any Arbitration Clauses in the Agreements Do Not Apply to IRUSA's Claims ............. 11

    II.    The Agreements Do Not Contain Binding Arbitration Clauses ....................................... 17

    III.    Even If the Arbitration Obligation Were Binding, IRW has Renounced its Right to Demand Performance by Repudiating its Own Dispute Resolution Obligation....................... 22

CONCLUSION........................................................................................................................... 25

## Table of Authorities

**Page(s)**

**Cases**

*Alzheimer's Disease Res. Ctr. Inc. v. Alzheimer's Disease and Related Disorders Ass'n.*,
981 F.Supp.2d 153 (E.D.N.Y. 2013) ................................................................16

*Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*,
424 F.3d 278 (2d Cir. 2005)...........................................................................20

*In re Bayou Hedge Fund Investment Litig.*,
No. 06 MDL 1755 (CM), 2006 WL 8439724 (S.D.N.Y. Oct. 18, 2006) .........................10, 18

*Benihana of Tokyo v. Benihana Inc.*,
73 F.Supp.3d 238 (S.D.N.Y. 2014) ...........................................................13, 20, 21

*Brown v. Peregrine Enters., Inc.*,
No. 22-2959, 2023 WL 8800728 (2d Cir. Dec. 20, 2023).......................................23

*Citibank, N.A. v. Jacobsen*,
No. 19-cv-959(ER), 2020 WL 7046841 (S.D.N.Y. Dec. 1, 2020) ..........................18

*Collins & Aikman Prods. Co. v. Building Sys., Inc.*,
58 F.3d 16 (2d Cir. 1995)...............................................................................14

*David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London)*,
923 F.2d 245 (2d Cir. 1991)............................................................................13

*Doctor's Assocs., Inc. v. Distajo*,
66 F.3d 438 (2d Cir. 1995)..............................................................................23

*Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionary Workers Intern., AFL-CIO*,
370 U.S. 254 (1962).......................................................................................22

*FUJIFILM N. Am. Corp. v. Geleshmall Enters. LLC*,
239 F.Supp.3d 640 (E.D.N.Y. 2017) ..............................................................14

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991).........................................................................................17

*Indus. Access Inc. v. Praetorian Holdings Grp. LLC*,
No. 22-cv-626(JLS)(MJR), 2023 WL 4409149 (W.D.N.Y. June 6, 2023) .............22

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007)..........................................................................................22

*Meyer v. Uber Technologies, Inc.*,
  868 F.3d 66 (2d Cir. 2017)............................................................................................17

*Mobile Real Est., LLC v. NewPoint Media Grp., LLC*,
  460 F.Supp.3d 457 (S.D.N.Y. 2020).............................................................................13

*Morgan v. Sundance, Inc.*,
  596 U.S. 411 (2022)......................................................................................................23

*Seltzer v. Clark Assocs., LLC*,
  20-cv-4685(AKH), 2020 WL 5525590 (S.D.N.Y. Sept. 3, 2020)..........................................21

*Smith v. Spizzirri*,
  601 U.S. 472 (2024)......................................................................................................23

*Specht v. Netscape Commc'ns. Corp. et al.*,
  306 F.3d 17 (2d Cir. 2002)............................................................................................11

*Starke v. SquareTrade, Inc.*,
  913 F.3d 279 (2d Cir. 2019)..........................................................................................10

*Sullivan v. Nassau Cnty. Interim Fin. Auth.*,
  959 F.3d 54 (2d Cir. 2020)............................................................................................24

*Thomas Crimmins Contracting Co., Inc. v. City of New York*,
  74 N.Y.2d 166 (1989) ...................................................................................................18

*United States v. L-3 Commc'ns EOTech, Inc.*,
  921 F.3d 11 (2d Cir. 2019)............................................................................................20

*Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
  25 N.Y.3d 675 (2015) ...................................................................................................18

*Zachman v. Hudson Valley Fed. Credit Union*,
  49 F.4th 95 (2d Cir. 2022) .....................................................................................10, 17

**Statutes**

Federal Arbitration Act, 9 U.S.C. §§ 2-4 ........................................................................ 17, 22-24

**PRELIMINARY STATEMENT**

Over the past several years, Islamic Relief Worldwide ("IRW") has become subject to increasing regulatory scrutiny in the United States and abroad for alleged support for terrorism and purported antisemitic statements. Islamic Relief USA ("IRUSA") is a wholly autonomous and independent organization operating in the United States as a 501(c)(3) non-profit. Because of historic connections between the two organizations, IRUSA has been significantly impacted by this scrutiny by U.S. regulators and banking partners – including repeated requests from the United States House of Representatives Ways and Means Committee (the "House Ways and Means Committee") to the Internal Revenue Service ("IRS") to investigate IRUSA for termination of its tax-exempt status, due solely to IRUSA's connections to IRW.

The allegations against IRW, irrespective of their veracity, pose an existential threat to IRUSA. IRUSA sought repeatedly to engage in discussions with IRW with the aim to definitively sever any residual relationship with IRW, given the risks to both organizations. After IRW refused to engage in such discussions, and after IRW stonewalled IRUSA's requests for audits and information regarding potential sanctions violations, IRUSA informed IRW of its suspension of existing IRUSA-funded projects administered by IRW on October 12, 2025. Following continued noncooperation from IRW, IRUSA informed IRW of its intent to sever all existing obligations with IRW on December 24, 2025, and demanded an immediate meeting to effect this necessary objective, a demand that remains unaddressed to this day.

IRW's conduct subsequent to the suspension notice forms the basis of this lawsuit. IRW commenced and then ramped up its illegal solicitation of donations in the United States, capitalizing on the perceived connection with IRUSA and confusion in identities, to mislead donors into thinking that they were donating to a registered, tax-exempt U.S. charity that was

1

transparent and accountable. IRW solicited and retained donations from U.S. donors who thought they were donating to IRUSA. IRW further sabotaged IRUSA's reputation and donor relationships by unilaterally canceling 645 sponsorships of orphans in various countries and doing so by impermissibly using the login credentials of an IRUSA employee.

In its Motion to Compel Arbitration ("Motion"), IRW seeks to compel arbitration of IRUSA's claims, claiming that the arbitration clauses in two agreements between the parties – the Members' Agreement dated December 14, 2019 and the License Agreement dated December 20, 2020 – include mandatory arbitration clauses and apply to the claims at issue. IRW is flatly wrong on multiple fronts.

First, while IRUSA disputes that there are any mandatory arbitration agreements, IRUSA's claims do not fall within the scope of any applicable arbitration clause. IRW repeatedly mischaracterizes IRUSA's claims as a "trademark infringement" dispute, which it is not, but asserts at the same time that IRW itself has the right to use the Islamic Relief trademarks under the Agreements. IRUSA is not alleging that IRW infringed any trademarks. Rather, IRW's conduct at issue involves tortious acts that postdate the suspension and severance of any obligations, and that do not arise out of, or relate to, the Parties' rights and obligations under the Members' Agreement or the License Agreement.

Second, the dispute resolution clauses in the Members' and License Agreements provide for an *option* for arbitration, as "an *alternative* to such Party instituting a lawsuit or legal action in any jurisdiction." To hold that such an agreement would *require* arbitration at the request of the counterparty would be contrary to the clear language in the contracts providing a choice for the party initiating the lawsuit.

Moreover, even if the arbitration clauses were mandatory, IRW has repudiated its own obligations under those clauses and has renounced any right to demand arbitration. After refusing on multiple occasions to engage in good faith in the dispute resolution procedure that proceeds in specific, multiple stages that necessarily precede arbitration, and asserting that the suspension of the Members' Agreement obviated any further obligations between the parties, IRW cannot now seek to demand IRUSA's compliance.

IRW's conduct has placed IRUSA in a position where its existence, as the leading Islamic charity based in the United States, is at serious risk. Rather than support the continued provision of necessary relief to beneficiaries in the United States and around the world, IRW instead tries deliberately to aggravate that risk and treat this situation as a garden variety commercial dispute, and send it for arbitration in Birmingham, England, where IRW is based and which has no regulatory or political purview over the unique and serious threat to Muslim non-profits in the United States in the current legal, regulatory and political environment.

The Motion must be denied.

## FACTUAL BACKGROUND

### I.      The Parties

IRUSA is the largest and leading Muslim charity in the United States, established in 1993. Amended Complaint ("AC") ¶¶ 1, 3. It is a 501(c)(3) non-profit organization and holds the 2025 GuideStar Gold Seal of Transparency and a four-star ranking from Charity Navigator, the largest charity evaluator in the U.S. *Id.* ¶ 2.

IRW is a charity registered and supervised by the Charities Commission in the United Kingdom, and the head office of the "Islamic Relief" structure. *Id.* ¶ 3. Upon information and belief, IRW is not and has never been registered as a 501(c)(3) charity in the U.S., nor is it or has

it ever been registered in any U.S. state to solicit or receive charitable donations, and it is under the supervision of no U.S. entity. *Id.* ¶ 24.

## II.    The Prior Agreements Between the Parties

IRW and IRUSA have entered into various Agreements over the years. *Id.* ¶ 32. Among these are the December 14, 2019 Members' Agreement, the December 20, 2020 License Agreement, and various grant agreements that are typical for IRUSA to enter into with entities for the purpose of funding specific humanitarian projects overseas. ECF No. 21-1 (Members' Agreement); ECF No. 21-2 (License Agreement); AC ¶ 33.

### A.  The Members' Agreement

The Members' Agreement provides specifically that IRUSA is an "independent and autonomous entity" from IRW. AC ¶ 32; ECF No. 21-1 Art. 3.5. The Members' Agreement also includes provisions relating to IRUSA's ability to use certain trademarks, including its right to use those trademarks in the United States. ECF No. 21-1 Arts. 4-6. As explained further below, the Members' Agreement provides an option for parties to submit a dispute arising out of or related to the agreement to arbitration, "as an alternative to such Party instituting a law suit [sic] or legal action in any jurisdiction." *Id.* Art. 8.2. If such an arbitration is instituted, the contract provides that the arbitration will be administered by the International Centre for Dispute Resolution under the International Expedited Procedures, with the seat of arbitration in Birmingham, England, where IRW is based, under English law. *Id.* Arts. 8.2.2, 8.2.3. The Members' Agreement also contemplates the existence of a "separate License Agreement and any contractual agreements regulating the movement of funds between IRW and IR USA," and that those agreements will "stand on their own terms." *Id.* Art. 9.1.

4

### B. The License Agreement

The License Agreement grants a license for IRUSA to use the Islamic Relief® and other trademarks in the United States. ECF No. 21-2 Art. 1.26. It is governed by "the laws of United States of America" but refers to no specific state law. *Id.* Art. 1.28(e). The License Agreement similarly provides an option for parties to submit a dispute arising out of or related to the agreement to arbitration, "as an alternative to such party instituting a law suit [sic] or legal action in any jurisdiction." *Id.* Art. 1.28. If such arbitration is instituted, the agreement provides that the arbitrator shall be appointed under different rules, those of the London Court of International Arbitration. *Id.* Art. 1.28(c).

### C. The Grant Agreements

IRUSA routinely enters into grant agreements with various partners to govern the funding and execution of specific philanthropic projects. AC ¶¶ 33-34. A typical grant agreement contains multiple provisions to ensure IRUSA's ability to monitor whether its funds are being used consistently with IRUSA's intended purpose and in compliance with all applicable laws. *Id.* ¶¶ 34-40. Such monitoring is essential for IRUSA, a 501(c)(3) organization, in order to ensure that it is not at risk of having its partners misuse funds, including the breach of international sanctions, which could result in IRUSA being held accountable for such misuse and potentially jeopardizing its tax-exempt status. These grant agreements do not include an arbitration agreement.

### III.    Increasing Regulatory Scrutiny of IRW and IRW's Refusal to Engage With IRUSA

In recent years, various governmental agencies within and outside the U.S. have raised significant and troubling concerns about IRW. AC ¶ 41. These included sanctions targeting IRW by Israel and the United Arab Emirates. *Id.* IRUSA received and continues to receive numerous inquiries from U.S. state regulators and from its banking partners seeking information about

IRUSA's relationship with IRW. *Id.* ¶ 42. Through letters sent on September 24, 2024 and again on October 6, 2025, the House Ways and Means Committee urged the IRS to investigate IRUSA for possible termination of its 501(c)(3) status, based solely on allegations relating to IRW's purported support for terrorism and antisemitic statements, and concerns relating to IRUSA's connections to IRW.[1] *Id.* ¶¶ 5, 13. None of these inquiries raised issues of any problematic conduct on the part of IRUSA itself, but only stated concerns regarding IRW's specific conduct and potential entanglement between the two organizations such that IRW's conduct could be attributed to IRUSA. *Id.* Not surprisingly, IRUSA took these inquiries very seriously.

IRW asserts in its Motion that the allegations underlying the sanctions and regulatory scrutiny are without merit, and appears to fault IRUSA for not "explain[ing] to the [House Ways and Means] Committee that its allegations lacked merit." Mot. at 8. While IRUSA takes no view on the merits of these allegations against IRW, IRUSA has no factual background, obligation or fiduciary duty to defend IRW before U.S. regulators, with all of the risk that this would entail. Indeed, even if the allegations were totally without basis, IRUSA's ability to survive as a U.S. tax-exempt organization would have been placed in great jeopardy, and IRUSA's leadership had a fiduciary duty to act in the best interests of the organization. IRUSA was also told and understood that the House Ways and Means Committee had serious concerns about IRUSA sending *any* money to IRW, and that doing so would jeopardize its tax-exempt status. AC ¶ 45. In other words, there could be no question that allegations of misconduct by IRW threatened IRUSA's ability to continue to operate and fulfill its essential mission to provide relief to its many thousands of beneficiaries worldwide.

---

[1] IRW notes that the second letter (of October 6, 2025) "mentioned IRUSA *once*" and "did not mention IRW at all," Mot. at 9 (emphasis in original), but the second letter referred back to the September 2024 letter – which laid out the allegations against IRW in detail – and enclosed the earlier letter with the correspondence. AC Ex. G at 2, n.3.

IRUSA therefore sought on an urgent basis to renegotiate its relationship with IRW to eliminate these threats, starting from around October 18, 2024. AC ¶ 46. IRW, however, did not engage in any meaningful, good-faith negotiations. *Id.* ¶ 47. While IRW asserts in its Motion that it did meet with IRUSA on a few occasions "through September 2025," Mot. at 8, those meetings failed to yield any meaningful progress or resolution.[2] *Id.* IRUSA, however, was understandably not willing to take its chances defying U.S. authorities and instead chose to comply with the guidance it received from its U.S.-based regulators.

IRUSA's concerns deepened significantly when, in or about July 2025, IRUSA learned that IRW had exported certain sewing machines from Iran for purposes of implementing an earthquake relief project in Afghanistan. AC ¶ 50. IRUSA was bound to investigate whether this conduct could constitute a potential violation of OFAC laws and regulations, and sought additional information and clarity from IRW, including by seeking an audit as it had the right and obligation to do. *Id.* ¶ 51. IRW asserts in its Motion that it "confirmed no violation had occurred," Mot. at 9, but the point is that IRW's actions likely would have violated sanctions if it was a U.S. person, and that such actions put in jeopardy IRUSA's reputation and good standing. Further, IRW provided cagey and contradictory responses, without any supporting evidence: first it asserted in July 2025 that it had "received" the machines and sought IRUSA's permission to distribute them, and then in October 2025 stated that it "[had] not taken delivery" of the machines." *Id.* ¶ 52, Exs. B, C. These responses caused even more concern about IRUSA's ability to ensure IRW's accountability and candor, and the overall transparency of IRW's project spending. *Id.* ¶ 52.

---

[2] Furthermore, such meetings preceded the tortious acts that are the subject of the Amended Complaint and as such could not cure any repudiation by IRW of the dispute resolution clauses in the Agreements vis-à-vis those tortious acts.

7

On August 7, 2025, IRUSA insisted on its right to conduct a full audit of the Afghanistan projects, through an accounting and consulting firm. *Id.* ¶ 54. As alleged in the Amended Complaint, IRW refused to cooperate with the audit, and the audit was unable to proceed. *Id.*[3] IRUSA thereafter sought to conduct an audit of additional projects with IRW, which IRW also ignored. *Id.* ¶ 55. This refusal by IRW to permit the necessary transparency that IRUSA is required to ensure as a non-profit organization was an additionally troubling red flag concerning IRW's good-faith and proper use of IRUSA's funds.

Therefore, by the time the second House Ways and Means Committee letter was issued on October 6, 2025, IRUSA for good reason had lost faith in IRW as a viable partner and had legitimate fear that IRW's conduct threatened IRUSA's 501(c)(3) status. On October 12, 2025, IRUSA notified IRW of its intent to suspend participation in all programs executed by IRW. *Id.* ¶ 58, Ex. H. IRUSA sought to engage in prompt, good-faith negotiations to resolve the situation, to no avail. *Id.* ¶¶ 58-61. On December 24, 2025, IRUSA provided notice to IRW seeking to "sever any existing contractual obligations or relationship to maintain continuity of independent operations and protect the interests of beneficiaries," and further emphasized the need for the parties to "commence negotiations and enter into a mutually acceptable termination agreement." *Id.* ¶ 68, Ex. K. IRUSA continued to seek urgent meetings and negotiations with IRW after this date, but IRW consistently failed to engage and refused any meetings of principals. *Id.* ¶¶ 68-69.

## IV.    IRW's Tortious Response To The Severance

Rather than cooperate with IRUSA's requests for information, transparency, and dialogue, IRW responded with hostility and aggressively tortious conduct. *Id.* ¶ 63. IRW specifically

---

[3] In its Motion, IRW does not appear to dispute its non-cooperation, but asserts only that the "parties' Agreements required cooperation on audits" and that the audit did not "involv[e] IRW." Mot. at 9. As explained in the Amended Complaint, the grant agreements for the Afghanistan projects authorized IRUSA to audit IRW upon reasonable notice, and IRW was required to cooperate – which it did not. AC ¶ 48.

8

directed its offices and affiliates (which were responsible for implementing IRUSA-funded projects) not to cooperate in any way with IRUSA. *Id.* ¶ 64.

IRW also began to exploit the confusion regarding IRW and IRUSA's identities—the very confusion that caused IRUSA to be linked to IRW's alleged wrongful conduct in the first place—to unlawfully solicit and collect donations from U.S. persons who thought they were donating to IRUSA. *Id.* ¶ 71. Upon information and belief, IRW was not registered with any of the U.S. states (approximately 40) that require registration prior to soliciting charitable donations within those states. *Id.* ¶ 72. Nor is IRW a 501(c)(3) organization that can offer tax deductions to U.S. donors. *Id.* Despite not being so registered, IRW solicited donations from U.S. individuals through its website, through ads on Meta and Google, and through offline channels. *Id.* ¶¶ 73-88.

IRUSA received multiple communications from donors in the U.S. who informed IRUSA that they mistakenly donated to IRW rather than IRUSA, to follow up regarding the status of a matching donation offer, or to request from IRUSA a 501(c)(3) receipt for their donation or other service related to their donation when they had in fact donated to IRW. *Id.* ¶ 87. IRW solicited these donations from U.S. donors by misrepresenting to U.S. donors that it is a "transparent" and "accountable" organization, and by falsely implying to donors that it is authorized to solicit donations from U.S. donors. *Id.* ¶¶ 11, 62, 108.

When IRUSA sought to transfer the sponsorship of certain orphans from IRW to a new administrator because IRUSA could no longer rely on IRW to administer these programs, IRW refused to cooperate and, instead, abruptly terminated the sponsorship of 645 orphans without any justification. *Id.* ¶¶ 92-94, 96.

IRW's harmful conduct directed at IRUSA appeared to only escalate over time, and IRUSA brought the instant lawsuit to seek redress for the severe harm it suffered. As detailed in the

Amended Complaint, IRUSA was required to sever ties with IRW to maintain its good standing as a 501(c)(3) organization under U.S. law. IRW subsequently engaged in tortious conduct that significantly increased risk to IRUSA's standing with the U.S. government, donors, partners, and beneficiaries. This conduct, which fundamentally conflicts with humanitarian and safeguarding principles, compelled IRUSA to initiate legal action.

As further described herein, IRUSA has no obligation for multiple reasons to arbitrate this tortious conduct or indeed any other conduct with IRW. IRW certainly saw no obligation to engage in any dispute resolution mechanisms when IRUSA sought to resolve the situation amicably. Only now, when it appears to see some tactical advantage to doing so, does IRW invoke an arbitration obligation. IRW no doubt seeks to insulate its hostile attacks on a U.S. charity from scrutiny by a U.S. court. IRW's position is without merit, distorts the dispute and the underlying documents, and is made in manifest bad faith. The Motion should be denied.

### **LEGAL STANDARD**

"[D]espite the strong federal policy favoring arbitration, arbitration remains a creature of contract." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019). It is IRW's burden to prove "by a preponderance of the evidence the existence of an agreement to arbitrate." *In re Bayou Hedge Fund Investment Litig.*, No. 06 MDL 1755 (CM), 2006 WL 8439724, at *4 (S.D.N.Y. Oct. 18, 2006). In assessing whether an agreement to arbitrate exists, the Court applies state-law principles of contract formation. *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022). If the Court finds that a binding agreement exists, then it must determine whether the dispute falls within the scope of the arbitration agreement. A dispute falls outside the scope of the arbitration agreement if it presents "no question involving construction of the [contract], and

10

no questions in respect of the parties' rights and obligations under it." *Specht v. Netscape Commc'ns. Corp. et al.*, 306 F.3d 17, 36 (2d Cir. 2002) (internal citations omitted).

## ARGUMENT

### I.  Any Arbitration Clauses in the Agreements Do Not Apply to IRUSA's Claims

While IRW's Motion fails for the separate reasons that the arbitration clauses in the Members' Agreement and License Agreement are permissive and that IRW has repudiated any right to rely on those clauses, as discussed further in Sections II and III *infra*, IRUSA's claims do not "aris[e] out of" nor are "related to" either the Members' Agreement or the License Agreement and therefore fall outside the scope of any arbitration clause.

The Amended Complaint alleges that IRW acted after the severance of the relationship by IRUSA with the intent to damage IRUSA's reputation after IRUSA suspended the agreements. IRW solicited donations in the U.S. despite not being registered to do so in the states that require such registrations and collected and retained donations from U.S. donors who intended to donate to IRUSA rather than IRW. *See* AC ¶¶ 71-90. In doing so, while refusing to engage with IRUSA's audit and information requests, IRW made material misrepresentations to these donors about its status as a transparent charity and created serious risk to IRUSA. *Id.* ¶¶ 50-62. The Amended Complaint also alleges that, after IRUSA notified IRW of its intent to transfer the sponsorships of certain orphans under the Orphan Sponsorship Program to a partner other than IRW, IRW unilaterally and arbitrarily canceled the sponsorship of hundreds of orphans without justification. *Id.* ¶¶ 93-95. These acts by IRW form the basis for IRUSA's claims for tortious interference with prospective business advantage (Count I), false and misleading representations in violation of the Lanham Act (Count II), unlawful deceptive acts and practices in violation of New York Gen. Bus. Law § 349 (Count III), and unjust enrichment (Count IV).

IRW seeks to shoehorn the claims under the scope of the arbitration clauses in the Members' Agreement and the License Agreement, arguing that the Members' Agreement is the "genesis of the parties' relationship" and governs the "entirety of the parties' relationship," and that the claims involve issues relating to IRW's use of the Islamic Relief trademark, which relates to the License Agreement. Mot. at 19-23. IRW is wrong with respect to both.

While the Members' Agreement sets forth the broad contours of IRW and IRUSA's relationship, it is by no means the "genesis of the parties' relationship" nor the contract from which all subsequent contracts between IRW and IRUSA stemmed. As stated in the Amended Complaint, IRW and IRUSA existed under the Islamic Relief umbrella long before the Members' Agreement was executed in December 2019. AC ¶¶ 3-4. Indeed, the Members' Agreement clarified the requirement that IRUSA had the complete right and obligation to function entirely autonomously and independently, a right that IRW chose to ignore.

The License Agreement, which was executed in December 2020, is also not dependent on the Members' Agreement. It acknowledges that the use of the Islamic Relief trademark prior to its execution was subject to a "verbal agreement" and "pursuant to agreements dated 19th December 2010 and 19th December 2015," i.e., agreements *other than* the Members' Agreement. ECF No. 21-2, Fifth Whereas Clause.

The Grant Agreements are likewise independent of the Members' and License Agreements. These are standalone project-based agreements that IRUSA enters into with various charitable entities to fund philanthropic projects. While some of those projects are administered by IRW with IRUSA-supplied funds, many are administered by completely unrelated entities. AC ¶ 33. Significantly, those separate, free-standing, project-based agreements contain no arbitration provisions. These agreements make no reference to the Members' Agreement and are not

12

contingent on or otherwise dependent on it in any way. In fact, the Members' Agreement itself specifically recognizes that "any contractual agreements regulating the movement of funds between IRW and [IRUSA]" will "stand on their own terms." ECF No. 21-1, Art. 9.1. *See also Benihana of Tokyo v. Benihana Inc.*, 73 F.Supp.3d 238, 257 (S.D.N.Y. 2014) (Engelmayer, J.) (finding that counterclaims were not arbitrable to the extent they relate to misleading statements on Benihana of Tokyo's website that are unrelated to the license agreement). This distinguishes IRUSA's case from *David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245 (2d Cir. 1991), upon which IRW relies, where a subsequent agreement between the parties "stemmed directly" from the prior contracts, and "absent the [prior contracts], the [subsequent] agreement 'had no starting point, no finishing point and no subject matter.'" *Id.* at 251-52 (internal quotation omitted). The situation here is entirely to the contrary.

But none of IRUSA's claims in the Amended Complaint[4] arises out of or relates to its rights and obligations under the Members' or License Agreements. As IRW itself argues, the Members' and License Agreements acknowledge IRW's "right to use, advertise or display the Trade-marks." Mot. at 19. IRUSA's claims are not based on IRW's infringement of the "Islamic Relief" trademark. Rather, they are based on IRW's unlawful, unregistered *solicitation* in the United States through misleading statements intended to sew confusion between IRUSA and IRW, and retention of donations that were meant for IRUSA and properly belong to it. The question of what statements IRW made to donors in the U.S., and whether IRW is registered to solicit donations in the U.S.

---

[4] IRW incorrectly argues that IRUSA's inclusion of breach of contract claims in the initial Complaint should be taken as a "concession" that the claims in the Amended Complaint are arbitrable. Mot. at 17. As IRW acknowledges, courts look at the **facts** of the conduct alleged, not the "plaintiff's framing of the claims." *Id*. The Amended Complaint, which IRW concedes alleges "the same conduct" as in the initial complaint, Mot. at 11, controls. *See Mobile Real Est., LLC v. NewPoint Media Grp., LLC*, 460 F.Supp.3d 457, 458 n.13 (S.D.N.Y. 2020) (rejecting argument that statements in plaintiffs' original complaint that alleged possible breaches of contract should be taken to be "judicial admission[s].").

states that require such donations, are issues that do not implicate the Agreements in any way. They relate entirely to IRW's misrepresentations to donors in the U.S. and IRW's improper retention of donations meant for IRUSA. IRUSA "would have the same claims it has now" had the Members' Agreement and License Agreement "never existed." *FUJIFILM N. Am. Corp. v. Geleshmall Enters. LLC*, 239 F.Supp.3d 640, 650 (E.D.N.Y. 2017).

IRUSA's claims are therefore entirely distinguishable from the trade libel claim in *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16 (2d Cir. 1995), which the Second Circuit found should be arbitrated because the conduct "clearly alleges conduct that would be wrongful in respect of the subject matter of the [contracts with the arbitration clauses]." *Id.* at 22. IRW's argument that certain provisions of the Members' Agreement survive suspension and/or termination is irrelevant, because those provisions – including the dispute resolution clause and a duty on IRUSA to "change its name to exclude use of the Trademark" (Mot. at 18) – are not implicated in the Court's determination of IRUSA's claims for post-suspension tortious conduct.

The fact that IRW is purposefully vague about whether it is the arbitration clause in the Members' Agreement or the arbitration clause in the License Agreement that applies to IRUSA's claims underscores its inability to establish a clear connection between the claims and the Agreements. The two clauses are in fact distinct. The Members' Agreement provides an option for arbitration under the rules of the International Centre for Dispute Resolution, under an arbitrator appointed in accordance with the International Expedited Procedures of the International Centre for Dispute Resolution Rules, and is governed by the law of England. ECF No. 21-1, Art. 8.2.2, 8.4. The License Agreement provides an option for arbitration under the London Court of International Arbitration Rules, and is governed by the "laws of United States of America." ECF No. 21-2, Art. 1.28(c), (e). IRW has not even attempted to lay out which parts of the claims would

14

be referred to arbitration under which contract, and which law would apply in that case. But the fact is that none of these post-termination tort claims arise under either of these agreements.

IRUSA's claim for tortious interference with prospective business advantage (Count I) is based on IRW's intentional acts in soliciting donations in violation of U.S. regulatory requirements, collecting and retaining donations intended for IRUSA, and unilaterally cancelling the sponsorship of hundreds of orphans and making it appear as if it was IRUSA's decision to do so. AC ¶ 104. As explained above, the basis for this claim is not a violation of the Members' or License Agreements, but rather IRW's failure to register to solicit contributions or to make clear to those it solicited who it was and whether it could legally solicit such claims or offer tax deductibility. IRW further argues that any actions relating to the Orphan Sponsorship Program (which was subject to a separate grant agreement with no arbitration clause) are also arbitrable because the sponsorships constituted "assets" under the Members' Agreement's termination provision, but provides no support for why sponsorship obligations for specific orphans would be considered "assets." The orphans at issue are, at the risk of stating the obvious about these unfortunate children, nobody's assets, and the payment obligations are liabilities. IRW has created its distasteful "assets" argument from whole cloth.[5]

IRW also argues that the independent grant agreement governing the Orphan Sponsorship Program is in any event related to the Members' Agreement. Mot. at 21. IRW is wrong. As stated above, IRUSA entered into many grant agreements of the same nature with different entities other than IRW, and they exist separate from and independent of the Members' Agreement.

---

[5] IRW's argument also does not justify its abrupt termination of orphan sponsorships – the Members' Agreement provides for the transfer of certain assets upon termination to a different charity, not IRW's ability to do whatever it would like. ECF No. 21-1, Art. 6.6.2.

15

With respect to IRUSA's Lanham Act claim and claim under N.Y. Gen. Bus. Law § 349 (Counts II and III), IRW mischaracterizes their nature. While the Lanham Act does prohibit trademark infringement, IRUSA's Lanham Act claim is a false advertising claim, based on "misrepresent[ing] the characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities," and does not depend on the existence of a protectable trademark. *See Alzheimer's Disease Res. Ctr. Inc. v. Alzheimer's Disease and Related Disorders Ass'n.*, 981 F.Supp.2d 153, 160-61 (E.D.N.Y. 2013). The alleged misrepresentations at issue are not IRW's wrongful use of the Islamic Relief trademark, but rather "implying to the marketplace that IRW and IRUSA are one and the same," that it "is authorized to solicit donations from U.S. donors" and in turn that donations made to it would be tax-deductible, and that IRW is a "'transparent' and 'accountable' organization." These constituted material misrepresentations and omissions given that IRW has shown itself to be opaque and dishonest in its activities and unwilling to subject its activities to proper audit scrutiny, which in turn subjects IRUSA to unacceptable risk. AC ¶¶ 107-08. IRUSA's claim under N.Y. Gen. Bus. Law § 349 likewise arises out of these misrepresentations and omissions, not IRW's purported misuse of the "Islamic Relief" trademark. The Amended Complaint says nothing about IRW's misuse of the specific intellectual property.

IRUSA's final claim, for unjust enrichment (Count IV), is based on IRW receiving and retaining donations from U.S. donors who intended to donate to IRUSA. Again, this claim is based on IRW's failure to comply with the necessary registration requirements and to make honest disclosure to U.S. donors, and not IRW's violation of either the Members' or License Agreements. IRW's attempt to force arbitration of these claims results in a tortured interpretation of each claim as a variation of a trademark infringement dispute, which this is not. IRUSA's claims do not require

any interpretation of the parties' rights and obligations under either the Members' or License Agreements, and as such are beyond the scope of any arbitration clause in those contracts.

The unique circumstances of this case also provide further support for a U.S. court's adjudication of IRUSA's claims. IRUSA was in a position where it could not verify IRW was using IRUSA funds in administering programs, and where IRW was refusing to engage with IRUSA's attempts at dialogue. This created grave risks for IRUSA in the context of the increasingly charged allegations of IRW's support of terrorist organizations or antisemitic associations, and the associated heightened regulatory scrutiny placed on IRW by the U.S. government and IRUSA's U.S. banking partners. IRW's unauthorized solicitation and collection of funds from U.S. donors takes on particular significance in this context. Given the compelling public interest at stake implicating regulatory compliance and donor protection, these matters should not be relegated to private arbitration in a foreign jurisdiction, and IRW's attempt to hide behind a non-applicable arbitration clause should be rejected. This Court is the appropriate place to adjudicate IRW's conduct once IRUSA made the necessary decision to sever the relationship.

## II.    The Agreements Do Not Contain Binding Arbitration Clauses

IRW's Motion fails for the separate and independently sufficient reason that the arbitration clauses in the Members' and License Agreements are not unambiguous binding agreements to arbitrate. Since this threshold "question of whether the parties agreed to arbitrate is determined by state contract law," *Zachman*, 49 F.4th at 101; *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 73-74 (2d Cir. 2017), it is not subject to the Federal Arbitration Act presumptions on which IRW improperly relies. While the "party resisting arbitration bears the burden of proving that [statutory claims] are unsuitable for arbitration," Mot. at 14 (internal citation omitted), that burden arises only after it is first determined that the party "made the bargain to arbitrate." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (internal quotation omitted).

17

Under New York contract law, "an arbitration agreement must be clear, explicit and unequivocal, and must not depend upon implication or subtlety." *Thomas Crimmins Contracting Co., Inc. v. City of New York*, 74 N.Y.2d 166, 171 (1989) (internal quotation marks omitted). Contractual "[w]ords and phrases are to be given their plain and ordinary meaning, and New York courts will commonly refer to dictionary definitions in order to determine that meaning." *Citibank, N.A. v. Jacobsen*, No. 19-cv-959(ER), 2020 WL 7046841, at *4 (S.D.N.Y. Dec. 1, 2020) (internal quotation omitted) (citing *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y.3d 675, 680 (2015)).[6]

Here, the Members' and License Agreements each characterize arbitration as an "alternative" to litigation rather than an obligatory substitute for litigation. ECF No. 21-1, Art. 8.2; ECF No. 21-2, Art. 1.28. An "alternative," in its ordinary meaning, is a choice rather than an obligation. Thus, IRUSA retained the right to pursue its own claims in litigation, and it has exercised that right. The Agreements do not permit IRW to then negate IRUSA's choice unilaterally simply by filing a motion to compel arbitration.

IRW's Motion dedicates only a single paragraph to the question of whether a binding arbitration obligation exists. Mot. at 14. The paragraph does not address the actual text of the provisions.[7] Given this text, on reply, IRW at most will be able to argue that it is equivocal whether there is a binding obligation to arbitrate. But that is not enough to carry IRW's burden, either as a matter of state substantive contract law or the federal procedural summary judgment standard.

---

[6] To the extent that the Members' Agreement is governed by the laws of England and Wales, IRW has not attempted to demonstrate the existence of a binding arbitration agreement under those laws and has therefore not met its burden. *See In re Bayou Hedge Fund Investment Litig.*, 2006 WL 8439724, at *4.

[7] That paragraph notes that the Agreements contain a "mechanism that required dialogue between CEOs of both organizations, then the Boards of both companies, then mediation, and finally arbitration." Mot. at 14; *see also* AC ¶ 69. Yet the Amended Complaint nowhere alleged that the mechanism itself was mandatory.

18

Articles 8.1-8.2 of the Members' Agreement provide:

> 8.1 Any dispute or difference between the Parties arising out of or related to this Agreement shall first be referred to the Chief Executive Officer of IRW and the Chief Executive Officer of IR USA. If such persons cannot resolve the dispute or difference within thirty (30) business days of such referral being made, then either Party may refer the matter to the Board of Trustees of IRW and the board of trustees (or equivalent) of IR USA, respectively, for resolution. The Board of Trustees of IRW and IR USA shall each designate one of its trustees (or equivalent) to serve as the liaison with the other Party's board of trustees (or equivalent), to attempt to mediate the dispute or difference.
>
> 8.2 In the event that a dispute or difference between the Parties arising out of or related to this Agreement is not resolved between the Parties in accordance with the procedures in clause 8.1 within 30 business days of the matter being referred to their respective boards of trustees (or equivalent), then without prejudice to or in any other way derogating from the rights of the Parties as set out in this Agreement, and ***as an alternative to such Party instituting a law suit or legal action in any jurisdiction***, the following process shall be followed:
>
>> 8.2.1    the International General Assembly shall, upon request from either Party, appoint a panel of three mediators whereby each Party appoints one mediator each and the International General Assembly appoints the third mediator. … The three mediators will then meet with the Parties in an attempt to mediate a resolution between the Parties…
>>
>> 8.2.2    if the dispute or difference is not resolved within 60 days of the first meeting of the mediators, or either Party fails to participate or to continue to participate in the mediation, or the mediation terminate before the expiration of the said period of 60 days without any resolution of the dispute or difference, it shall be determined by arbitration administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules, The International Expedited Procedures of the International Centre for Dispute Resolution shall apply regardless of the

19

amount in dispute. The place of arbitration shall be Birmingham, England. ....

ECF No. 21-1 (emphasis added).[8]

The dispute resolution process in the Agreements is an "alternative" to a Party "instituting a law suit [sic] or legal action in any jurisdiction." *Id.* The ordinary meaning of the term "alternative" is "a choice between two or among more than two objects or courses." *United States v. L-3 Commc'ns EOTech, Inc.*, 921 F.3d 11, 27 (2d Cir. 2019) (citing *Webster's Third New International Dictionary* 63 (2002)). Therefore, a party seeking to bring legal claims has a ***choice***: either arbitration (after having completed the steps in Articles 8.2.1 and 8.2.2), or "instituting a law suit [sic] or legal action in any jurisdiction" (i.e. litigation).[9]

This Court recognized in *Benihana* that "the fact that an agreement containing an arbitration clause refers to alternative mechanisms for dispute resolution, such as litigation, does not speak to the issue of whether a party's election to submit the dispute to arbitration makes that election compulsory." 73 F.Supp.3d at 250. Here, once a party seeking to bring claims has chosen litigation, that choice cannot be unilaterally negated by the other party. The Agreements explicitly recognize that a party seeking to bring claims has the "alternative" – the choice – of litigating its claims or arbitrating them in accordance with Article 8.2's procedures. Such a choice would be illusory if the defending party could nullify it simply by filing a motion to compel arbitration.

---

[8] The License Agreement likewise includes the same language stating that a mediation and arbitration process may be followed "as an alternative to [a] party instituting a law suit [sic] or legal action in any jurisdiction." *See* ECF No. 21-2, Arts. 1.27-1.28.

[9] Other parts of the Members' Agreement support this. Article 10.3 provides that the rights under the Agreement "are cumulative and not exclusive of any rights, powers and remedies provided by law." ECF No. 21-1, Art. 10.3. This means that Article 8.2.2's conferral of an arbitration right does not exclude a party's right provided by law to begin litigation. *See Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005) (parties' litigation rights existed alongside arbitration rights because of similar "cumulative rights" clause).

*Benihana* supports the view that where an arbitration clause is optional, the choice of forum of **the party bringing the claims** is controlling. In *Seltzer v. Clark Assocs., LLC*, this Court noted that an arbitration provision could be "enforceable but give[] both parties the *option* (rather than obligation) to arbitrate." 20-cv-4685(AKH), 2020 WL 5525590, at *4 (S.D.N.Y. Sept. 3, 2020). "In that scenario, *neither* party can be forced to pursue its own claims in arbitration, but *either* party can be compelled to defend arbitration claims brought by the other." *Id.* (citing *Benihana*, 73 F.Supp.3d at 250) (emphasis in original). But here, IRW has not brought any claims against IRUSA in arbitration or otherwise and so there is no issue of any obligation by IRUSA to defend arbitration claims.

This Court in *Benihana* interpreted the arbitration clause before it differently, as requiring arbitration once either party moved to compel, based on two reasons that do not apply here.

First, rather than explicitly characterizing litigation and arbitration as "alternatives," the clause in *Benihana* stated that either party "may" elect to submit a dispute to arbitration. 73 F.Supp.3d at 244. Yet "[t]he overwhelming balance of authority in this circuit and elsewhere indicates that . . . provisions with the word 'may' trigger mandatory arbitration." *Id.* at 249 (internal citation omitted). There is no similar case law addressing a clause that presents litigation and arbitration as "alternatives."

Second, the Court was concerned that a construction "under which only two-party consent could trigger arbitration" would make the arbitration provision "meaningless," since parties can always submit a dispute to arbitration by mutual consent. *Id.* at 250. Here, two-party consent is not required for arbitration, and the arbitration clauses retain full force. If a party elects to bring **its own claims** in arbitration, that choice is binding on the other party. Furthermore, the party that elects to bring claims in arbitration must do so according to the particular arbitration procedure

21

specified in the Agreements. *See Indus. Access Inc. v. Praetorian Holdings Grp. LLC*, No. 22-cv-626(JLS)(MJR), 2023 WL 4409149, at *6 (W.D.N.Y. June 6, 2023) (interpreting permissive arbitration clause to have effect since "*where arbitration occurs*, it will be held in" the location specified in the clause and according to the rules specified in the clause).

Here, one party has exercised its alternative right to litigation and, whatever its own rights to choose to arbitrate any claims that it may have, IRW cannot unilaterally curtail IRUSA's right to litigate its own claims. What is more, and as discussed below, IRW conveniently ignored and refused to engage with the mechanism when it was convenient for it do so and should not gain the benefit of its bad faith conduct.

## III.    Even If the Arbitration Obligation Were Binding, IRW has Renounced its Right to Demand Performance by Repudiating its Own Dispute Resolution Obligation

"One who flatly repudiates the provision for arbitration itself should have no right to the stay of a court action brought by the other party." *Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionary Workers Intern., AFL-CIO*, 370 U.S. 254, 262-63 n.10 (1962). That is the situation here. IRW does not dispute the Amended Complaint's allegations that it flatly rejected IRUSA's repeated attempts to resolve IRUSA's claims in accordance with the dispute resolution mechanism; this constitutes repudiation. Thus, even if the mechanism were mandatory – which it is not – IRW could not invoke it now.

"Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). There is no exception for contractual obligations concerning dispute resolution. For example, IRW brings its motion under Section 3 of the Federal Arbitration Act, *see* ECF No. 19 (citing 9 U.S.C. §§ 2-4), which provides that a party may not move to stay a litigation in favor of arbitration if the party has been "in default in proceeding with

22

such arbitration." 9 U.S.C. § 3; *see also Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 456 (2d Cir. 1995) (court must conduct a "statutorily mandated inquiry" into whether party moving to compel arbitration is in default). In applying this provision, courts must "treat[] arbitration contracts like all others" and not necessarily "foster[] arbitration." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).

A "default" under Section 3 "refer[s] to a party who, when requested, has refused to go to arbitration." *Brown v. Peregrine Enters., Inc.*, No. 22-2959, 2023 WL 8800728, at *3 (2d Cir. Dec. 20, 2023) (internal quotation omitted); *see also id.* (party opposing arbitration need not show that it was prejudiced by default (citing *Sundance*, 596 U.S. at 419)). That is what happened here. IRW refused to perform the pre-arbitration dispute resolution measures, which are required to proceed in a designated order. Furthermore, the default requirement in Section 3 "ensures that the parties can return to federal court if arbitration breaks down or fails to resolve the dispute." *Smith v. Spizzirri*, 601 U.S. 472, 477 (2024). Where the defaulting party ensures that the contractual dispute resolution process has broken down even before it has begun, the purpose of Section 3 is fully vindicated by allowing the matter to remain in federal court.

That is what occurred here. After it committed the tortious conduct, IRW refused to engage in any dispute resolution measures since at least October 2025, beginning even with simple negotiation between organizational officers or boards. *See* AC ¶¶ 61 (IRW refused IRUSA's request to "discuss the matter to seek resolution"), 64 (IRW directed its offices and affiliates "not to cooperate in any way with IRUSA"), 65 (upon receipt of formal notice of dispute, "IRW refused to engage substantively in such discussions"), 66 (upon receipt of second "notice to initiate dispute resolution discussions," IRW "not only refused to engage meaningfully with IRUSA, it escalated the situation aggressively to the detriment of IRUSA"), 68 ("good-faith negotiations having failed

23

to take place," IRUSA sought an immediate meeting, and IRW "declined to commit to such a meeting"), 69 (IRW "again[] refused to engage in meaningful negotiations"). IRW's Motion disputes none of these allegations, nor does it provide evidence that it ever communicated an intent to participate in arbitration.

IRW has demonstrated utter contempt for the dispute resolution process – what it characterizes as dispute resolution ***obligations*** – in the Agreements. In so doing, it has repudiated the arbitration clause therein and has been in "default in proceeding with" arbitration within the meaning of the Federal Arbitration Act § 3.[10] When it was up to IRW, there were no obligations whatsoever; now, when it has been sued for its tortious conduct, it has suddenly discovered requirements which, in fact, are not requirements at all.

Rather than defend its conduct, IRW conveniently ignores the plain language of the Agreements and applicable law to attempt to escape the consequences of its default. Incapable of recognizing the irony in its position, IRW argues that the Agreements do not even provide for the possibility that the dispute resolution procedure can be deemed "renounced." Mot. at 15. Yet it is not necessary for a contract to provide for what is already in the law. *See Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 62 (2d Cir. 2020). IRW cannot reasonably maintain that its failure to abide by the Agreements simply means that its failure is excused and things just proceed to the next step. A failure of each step is a repudiation of the Agreements' terms. IRW should not be allowed to profit from its bad-faith conduct.

---

[10] Nor can IRW argue on reply that IRUSA did not formally invoke the Agreements' dispute resolution mechanism in connection with the particular tort and statutory claims alleged in the Amended Complaint. Even assuming this were factually supported, (i) IRW's conduct as alleged and proven above provides ample grounds to infer that it would have scuttled any CEO-to-CEO or Board-to-Board negotiations or mediation attempts regarding these particular claims; and (ii) such alleged failure by IRUSA to invoke the dispute resolution mechanism would be consistent with IRUSA's view that these claims are not related to the Agreements.

Nor can IRW find refuge in the "waiver provisions" of the Agreements. *See* Mot. at 15-16. The License Agreement states that a party's failure to enforce "any of the provisions hereof" shall not constitute a waiver of the Party's right to enforce "any ***other*** provisions of this Agreement." ECF No. 21-2, Art. 1.33 (emphasis added). This does not preclude waiver of the ***same*** provision that Defendant failed to enforce – here, the dispute resolution clause. As to the Members' Agreement, it provides that a party's delay in "exercising any right, power or remedy" shall not constitute a waiver of it. ECF No. 21-1, Art. 10.3. Yet the issue here is not Defendants' failure to exercise a "right, power or remedy." It is with IRW's failure to perform an (alleged) obligation. It is now apparently IRW's position that the dispute resolution clause of the Members' Agreement imposes a mandatory obligation on both parties. *See* Mot. at 14. Since IRW failed to perform, it cannot demand reciprocal performance from IRUSA.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion.

Dated: June 18, 2026

Respectfully submitted,

LEWIS BAACH KAUFMANN MIDDLEMISS PLLC

/s/    *Arthur D. Middlemiss*
Arthur D. Middlemiss
arthur.middlemiss@lbkmlaw.com
Marc Frazier Scholl
marc.scholl@lbkmlaw.com
10 Grand Central
155 East 44th Street, 25th Floor
New York, New York 10017
(212) 826-7001

Eric L. Lewis
eric.lewis@lbkmlaw.com
Alexander S. Bedrosyan
alexander.bedrosyan@lbkmlaw.com
1050 K Street NW, Suite 400
Washington, DC 20001
(202) 833-8900

*Counsel for Plaintiff Islamic Relief USA*

26